# EXHIBIT 1

# REDACTED

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

# Co-Development and License Agreement

This Agreement is entered into with effect as of the Effective Date (as defined below)

by and between

**Verge Analytics Inc. Dba Verge Genomics**

a company incorporated in Delaware, USA, having its registered office at 131 Oyster Point Blvd, Suite 300 South San Francisco, CA 94080 (herein "Licensor")

And

**Ferrer Internacional S.A.**

a company registered in Spain having its registered office at Av. Diagonal, 549, 5th floor, 08029 Barcelona (Spain) (herein "Licensee").

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac704ab0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**Co -Development and License Agreement**

WHEREAS, the Licensor has developed and is the sole and full owner of certain patents, technology, know-how and other intellectual property rights relating to the Product (as defined herein); and

WHEREAS, the Licensee has expertise in the research, development, manufacture and commercialisation of medicinal products and wishes to obtain certain licenses from the Licensor to develop and explore the potential applications of the Product under the licensed patents, know-how and intellectual property rights for its commercialisation; and

WHEREAS the Licensor is willing to grant to the Licensee rights to use its patents, know-how and intellectual property rights to develop and commercialise the Product.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do agree as follows:

## 1.  Definitions

For the purposes of this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

### 1.1    Active Ingredient

The term "Active Ingredient" means the compound known and identified as VRG50635 and the active metabolite identified as VRG50468 having the structure set forth in Exhibit 1.

### 1.2    Affiliate

The term "Affiliate" means any individual, corporation, association or other business entity that directly or indirectly controls, is controlled by, or is under common control with the Party in question. As used in this definition of "Affiliate," the term "control" means the direct or indirect ownership of more than fifty percent (>50%) of the stock having the right to vote for directors thereof or the ability to otherwise control the management of the corporation or other business entity whether through the ownership of voting securities, by contract, resolution, regulation or otherwise.

### 1.3    Agreement

The term "Agreement" means this document including any and all appendices and Exhibits and amendments to it as may be added and/or amended from time to time in accordance with the provisions of this Agreement.



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

### 1.4    Agreement Term

The term "Agreement Term" means the period of time commencing on the Effective Date and, unless this Agreement is terminated sooner as provided under this Agreement, expiring on the date when no royalty or other payment obligations under this Agreement are or will become due.

### 1.5    ALS

The term "ALS" means Amyotrophic Lateral Sclerosis.

### 1.6    Applicable Law

The term "Applicable Law" means any law, statute, ordinance, code, rule or regulation that has been enacted by a government authority (including without limitation, any Regulatory Authority) and is in force as of the Effective Date or come into force during the Agreement Term, in each case to the extent that the same are applicable to the performance by the Parties of their respective obligations under this Agreement.

### 1.7    Background IP

The term "Background IP" means, in relation to a Party: all of the intellectual property Controlled by that Party as of the Effective Date; any intellectual property that is generated by or on behalf of that Party on or after the Effective Date other than the Licensed Rights; and any intellectual property that is licensed to, or acquired by, that Party on or after the Effective Date other than the Licensed Rights.

### 1.8    Business Day or Business Days

The term "Business Day" or "Business Days" means 9.00 am to 5.00 pm local time on a day other than a Saturday, Sunday or bank or another public holiday in Spain.

### 1.9    Calendar Quarter

The term "Calendar Quarter" means each period of three (3) consecutive calendar months, ending March 31, June 30, September 30, and December 31.

### 1.10    Calendar Year

The term "Calendar Year" means the period of time beginning on January 1 and ending December 31, except for the first year which shall begin on the Effective Date and end on December 31.

### 1.11    CHMP

The term "CHMP" term means the Committee for Medicinal Products for Human Use and is one of the main scientific committees at the European Medicines Agency (EMA). The CHMP is responsible for the scientific evaluation of human medicines, providing recommendations on their marketing authorization within the European Union.

### 1.12    Change of Control

The term "Change of Control" means, with respect to a Party: (a) the acquisition by any Third Party of beneficial ownership of fifty percent (50%) or more of the then outstanding common shares or voting power

- 3 -

of such Party, other than acquisitions by employee benefit plans sponsored or maintained by such Party. (b) the consummation of a business combination involving such Party, unless, following such business combination, the stockholders of such Party immediately prior to such business combination beneficially own directly or indirectly more than fifty percent (50%) of the then outstanding common shares or voting power of the entity resulting from such business combination; or (c) the sale of all or substantially all of such Party's assets or business relating to the subject matter of the Agreement.

### 1.13    Clinical Study or Clinical Studies

The term "Clinical Study" or "Clinical Studies" means such clinical studies and tests in human subjects that have been approved by a Regulatory Authority and are designed to measure the safety or efficacy of a pharmaceutical product.  For the avoidance of doubt, Clinical Studies shall include all studies in the Development Plan (Phase I Clinical Studies, Phase II Clinical Studies and Phase III Clinical Studies, or studies incorporating more than one of these phases). For clarity, "Clinical Studies" shall exclude any post-Regulatory Approval clinical studies that are not required to obtain or maintain such Regulatory Approval

### 1.14    Competing Product

The term 'Competing Product' shall mean any other Product that contains PIKFYVE inhibitor analogue thereof or any molecule that targets PIKFYVE, that is used in the treatment of ALS in the Territory.

### 1.15    Commercially Reasonable Endeavours

The term "Commercially Reasonable Endeavours" means such level of efforts required to carry out such obligation in a sustained manner consistent with the efforts the Licensee or the Licensor, as applicable, devotes at the same stage of development or commercialisation, as applicable, for its own internally developed pharmaceutical products in a similar area with similar market potential, at a similar stage of their product life taking into account the existence of other competitive products in the market place or under development, the proprietary position of the product, the regulatory structure involved, the anticipated profitability of the product and other relevant factors. It is understood that such product potential may change from time to time based upon changing scientific, business and marketing and return on investment considerations.

However, the Licensee (and its Affiliates) does not always seek to market a Product in every country or seek to obtain regulatory approval in every country or for every indication. As a result, the exercise of diligence by the Licensee is to be determined by judging the Licensee's Commercially Reasonable Endeavours, taken as a whole.

### 1.16    COMP

The term "COMP" means the Committee for Orphan Medicinal Products that plays a crucial role in the orphan medicinal product designation process, which is intended to encourage the development of drugs for rare diseases within EMA.

### 1.17    Completion or Complete

The term "Completion" or "Complete" means the availability of the final study report.

- 4 -



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

### 1.18    Confidential Information

The term "Confidential Information" means any and all information, data or know-how (including Know-How), whether technical or non-technical, oral or written, that is disclosed by one Party or its Affiliates ("**Disclosing Party**") to the other Party or its Affiliates ("**Receiving Party**"). Information shall not include any information, data or know-how that:

(i)    was generally available to the public at the time of disclosure, or information that becomes available to the public after disclosure by the Disclosing Party other than through fault (whether by action or inaction) of the Receiving Party or its Affiliates,

(ii)    can be evidenced by written records to have been already known to the Receiving Party or its Affiliates prior to its receipt from the Disclosing Party,

(iii)    is obtained at any time lawfully from a Third Party under circumstances permitting its use or disclosure,

(iv)    is developed independently by the Receiving Party or its Affiliates as evidenced by written records other than through knowledge of Confidential Information,

(v)    is required to be disclosed by the Receiving Party or its Affiliates to comply with a court or administrative order providing the Receiving Party or its Affiliates furnishes prompt notice (in no event less than three (3) days) to the Disclosing Party to enable it to resist such disclosure, or

(vi)    is approved in writing by the Disclosing Party for release by the Receiving Party.

The terms of this Agreement shall be considered Confidential Information of the Parties. The Licensor Platform IP, Licensor Platform Improvements, and Licensor Background IP will be considered Confidential Information of Licensor. Licensee Background IP will be considered Confidential Information of Licensee.

### 1.19    Control

The term "Control" means (as an adjective or as a verb including conjugations and variations such as "Controls" "Controlled" or "Controlling") (a) with respect to Patent Rights and/or Know-How, the possession by a Party of the ability to grant a license or sublicense of such Patent Rights and/or Know-How without violating the terms of any agreement or arrangement between such Party and any other party and (b) with respect to proprietary materials, the possession by a Party of the ability to supply such proprietary materials to the other Party as provided herein without violating the terms of any agreement or arrangement between such Party and any other party.

### 1.20    Cover

The term "Cover" means (as an adjective or as a verb including conjugations and variations such as "Covered," "Coverage" or "Covering") that the developing, making, using, offering for sale, promoting, selling, exporting or importing of the formulation or the Product would infringe a Valid Claim in the absence of a license under the Patent Rights to which such Valid Claim pertains. The determination of whether a formulation, process or Product is Covered by a particular Valid Claim shall be made on a country-by-country basis.

**1.21    Development Costs**

The term "Development Costs" means the costs and expenses necessary to execute the activities foreseen for the global development of the Product in the Field as set forth in the Development Plan and Modified Development Plan.    The estimated Development Costs are set forth in the Development Plan attached hereto as Exhibit 3.

**1.22    Development Data**

The term "Development Data" means reports of pre-clinical studies and Clinical Studies, and all other documentation containing or embodying any non-clinical data or clinical data, pharmacovigilance data, results and analysis relating to the global development activities of the Product and the Active Ingredient in the Field, including regulatory dossiers, materials, reports and data captured using any digital health technology.

**1.23    Development Plan**

The term "Development Plan" means the document set forth as Exhibit 3 hereto, outlining the key clinical development activities foreseen for the global development of the Product in the Field.  The Development Plan may be amended from time to time according to the provisions of this Agreement. When exploring any amendment to the Development Plan, the Parties agree to follow the recommendations of the Regulatory Authorities (including the EMA and FDA) based on Scientific Advises that will maximize the successful Regulatory Approval of the Territories. The Development Plan may include any changes within the "Modified Development Plan" agreed by the Parties.

**1.24    Effective Date**

The term "Effective Date" means  March 18, 2024.

**1.25    EMA**

The term "EMA" means the European Medicines Agency of the European Union.

**1.26    Field**

The term "Field" means the treatment, cure, diagnosis, prediction, detection and/or prevention of any disease, disorder, state, condition and/or malady in ALS.

**1.27    Filing**

The term "Filing" means the filing of an application with any Regulatory Authority, the official approval of which is required before any lawful commercial sale or marketing of Products in the Territory.

**1.28    First Commercial Sale**

The term "First Commercial Sale" means, on a country-by-country basis, the first collected invoice from the sale of a Product to a Third Party by the Licensee after the receipt of any Regulatory Approval required for the sale of such Product in such country.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**1.29    Generic Product**

The term "Generic Product" means a product that is not produced, licensed or owned by the Licensee or its Affiliates that contains the same pharmaceutical Active Ingredient and the same pharmaceutical dosage form as the Product or a pharmaceutical dosage form that is equivalent to it.

**1.30    GCP**

The term "GCP" means the Good Clinical Practice (GMP) Guidelines adopted by the Commission of the European Union, as amended.

**1.31    GLP**

The term "GLP" means the Good Laboratory Practice (GMP) Guidelines adopted by the Commission of the European Union, as amended.

**1.32    GMP**

The term "GMP" means the Good Manufacturing Practice (GMP) Guidelines adopted by the Commission of the European Union, as amended.

**1.33    Handle**

The term "Handle" means preparing, filing, prosecuting (including interference and opposition proceedings) and maintaining (including interferences, reissue, re-examination, post-grant reviews, inter-parties reviews, derivation proceedings and opposition proceedings).

**1.34    HTAs bodies**

The term "HTAs bodies" means the health technology assessment bodies that provide recommendations on medicines and other health technologies that can be financed or reimbursed by the healthcare system in a particular European Union (EU) Member State or region.

**1.35    Know-How**

The term "Know-How" means and includes all data, knowledge and information, including analysis, reports, raw data, methods, materials, samples, chemical manufacturing data, toxicological data, pharmacological data, preclinical and clinical data, assays, platforms, formulations, specifications, quality control testing data, and any work product generated by the Licensor, any Licensor's contract research organizations or the personnel of participating institutions (including principal investigators) that are necessary or useful for the discovery, manufacture, development or commercialisation of Products.

**1.36    Licensee Group**

The term "Licensee Group" means collectively the Licensee, its Affiliates and its Sublicensees.



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**1.37    Licensee Know-How**

The term "Licensee Know-How" means all Know-How conceived or developed that the Licensee Controls during the Agreement Term.

**1.38    Licensee Patent Rights**

The term "Licensee Patent Rights" means all Patent Rights covering the Product or the Active Ingredient that the Licensee Controls during the Agreement Term and that protect, among others, the Licensee Inventions.

**1.39    Licensor Database**

The term "Licensor Database" means the proprietary human tissue repository and multi-omics database Controlled by Licensor.

**1.40    Licensor Know-How**

The term "Licensor Know-How" means the Know-How that the Licensor Controls at the Effective Date and during the Agreement Term. The list of Licensor Know-How as of the Effective Date is attached as Exhibit 2.

**1.41    Licensor Patent Rights**

The term "Licensor Patent Rights" means the Patent Rights that the Licensor Controls at the Effective Date and during the Agreement Term, relating to or arising from the discovery, manufacture, development or commercialisation of or covering or protecting the Product or the Active Ingredient.

**1.42    Licensor Platform**

The term "Licensor Platform" means the CONVERGE™ platform Controlled and operated by Licensor.

**1.43    Licensor Platform Improvements.**

The term "Licensor Platform Improvements" means intellectual property and Know-How generated or reduced to practice by Licensor in connection with its activities under this Agreement that constitute improvements that specifically relate to the Licensor Platform IP.

**1.44    Licensor Platform IP**

The term "Licensor Platform IP" means the intellectual property and Know-How owned or Controlled by Licensor (a) as of the Effective Date or (b) during the Term independent of this Agreement, in each case ((a) and (b)), that specifically relates or covers the Licensor Platform or the Licensor Database.

**1.45    Modified Development Plan**

The term "Modified Development Plan" means any amendment to the Development Plan to be followed by the Parties that would result in any Clinical Study for Phase 2b Clinical Study 002 that has (a) a duration up to the expected Clinical Study duration of 24 weeks, (b) up to three arms for such Clinical Study or (c) up to 100 additional participating patients in excess of the participating patients originally expected for such

- 8 -



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

Clinical Study. The Modified Development Plan also includes the subsequent required amendments to the Development Plan for the OLE Study.

### 1.46    Material Development Plan Change

The term "Material Development Plan Change" means any amendment to the Development Plan (a) that exceeds the duration, arms or participating patients contemplated by the Modified Development Plan or (b) that is unilaterally imposed by a Party and results in more than  six (6)  months delay in the duration of the Clinical Studies contemplated by the Modified Development Plan.

### 1.47    Net Sales

The term "Net Sales" means with respect to the Products, the gross amounts collected by the Licensee or its Affiliates or their respective Sublicensees from any Third Party for sales of Products in the Territory, less the following deductions actually incurred, allowed, paid, accrued, and specifically allocated, provided that all such deductions shall be commercially reasonable and actually deducted and not recouped: a) normal and customary trade, cash and quantity discounts, allowances and credits actually allowed or paid; b) credits or allowances actually granted for damaged Products, returns or rejections of Products, price adjustments and billing errors; c) rebates, chargebacks and discounts (or equivalents thereof) granted to managed health care organisations, pharmacy benefit managers (or equivalents thereof), federal, state/provincial, local and other governments, their agencies and purchasers and reimburses or to trade customers that are directly attributable to the Products; d) sales taxes, value added taxes and other taxes directly linked to the sales of the Products to the extent included in the gross amount invoiced; e) customs duties, surcharges and other governmental charges incurred in connection with the exportation or importation of the Products; f) transportation and insurance. Each of the deductions listed above shall be determined on a country-by-country basis, and all above listed components of Net Sales shall be determined in the ordinary course of business. Should a deduction fall into more than one of the categories of (a)-(f) above such deduction shall be made under only one of the foregoing clauses.

### 1.48    New Development

The term "New Development" means, during the Term, (a) a Licensor proposed development of any product or therapeutic directed at any neurological indication other than ALS using the Active Ingredient or, (b) a Licensor proposed development of any product or therapeutics directed at ALS using any compound or molecule that is not the Active Ingredient.

### 1.49    Party

The term "Party" means the Licensor or the Licensee, as the case may be, and "Parties" means the Licensor and the Licensee collectively.

### 1.50    Patent Rights

The term "Patent Rights" means all rights under any patent or patent application or similar rights such as utility models, in any country of the Territory, including any patents issuing on such patent application, and further including any substitution, extension or supplementary protection certificate, reissue, re-examination, renewal, divisional, continuation or continuation-in-part of any of the foregoing.



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**1.51    Pharmacovigilance Agreement**

The term "Pharmacovigilance Agreement" means an agreement entered into by the Parties to set forth the protocols and procedures for reporting adverse events and complying with reporting requirements set forth by Regulatory Authorities.

**1.52    Product**

The term "Product" means and include any and all pharmaceutical products that contains the Active Ingredient, whether or not as the sole active ingredient, including any formulation, dosage form, or package configuration and for any mode of administration. Product shall include any Product Improvements, enhancements, modifications or future developments thereto.

**1.53    Product Improvement**

The term "Product Improvement" means any and all improvements, enhancements or developments to the Active Ingredient or Product. (e.g. new route of synthesis, a new formulation, new delivery route, new dosage form or new primary package for the Active Ingredient in the Field)

**1.54    Regulatory Approval**

The term "Regulatory Approval" means all approvals (including pricing and reimbursement approvals as applicable), licenses, registrations or authorisations by a Regulatory Authority, necessary for the manufacture and sale of a Product within the Field.

**1.55    Regulatory Authority**

The term "Regulatory Authority" means any national, supranational (e.g., the European Commission, the European Medicines Agency), regional, state or local regulatory agency, department, bureau, commission, council or other governmental entity.

**1.56    Royalty Term**

The term "Royalty Term" means, with respect to each Product and for a given country in the Territory, the period of time commencing on the date of First Commercial Sale of such Product in such country and ending on the earlier to occur:
(a) ten (10) years after the First Commercial Sale of such Product in such country, or
(b) the expiration (or abandonment or dedication to the public) of the last to expire Valid Claim in such country Covering the use, import, offering for sale, or sale of the Product, or
(c) the expiry of any regulatory exclusivity (data exclusivity) in such country, or
(d) the first commercial sale of a Generic Product in such country.

**1.57    Scientific Advise**

The term "Scientific Advise" term means a formal procedure where the Licensor or Licensee seek guidance and recommendations from the EMA and/or FDA and or any relevant committee (ie. CHMP, COMP, HTA) on scientific and regulatory aspects related to the development and eventual approval of medicinal products,

- 10 -



with the aim to ensure that the Development Plan is in line with regulatory requirements and increase the likelihood of successful marketing authorization in the respective territories.

### 1.58    Sublicensee

The term "Sublicensee" means an entity to which Licensee has licensed rights (through one or multiple tiers) pursuant to this Agreement.

### 1.59    Territory

The term "Territory" means European Economic Area (EEA), United Kingdom, Switzerland, geographically Central and South America (including, for the avoidance of doubt, Mexico, Belize, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, South America, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Guyana, Paraguay, Peru, Suriname, Uruguay, Venezuela), Brunei Darussalam, Cambodia, Indonesia, Laos, Malaysia, Myanmar (Burma), Philippines, Singapore, Timor-Leste, Thailand , Vietnam and Japan.

### 1.60    Third Party

The term "Third Party" means a person or entity other than (i) the Licensor or any of its Affiliates or (ii) a member of the Licensee Group.

### 1.61    Valid Claim

The term "Valid Claim" means, as applicable, a claim in any (i) unexpired and granted patent in the Licensor Patent Rights that has not been disclaimed, revoked or held invalid by a decision of a court of competent jurisdiction or government agency or (ii) pending patent application within the Licensor Patent Rights in any country of the Territory that (a) is on file with the applicable patent office and has shown evidence of reasonably consistent activity to advance to issuance of a patent and (b) which application has been on file with the applicable patent office for no more than five (5) years from the earliest date to which the patent application claims its earliest priority.

### 2.    Grant of License

### 2.1    Licenses to Licensee

The Licensor hereby grants to the Licensee an exclusive, perpetual right and license, including the right to sublicense, under Licensor Patent Rights and Licensor Know-How to research, have researched, develop, co-develop with Licensor or have developed, manufacture or have manufactured, register, have registered, use, have used, make, have made, import, have imported, export, have exported, market, have marketed, distribute, have distributed, sell and have sold the Active Ingredient or the Product in the Field in the Territory (the "**Licensed Rights**").

Except as expressly provided herein, neither Party grants to the other any other right or license under this Agreement, including any rights or licenses to any Know-How or intellectual property of such Party not otherwise expressly granted herein, whether by implication, estoppel, or otherwise. For the avoidance of doubt, the Licensed Rights will not include or grant Licensee any rights in Licensor Platform.

- 11 -

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Notwithstanding any other provision of this Agreement, nothing in this Agreement shall operate to transfer ownership of Background IP from one Party to the other Party. Notwithstanding any other provision of this Agreement, nothing in this Agreement shall operate to transfer ownership of Licensor Platform IP from Licensor to Licensee. Additionally, all Licensor Platform Improvements shall vest in Licensor absolutely.

### 2.2    Licensee's Right to be notified for Products outside the Territory

Promptly upon the occurrence of Licensor's decision to out-license, divest, dispose of, abandon or otherwise relinquish the control of the Licensor Know-How or Licensor Patents rights in relation to the Product in the Field outside the Territory to a Third Party or upon receipt by Licensor of an unsolicited offer to do the same, Licensor shall inform Licensee accordingly and shall provide Licensee with written notice thereof. Licensee may, within thirty (30) days after receipt of such notice, notify Licensor in writing either that: (a) Licensee is interested in negotiating of such rights (and will present proposed terms for such rights); or (b) Licensee has no such interest at such time.

When Licensee notifies Licensor within such thirty (30) day period that Licensee is interested in negotiating with Licensor for such rights, the Parties shall negotiate in good faith during a period of thirty (30) days counting from the reception of the notification from Licensor, provided, however, (a) that Licensor will not be precluded from discussing or negotiating such rights with any other third party, (b) Licensor will have no obligation to accept Licensor's terms and may terminate the discussions between Licensee and Licensor for such rights at any time and (c) Licensor will be free to, and not be restricted from, entering into an agreement with a third party for such rights.

### 2.3    Sublicense and Subcontract

The Licensee and its Affiliates shall have the right to sublicense or subcontract (through multiple tiers).

#### 2.3.1    Right to Sublicense to its Affiliates

The Licensee shall have the right to grant sublicenses of the Licensed Rights to its Affiliates (through multiple tiers) under its rights granted under Section 2 without prior approval of the Licensor.

#### 2.3.2    Right to Sublicense to Third Parties

The Licensee and its Affiliates shall have the right to grant written sublicenses of the Licensed Rights to non-Affiliate entity Sublicensees (through multiple tiers) under its rights granted under this Agreement without prior approval of Licensor, provided that the terms of any such sublicense are consistent with the terms and conditions of this Agreement. The Licensee assumes full responsibility for the performance of all obligations and observance of all terms so imposed on such Sublicensee and shall itself account to the Licensor for all payments due under this Agreement by reason of such sublicense.

#### 2.3.3    Right to Subcontract

The Licensee or Licensor shall have the right to subcontract the work performed under this Agreement (including development task or activities) provided that the Subcontracting Party shall (i) cause the subcontractor to be bound and to abide by terms no less stringent than the terms applicable under this Agreement and (ii) be liable for any act and omission of the subcontractors as if it was its own under this Agreement.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**2.4    Joint Steering Committee.**

As soon as possible, but no later than thirty (30) days after the Effective Date, the Parties shall establish a joint steering committee ("JSC"). The JSC shall have the overall management of the Development Plan. In this context, the JSC shall have review, oversight and decision-making responsibilities and authority as more specifically provided herein. The working language of the JSC is English.

(i)    **Membership:** The JSC shall be comprised of two (2) representatives from Licensee and two (2) representatives from Licensor. Each Party shall provide the other with a list of its initial members of the JSC as soon as possible, but no later than fifteen (15) days after the Effective Date. Each Party may replace any or all of its representatives on the JSC at any time upon written notice to the other Party. Each representative of a Party shall have sufficient seniority and expertise in the pharmaceutical industry to participate on the JSC. Any member of the JSC may designate a substitute representative of such Party to attend and perform the functions of that member at any meeting of the JSC, provided that such substitute meets the foregoing qualifications. Each Party may, subject to the other Party's prior approval, invite non-member representatives of such Party to attend meetings of the JSC as non-voting participants, subject to the confidentiality obligations of this Agreement. At all times, Licensor and Licensee shall designate one (1) member of the JSC from representatives as the Chairperson ("Chairperson").

(ii)    **Meetings:** unless otherwise agreed, the JSC shall meet at least every three (3) months by conference call or in person and at least once per year in person. Notwithstanding the aforesaid, the JSC shall meet (a) more frequently as the Parties mutually deem appropriate and (b) if required to meet specific timelines for decisions of the JSC as set forth in this Agreement. The first scheduled meeting of the JSC shall be held as soon as possible, but no later than one (1) month after the Effective Date. Meetings of the JSC that are held in person shall alternate between the offices of the Parties, or such other location as the Parties may agree. The Chairperson shall develop JSC meeting agendas with input from the Licensor and Licensee JSC representatives. The Chairperson shall include on the agenda any items proposed by either Party. The Chairperson shall be responsible for calling meetings of the JSC (provided that the Licensor and/or Licensee JSC representatives may also call JSC meetings in their discretion) and for leading the meetings. Each party will bear all expenses it incurs in regard to participating in all meetings of the JSC, including all travel and living expenses.

(iii)    Each Party shall use reasonable efforts to cause its representatives to attend the meetings of the JSC. Without limitation to any specific reporting obligation of either Party under this Agreement, each Party shall provide written progress reports (in English language) on the status of its activities under the Development Plan and/or the Modified Development Plan at least seven (7) days in advance of each JSC meeting, including summaries of data and results associated with such activities and progress towards the development and of the Product.

(iv)    The Chairperson shall promptly prepare and distribute to all members of the JSC draft minutes of each meeting for review and comment, including a list of any actions or



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

decisions approved by the JSC, with the goal of distributing final approved minutes of each JSC meeting within thirty (30) days after the meeting.

(v)  **Responsibilities:**  The JSC shall have the following responsibilities and oversight authority:

    (a)  oversight for all aspects of the Development Plan of the Parties under this Agreement;

    (b)  review the Development Plan and approve any amendments thereto (including approval of any Modified Development Plan);

    (c)  review and approve any Material Development Plan Change as an amendment to the Development Plan;

    (d)  oversee the regulatory pathway ensuring the maximum success of Regulatory Approval inside and outside the Territory; and

    ( e)  such other responsibilities and oversight authority as may be mutually agreed upon by the Parties from time to time or as specifically assigned to the JSC under this Agreement. If reasonably required pursuant to the JSC's discretion, the JSC may establish subcommittees and working groups; and

    (f)  Oversee the optimization of both Parties respective day to day operations and ensure that responsibilities reflect each Party commitments under this Agreement.

(vi)  **Decision Making.** Each Party, through its representatives, shall have one (1) consolidated vote on the JSC, irrespective of the number of a Party's representatives present at the JSC meeting. Decisions shall be made by unanimous vote. Decisions on any matter may be taken at a meeting, by conference call, video conference or in writing (including email). The JSC shall not have any power to amend or waive any terms or conditions of this Agreement. In the event that the JSC does not approve any amendment to the Modified Development Plan or any Material Development Change, then the non-approval shall be resolved as per the following paragraph 2.4 (vii).

(vii)  **Dispute Resolution within the JSC.** In the event that the Parties cannot agree on a matter by unanimous vote, the Parties shall attempt to resolve the dispute. In resolving any disputes within the responsibility of the JSC, each Party shall act in good faith, subject to the terms and conditions of this Agreement. If the JSC is unable to resolve any dispute within the responsibility of the JSC within ten (10) days after a Party provides notice to the other Party of the existence of such dispute such dispute or other matter shall be referred to the Executive Officers for resolution.

In the event that the Executive Officers cannot facilitate a resolution between the Parties, the dispute shall be resolved according to:

-  If the dispute relates to any regulatory, Scientific Advise, quality, manufacturing, development, Clinical Study execution in the Territory (including any Material Development Plan Change), Licensee will have the final decision-making authority and will bear 100% of any cost increase above the Development Costs included under

- 14 -

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

Exhibit 3.(except if such decision was already contemplated by the Development Plan or Modified Development Plan in which case, the 70%/30% Licensor/Licensee split shall apply as per Section 3.2.4).

However, the Licensee will not effect or commence any disputed regulatory, quality, manufacturing, development, Clinical Study execution activities (excluding any change within the terms of the Modified Development Plan) for the Active Ingredient or the Product if the Licensor demonstrates (with supporting evidence by an independent expert) that such activities would be materially detrimental to the regulatory approval process or commercial viability of the Product outside of the Territory that is of material importance (with supporting evidence by an independent expert) to Licensor's Product regulatory or commercialization strategy.

- For clarification purposes, Licensee shall be the sole owner of any data, invention and/or results, patentable or not, that may arise from the studies that Licensee solely controls and bears 100% of its costs. If the dispute relates to any regulatory, Scientific Advise, quality, manufacturing, development, Clinical Study execution) outside the Territory (including any Material Development Plan Change), Licensor will have the final decision-making authority and will bear 100% of any cost increase above the Development Costs included under Exhibit 3 (except if such decision was already contemplated by the Development Plan or Modified Development Plan, in which case, the 70%/30% Licensor/Licensee split shall apply as per Section3.2.4).

However, Licensor will use Commercially Reasonable Endeavours to conduct (or to have conducted by its Affiliates or licensees) any such activities in a manner that minimizes any material adverse impact on the regulatory approval process or commercial viability of the Product in the Territory.

For clarification purposes, Licensor shall be the sole owner of any data, invention and/or results, patentable or not, that may arise from the studies that Licensor solely controls and bears 100% of its costs.

(viii)   **Termination of JSC**. If the development of the Product ceases as per the terms of this Agreement, the JSC and its subcommittees shall automatically disband and cease to exist.

## 2.5    Information on Active Ingredient and the Product

At the Effective Date the Licensor shall immediately provide the Licensee with all the information on the Active Ingredient and the Product not previously revealed, including among others the chemical structure of the Active Ingredient and will be attached to this Agreement as Exhibit 1.

## 3.   Rights to Research and Development

## 3.1. Development Plan

The Development Plan will define the development activities for the Product and the Active Ingredient. The Development Plan is set forth as Exhibit 3 to this Agreement and responsibilities includes development tasks, timelines, costs and expected development activities for obtaining each corresponding regulatory approvals inside or outside the Territory.

- 15 -



The Development Plan and the Modified Development Plan will be reviewed and amended, if necessary, by the JSC (and if the JSC cannot agree on the terms of any amendment then such amendment will be subject to the dispute resolution process set forth in Section 2.4(vii)). To the extent not already defined in the initial Development Plan set forth as Exhibit 3 hereto, the JSC will define the respective responsibilities of the Parties under the Development Plan.

The JSC and the parties will follow and/or execute any adoptions to the Development Plan and the Modified Development Plan suggested by and discussed with the EMA and FDA or any other relevant committee (ie. CHMP, COMP) and their respective governments under the Scientific Advice, provided that if such suggestions result in Material Development Plan Changes that are not unanimously approved by the JSC but are unilaterally introduced by application of the Section 2.4 (vii) of this Agreement, the Party that is not unilaterally introducing the Material Development Plan Changes will not have any obligation to bear costs increases resulting from Material Development Plan Changes.

### 3.2    Co- Development Responsibilities

#### 3.2.1    Ongoing Clinical Studies at the Effective Date.
Clinical Studies initiated by Licensor prior to and ongoing as of the Effective Date as listed in the Development Plan (which Development Plan includes the estimated total aggregate costs for each Clinical Study in the Development Plan) shall continue according to the definition of responsibilities within the Development Plan unless otherwise agreed by the JSC.
For clarification purposes, in terms of the clinical operations and its execution, the JSC will agree upon and define the responsibilities for the study project management in the Territory.

#### 3.2.2    Joint Development.
Licensor and Licensee shall jointly and collaboratively develop the Product and the Active Ingredient in the Field and conduct (either by themselves or through their respective Affiliates, agents or third Party subcontractors) all development activities (including Clinical Studies and non-clinical studies) to obtain Regulatory Approval for the Product in accordance with the Development Plan and/or the Modifed Development Plan, the other terms of this Agreement, and feedback received from Health Authorities after Scientific Advices, provided that all development activities must be set forth in the Development Plan.

Unless otherwise agreed upon by the JSC or otherwise provided in the Development Plan and/or the Modified Development Plan, it is being understood that Licensor will be responsible for the development and day to day operations and execution outside the Territory and Licensee will be responsible for the Development and day to day operations and execution in the Territory.

Each Party shall assign qualified personnel and devote adequate resources, consistent with the Development Plan and/or the Modified Development Plan, and this Agreement, to perform its responsibilities under the Development Plan and/or the Modified Development Plan.

Specific development tasks addressed in the Development Plan and/or the Modified Development Plan may include, without limitation:

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

(i) non-clinical studies and Clinical Studies of the Product including establishment of protocols for such Clinical Studies and estimated timeframes for completion of such activities;

(ii) tests, studies and activities that may be required or recommended by or for any Regulatory Authority to obtain Regulatory Approval of the Product in each Territory and estimated timeframes for completion of such activities;

(iii) engagement of scientific, medical, technical, regulatory and legal consultants and experts, and clinical research organizations ("CROs");

(iv) conduct of activities directed to market access activities for Product, as applicable;

(vi) conduct of such other activities in connection with development of the Product as are contemplated under this Agreement.

### 3.2.3    Allocation of Tasks under the Development Plan.
The Development Plan and/or the Modified Development Plan shall allocate Development activities, responsibilities and tasks, including sponsorship of Clinical Studies, between the Parties in accordance with and in furtherance of the Development Plan and/or the Modified Development Plan.

### 3.2.4    Sharing of Development Costs.
The Development Plan shall set the anticipated estimated Development Costs. The estimated Development Costs incurred by the Parties and their respective Affiliates in the conduct of the Development Plan and/or the Modified Development Plan are set forth in the Development Plan and/or the Modified Development Plan and, subject to the second paragraph of this Section 3.2.4, shall be borne by the Parties according to the following split: seventy percent (70%) of the Development Costs shall be borne by Licensor and thirty (30 %) of the Development Costs shall be borne by Licensee.

The split 70% - 30% of the Development Cost shall apply to all Development Costs incurred under the Development Plan and the Modified Development Plan provided that:

(a) except as otherwise agreed by the Parties, a Party will not have any obligation to bear costs increases above the Development Costs set forth in the Development Plan and/or the Modified Development Plan if the cost increases result from a Material Development Plan Changes that are not approved by the JSC but are unilaterally introduced by application of the Section 2.4 (vii) of this Agreement and;

(b) a Party will not have any obligation to bear costs associated with headcounts or FTEs of the other Party except that (i) Licensor will bear 70% and Licensee will bear 30% of the Development Costs (including "study team" headcount/FTE costs) for "Cohort 1" as identified in the Development Plan and (ii) the JSC will have the ability to cause "study team" FTEs or headcounts to be included in the Development Costs to which the 70%-30% split is applicable.

Within thirty (30) days prior to the commencement of each Calendar Quarter, for as long as the Parties are performing development according to the Development Plan and/or the Modified Development Plan, the

JSC shall agree upon the expected Development Costs to be incurred and borne by each Party in such Calendar Quarter (the "Expected Development Costs"). Within thirty (30) days following the end of each Calendar Quarter, each of the Parties shall submit to the JSC, a written report setting forth in reasonable detail all Development Costs it actually incurred in performing its development activities during such Calendar Quarter. With each written report each Party shall include (a) appropriate proof of prior payment and/or disbursement and/or expense, and (b) all information and/or documentation that each Party may reasonably require but only in case such request/requirement is compliant with applicable law; provided that, if no information and/or documentation reasonably requested by any Party is received, then such payment and/or disbursement and/or expense shall not be included as Development Costs. Within thirty (30) days following a JSC's receipt of such report from each Party, the JSC shall calculate total Development Costs for such Calendar Quarter and allocate each Party's respective share of the Development Costs, provided that any decision of the JSC with respect thereto shall require the express unanimous written consent of JSC to the extent that any such decision would result in a Party being responsible for more than its allocated split of Development Costs set forth in the Expected Development Costs. Each Party will pay its portion of the Development Costs for the applicable Calendar Quarter within thirty (30) days of JSC final approval and allocation of the Development Costs and delivery of an invoice.

### 3.2.5    Right to Subcontract.

Each Party may subcontract to Third Parties portions of any Development activities to be performed by it under the Development Plan and/or the Modified Development Plan or contract with consultants to provide services specifically relating to such activities without the prior consent of the other Party, but in consultation and coordination with the JSC, as long as each such subcontractor shall enter into an agreement with such Party requiring such subcontractor to maintain Confidential Information of the other Party in confidence and to comply in all material respects with all applicable provisions of this Agreement and all requirements of applicable Laws, together with all applicable cGLP, cGMP and cGCP. The subcontracting Party shall negotiate and execute such agreements and be responsible under this Agreement for such subcontracted work. All such subcontracts shall be consistent with the terms of this Agreement.

### 3.2.6    Audit Rights.

Each Party shall have the right to audit or to arrange for the audit of the books and records of the other Party for purposes of confirming the amount of Development Costs incurred by such other Party in connection with the Development Plan and/or the Modified Development Plan during one or more Calendar Quarters. Any such audit shall be at the auditing Party's expense unless such audit reveals that the amount of such Development Costs was overstated in which case the audited Party shall reimburse the auditing Party for all of the reasonable out-of-pocket expenses incurred by the auditing Party in connection with such audit.

### 3.3    Rights to Data.

During the Agreement Term, each Party shall provide access to the other Party (and its Affiliates or Sublicensees) with all the Development Data. Each party grants to the other party a royalty free, fully paid-up, irrevocable sublicensable and non-exclusive licence to the Development Data to the extent required by the other party for the development and commercialization of the Product and/or Active Ingredient in its territory.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**3.4    Product Improvements**

The Parties agree that Licensor and Licensee Development activities and efforts under this Agreement shall be directed to the Development of the Product and the Active Ingredient in the Field. Either Party may propose to the other Party a project directed to the identification and evaluation of a potential Product Improvements (e.g. new route of synthesis, a new formulation, new delivery route, new dosage form or new primary package for the Active Ingredient in the Field).

For this purpose, the requesting Party shall submit to the other Party an initial proposal for a respective project, which shall outline on a high level (i) the subject, scope and goal of the project; (ii) the major work packages with estimated timelines for completion as well as an estimation of costs and (iii) the suggested allocation of responsibilities between the Parties, including responsibility for costs.

If the other Party is willing to proceed with a collaboration on the proposed project, either in line with the proposed terms or subject to other terms, the Parties shall convene promptly in the JSC to discuss the details of the collaboration and the allocation of cost.   If the other Party is not willing to proceed with a collaboration for a joint improvement, the requesting Party shall be free to continue at its own risk, decision and expense and shall be the sole owner of any right related to the improvement (including the intellectual property generated from it). For the sake of clarity, the Parties may jointly develop an improvement in light of each Party's retained rights in the Territory. For the further stake of clarity, Product Improvements are included in the licenses granted pursuant to Section 2.1.

**3.5    New Developments**

During the Agreement Term, subject to the other terms of this Agreement, the Licensor retains all rights to make New Developments inside and outside the Territory.

**3.5.1    Licensee Right of First Negotiation for New Developments in the Territory.**

Licensee shall have a right of first negotiation for any and all Licensor New Developments in the Territory. The Licensor grants the Licensee a right of first negotiation as set below. If Licensor elects to pursue the development or exploitation of any New Development in the Territory, Licensee shall have a right of first negotiation to agree with the Licensor on terms and conditions for a collaboration agreement for joint research and development and/or the exploitation of the rights of any such New Development on an exclusive basis in the Territory and on terms to be negotiated within the New Development Negotiation Period. The Licensor shall promptly provide the Licensee with written notice of such New Development in the Territory (the "New Development Notice") and the Licensee shall have a period of thirty (30) days from receipt of the New Development Notice to notify the Licensor in writing of its interest.

If the Licensee provides such notification to the Licensor, the Parties shall thereafter negotiate in good faith the main terms of the agreement and enter into a binding and definitive agreement with respect to the exclusive license of the rights of exploitation of the concerned New Development in the Territory or a joint co-development agreement provided that the Parties shall agree the contribution of Licensee to reimburse Licensor for the development costs agreed for each such New Development and there will be milestone and royalty payments applicable to the New Development in question. This negotiation period (the "New Development Negotiation Period") shall last for a maximum of forty five (45) days after the New

- 19 -

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

Development Notice, subject to be extended at the request of either Party and such extension subject to the mutual agreement of both Parties.

So long as the Licensor negotiates in good faith with the Licensee during the New Development Negotiation Period, the Licensor shall not enter into discussions for a potential agreement with any Third Party with respect to the exploitation of the concerned New Development in the Territory until the New Development Negotiation Period has elapsed. If (i) the Licensee fails to notify Licensor during the thirty (30) days after receipt of the New Development Notice or (ii) the Licensee notifies the Licensor that it is not interested in the exploitation of the concerned New Development, then the Licensor shall be free to negotiate and enter into a transaction regarding the exploitation of such New Development in the Territory with any Third Party.

If after good faith negotiation during the New Development Negotiation Period the Parties are unable to agree upon a binding and definitive agreement as provided above, once twelve (12) months have elapsed since the date of the expiration of the New Development Negotiation Period and provided that the Licensor has not entered into a term sheet with any Third Party, the Licensee shall have an additional right of first negotiation. The Licensor shall promptly provide the Licensee with a new New Development Notice and the terms and conditions of this Section shall apply, provided however that such additional right of first refusal shall apply only once.



### 5. Manufacturing and Supply for development or Commercial Purpose

During the Agreement Term, and only if explicitly provided by the Development Plan and/or the Modified Development Plan, Licensor either directly or through a Third Party, shall ensure Licensee a supply of the Active Ingredient and/or the Products for use in the Development activities contemplated by this Agreement and the Development Plan and/or the Modified Development Plan.

If Licensee wishes the agreements with Licensor CMOs that are listed in Exhibit 4 (the "CMO Agreements") to be assigned by Licensor to Licensee or to have the right to manufacture the Active Ingredient and/or the Product directly or by a Third Party, the Licensee will inform the JSC. For the avoidance of doubt, any assignment of Licensor CMO agreements must be approved by the Licensor and will be subject to the terms of the applicable CMO agreements.

If Licensee decides to manufacture the Product and/or the Active Ingredient directly or through a Third Party, upon Licensee's reasonable request during the Agreement Term, Licensor shall provide reasonable cooperation to Licensee, at Licensee's cost, with respect to the conduct of the activities pursuant to this Agreement, including:

(i)     the transfer of any additional Licensor Know-How, materials and other Licensor Intellectual Property Rights to the extent necessary or reasonably useful to enable Licensee to manufacture the Active Ingredient or the Product, at Licensee's cost.

(ii)    provide to Licensee with technical assistance through personnel familiar with the Active Ingredient to enable the development and commercialization of the Active Ingredient and Product, at Licensee's cost.

Licensor and its Affiliates hereby grant to  Licensee and its Affiliates a non-exclusive licence under the Licensed Rights to develop, make and have made the Active Ingredient and any Product outside the Territory (and to the extent applicable import, export, transport, obtain customs clearance, warehouse, invoice, handle and deliver); provided that the Active Ingredient or Product is not sold, transferred, otherwise disposed of, used or supplied for use outside the Territory and is used solely for the purpose of making, having made, using, developing, selling, offering for sale, importing, exporting and otherwise Commercializing such Active Ingredient or Product within the Field and within the Territory.

### 6.   Agreements with suppliers and vendors

Licensor will use Commercially Reasonable Endeavours to maintain relationships with suppliers and vendors who conducted or were involved in development of the Active Ingredients or Product to enable Licensor and Licensee to have access to all documentation, data and other Know-How with respect to such activities as are necessary or reasonably useful for the development of the Active Ingredient and the Product. Licensor may secure all such documentation, data and other Know-How and transfer it to Licensee if agreed to by both Parties and such transfer is included in the Development Plan and/or the Modified Development Plan.

In this sense, Licensor shall use Commercially Reasonable Endeavours to maintain good relationships with vendors, suppliers, contractors, and others providing services under the contracts, and shall perform all of its obligations under the contracts.
The JSC will agree in good faith and undertake the actions reasonably required to ensure that those ongoing development activities agreed to by the Parties may continue after the Effective Date without interruption.

For any Contracts that, following the Effective Date, the JSC agrees should be assigned to Licensee, (the "Assigned Contracts") pursuant to the Development Plan and/or the Modified Development Plan or any amendment thereto, Licensor shall use Commercially Reasonable Endeavours to promptly assign, transfer, convey and deliver to Licensee, and Licensee shall accept from Licensor all right, title and interest in such Assigned Contracts free and clear of any and all encumbrances.  Upon such assignment, Licensee shall assume all obligations of Licensor under the Assigned Contracts arising on or after the date of assignment but excluding any liabilities or obligations resulting or arising from any breach of or non-compliance with any such Assigned Contract by Licensor or any of its Affiliates (the "Assumed Liabilities").  Licensee shall

- 21 -

not assume any liabilities or obligations of Licensor or its Affiliates other than the Assumed Liabilities, and any such liabilities or obligations of Licensor or its Affiliates shall remain the sole obligation and responsibility of Licensor and its Affiliates. To the extent that there are any Contracts that the parties agree should be assigned, but which apply outside the Territory as well as in the Territory or that apply to other compounds or products of Licensor as well as the Active Ingredient or Product, if requested by Licensee, Licensor will use Commercially Reasonable Endeavours to modify such agreements as appropriate so that a modified version of the agreement that applies only to the Active Ingredient or Product for the Territory may be assigned to Licensee.

For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement or the Development Plan and/or the Modified Development Plan, the Licensor must agree in writing, in its sole discretion, to assign any Contract to Licensee.

## 7.  Regulatory

Prior to the delivery to the Licensee of a copy of all regulatory documents of the Product ("**Regulatory Transfer**") the Licensor shall be responsible for the preparation, conduct and implementation of all agreed upon regulatory strategies, making Filings and engaging with the relevant Regulatory Authorities, ethics committees or other governmental entities ("**Entities**") regarding the Product in the Territory.

After the Regulatory Transfer, the Licensee shall have the sole right and responsibility with respect to the regulatory matters for the Product in the Territory, including updating and maintaining the Regulatory Approval.

### 7.1    Regulatory Transfer
Within thirty (30) days after the Effective Date, so long as Licensor has received the Upfront Payment, the Licensor shall conduct the Regulatory Transfer as follows: the Licensor shall transfer and assign to the Licensee any regulatory dossiers containing information necessary or reasonably useful to Licensee in connection with its Filings for the Product, including, but not limited to INDs, Clinical Trial Application (CTA) dossiers, regulatory correspondence, Regulatory Authority meeting minutes and study reports from completed non-clinical and clinical studies.

For all completed study reports Controlled by the Licensor, the Licensor shall provide necessary documentation to confirm data reliability, including, but not limited to original author signatures, raw data lists, GLP and GCP compliance information. All such documentation is to be provided in English.

### 7.2    Regulatory Approval Applications and marketing authorisations
The Licensee shall have sole responsibility (in its sole discretion) in the Territory to seek and/or obtain any necessary approvals and for determining whether the same requires approval.

The Licensee shall own and be solely responsible for Filing applications for Regulatory Approval for Product in the Territory.

- 22 -

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

The Licensee (or its Sublicensees) will hold the marketing authorisations and product registrations in all countries of the Territory. The Licensee shall decide in its sole discretion whether either the Licensee, or its sublicensees shall be the marketing authorization holder.

### 7.3    Meetings/Communications with Regulatory Authorities and Ethics Committees

#### 7.3.1    Prior to the Regulatory Transfer.

Prior to the Regulatory Transfer, the Licensor shall have the sole right and responsibility, subject to the Licensee's participation pursuant to this Article 7, for conducting meetings and discussions, including telephone communications, related to the Product, with the Entities in the Territory.

The Licensor shall provide the Licensee with prior notice of any scheduled meetings and interactions, including telephone conversations with any Entities. The Parties shall discuss and agree on a strategy and input for such upcoming meetings and interactions.

#### 7.3.2    After the Regulatory Transfer.

After the Regulatory Transfer, the Licensee shall have the sole right and responsibility for conducting meetings and discussions, including telephone communications and emails, related to the Product, with all Entities in the Territory. However, Licensor shall support Licensee with the meetings and discussions with the Entities in the Territory up to the end of Phase II Studies, if Licensee considers it appropriate.

The Licensor shall not, without the Licensee's prior written consent, unless so required by Applicable Laws, correspond or communicate with any Entity in the Territory concerning the Product, or otherwise take any action concerning any Regulatory Approval or other authorisation under which the Product is marketed or sold in the Territory.

### 7.4    Disclosure of Regulatory Documents

#### 7.4.1.    Prior to the Regulatory Transfer.

Prior to the Regulatory Transfer, Licensee shall review and approve the substantive regulatory documents in the Territory (to EMA and/or national authorities).

If the Licensor receives substantive written material or oral communication relating to the Product from any relevant Entity in the Territory, then Licensor shall provide a copy of such written or oral communication to the Licensee as soon as reasonably practicable but not later than two (2) Business Days after receipt. For all completed study reports, the Licensor shall provide necessary documentation to confirm data reliability, including, but not limited to original author signatures, raw data lists, GLP and GCP compliance information. All documentation is to be provided in English.

If the Licensee receives written material or oral communication relating to the Product from any Entity in the Territory, then the Licensee shall provide a copy of such written material or oral communication to the Licensor as soon as reasonably practicable, but not later than two (2) Business Days after receipt.



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

### 7.4.2    After the Regulatory Transfer.

If the Licensor receives written material or oral communication relating to the Product from any Entity in the Territory, then the Licensor shall provide a copy of such written material or oral communication to the Licensee as soon as reasonably practicable, but not later than two (2) Business Days after receipt, except as otherwise stated in the Pharmacovigilance Agreement.

Upon the Effective Date , Licensee (or one of its Affiliates or Sublicensees) shall be responsible for and act as the sole point of contact for communications with Regulatory Authorities in the Territory in connection with the development and Commercialization of the Licensed Product in the Field in the Territory.

## 7.5    Pharmacovigilance

The Licensee shall have sole responsibility regarding pharmacovigilance activities, including, without limitation, monitoring and reporting of complaints, adverse events and safety data regarding the Product in the Territory.

## 8.    Commercialisation

## 8.1    Responsibility

The Licensee, at its own expense, shall have sole responsibility and decision-making authority for the marketing, promotion, sale and distribution of the Products in the Territory.  The Licensee shall use Commercially Reasonable Endeavors to develop and commercialize the Products in the Territory. The scope of such development and commercialization activities shall include clinical development, manufacturing, process development and scale-up, seeking marketing approval, providing for a reasonable commercial launch in each country where marketing approval is obtained.

## 8.2    Commercialisation updates; Product Commercialization Activities of the Licensor and Licensee.

Prior to and at least once per Calendar Year after the First Commercial Sale, the Licensee shall update the Licensor regarding the commercialisation activities of the Product in the Territory. The Licensee shall provide a high-level summary consistent with the Licensee's usual processes at that time, in writing and/or through a meeting (videoconference or telephone). Similarly, the Licensor shall update the Licensee regarding the commercialization activities of the Product outside of the Territory.

Additionally, (a) if the Licensor demonstrates (with supporting evidence by an independent expert) that any commercial activity of Licensee is materially detrimental to the commercial viability of the Product outside of the Territory that is of material importance (with supporting evidence by an independent expert) to Licensor's Product regulatory or commercialization viability, the Licensee will use good faith efforts and Commercially Reasonable Endeavours to conduct any of such commercialization activities of the Product in the Territory in such manner that will avoid this material adverse impact on the commercial viability of the Product outside the Territory *provided that* this Subsection 8.2(a) will be deemed of no force and effect if Licensee demonstrates (with supporting evidence from an independent expert) that the application of this Subsection 8.2(a) to any such commercialization activities would violate applicable anti-trust laws and (b) Licensor will use good faith efforts and Commercially Reasonable Endeavours to conduct (or to have

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

conducted by its Affiliates or licensees) any commercialization activities of the Product outside of the Territory in a manner that minimizes any material adverse impact on the regulatory or commercial viability of the Product in the Territory.

## 9.  Payments

### 9.1    Upfront Payment; Reimbursement

In partial consideration of Licensor's grant of the rights and licenses to Licensee, Licensee shall pay, or cause to be paid to Licensor a one-time, non-refundable fee of **FIFTEEN MILLION EURO** (15,000,000 €) (the "Upfront Payment") within thirty (30) Business Days after the Effective Date and subject to the receipt of an invoice from Licensor.

As further partial consideration of Licensor's grant of the rights and licenses to the Licensee, Licensee shall pay, or cause to be paid to Licensor 30% of the Development Costs already incurred by the Licensor and disclosed under Exhibit 3 under "Cohort 1" within thirty (30) Business Days after the Effective Date and subject to the receipt of an invoice from Licensor. Such amounts shall not be creditable against any other amount due hereunder.

### 9.2    Product Development Milestone Payments



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



**9.3      Commercial Milestones**



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

### 9.4    Royalty Payments

#### 9.4.1    Royalty Term.

As further partial consideration for Licensor's grant of the rights and licenses to Licensee, royalties shall be payable by the Licensee on Net Sales of the Product after the First Commercial Sale and until the expiry of the Royalty Term unless otherwise agreed hereunder.

#### 9.4.2    Royalty Rates.



#### 9.4.3    Third Party Payments.

The Licensor shall be responsible for paying all third-party payment obligations between Licensor and any third-party (e.g. license, milestone and/or royalty) related to Product existing as of the Effective Date, if any.

If the Licensee is required to obtain any additional third-party licenses that are necessary to develop and/or commercialise the Product and after taking any input from the Licensor about the need to take such licenses into consideration in good faith, the Licensee shall be entitled to deduct up to 50% of the costs of such additional licenses from all royalty payments made or to be made under this Section 9, provided that in no event shall any deduction to royalty payments reduce the royalty payments owed by Licensee to Licensor under Section 9 by more than fifty percent (50%) in any calendar quarter. If in a calendar quarter Licensee is unable to offset the full deductions to royalty payments as a result of the foregoing fifty percent (50%)

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

floor, then any such deduction to royalty payments that has not been exhausted in any calendar quarter may be carried forward to subsequent calendar quarters.

## 9.5    Disclosure of Payments

The Licensor acknowledges that the Licensee may be obligated to disclose this financial arrangement, including all fees, payments and transfers of value, as may be advisable or required under Applicable Law.

## 10. Accounting and reporting

## 10.1    Timing of Payments

### 10.1.1    Development and Sales Based Event Payments.

Upon reaching a development or sales-based event, the Licensee shall timely notify the Licensor and such development or sales-based event payment shall be paid by the Licensee to the Licensor within ten (10) days from occurrence of the applicable event and receipt of an invoice from the Licensor.

### 10.1.2    Royalties.

The Licensee shall calculate payments every quarter as of March 30, June 30, September 30 and December 31 (each being the last day of a reporting period). The Licensee shall pay such payments for a quarter within forty five (45) Business Days after the end of each reporting period in which Net Sales occur, subject to receiving the relevant invoice from the Licensor.

### 10.1.3    Late Payment.

Any payment under this Agreement that is not paid on or before the date such payment is due shall bear interest, to the extent permitted by Applicable Law, at three (3) percentage points above the average twelve-months Euro Interbank Offered Rate (EURIBOR), as reported by Reuters from time to time, calculated on the number of days such payment is overdue.

### 10.1.4    Method of Payment.

Royalties on Net Sales and all other amounts payable by the Licensee hereunder shall be paid by Licensee in Euros (the "Payment Currency") to the bank account designated by the Licensor. Unless the Licensor otherwise notifies the Licensee according to this Agreement, all payments under this Agreement shall be by electronic funds transfer in immediately available funds to the following bank account of the Licensor:







Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

### 10.1.5  Currency Conversion.

When calculating the Net Sales of any royalty-bearing Product that occur in currencies other than the Payment Currency, Licensee shall convert the amount of such sales into the Payment Currency based on the average exchange rate applicable to the corresponding period or the due date by the European Central Bank.

### 10.1.6  Reporting.

With each royalty payment according to Section 10, the Licensee shall provide the Licensor in writing for the relevant reporting period on a Product-by-Product and country-by-country basis the following information:

a)   Net Sales in Euros on a country-by-country basis;

c)   Exchange rate, if applicable, used for the conversion of Net Sales from local currency to the Payment Currency pursuant to Section 10.

f)   royalty rate pursuant to Section 10; and

h)   total royalty payable in Euros.

## 11. Taxes

All payments made under this Agreement shall be net prices and free and clear of any and all taxes (like sales and use taxes, consumption taxes, goods- and sale taxes or value added taxes or comparable taxes), duties, levies, fees or other charges, except for withholding taxes. Where any sum due to be paid to a Party hereunder is subject to any withholding tax, the Parties shall use Commercially Reasonable Endeavours to do all such acts and things and to sign all such documents as will enable them to take advantage of any applicable double taxation agreement or treaty. In the event there is no applicable double taxation agreement or treaty, or if an applicable double taxation agreement or treaty reduces but does not eliminate such withholding or similar tax, the paying Party shall deduct any withholding taxes from payment and pay such withholding or similar tax to the appropriate tax authority. In any case the paying Party will apply for issuing the tax certificate of paid withholding tax at the tax authority and send this certificate in the original version to the other Party.

If a Change of Control take place, the Party involved in such change shall inform the other Party within thirty (30) days and shall consult with the other Party regarding the eventual tax consequences of such change.



## 12. Auditing

### 12.1    Licensor Right to Audit

The Licensee shall keep, and shall require its Affiliates and Sublicensees to keep, full, true and accurate books of account containing all particulars that may be necessary for the purpose of calculating all royalties payable under this Agreement. Such books of accounts shall be kept at their principal place of business. At the expense of the Licensor, the Licensor has the right to engage an internationally recognised independent public accountant reasonably acceptable to the Licensee to perform, on behalf of the Licensor an audit of such books and records of the Licensee and its Affiliates, that are deemed necessary by the independent public accountant to report on Net Sales of Product for the period or periods requested by the Licensor and the correctness of any financial report or payments made under this Agreement.

Upon timely request and at least sixty (60) Business Daysprior written notice from the Licensor, such audit shall be conducted, during regular business hours in such a manner as to not unnecessarily interfere with the Licensee's normal business activities and shall be limited to results in the two (2) Calendar Years prior to audit notification.

Such audit shall not be performed more frequently than once per Calendar Year nor more frequently than once with respect to records covering any specific period of time.
All information, data documents and abstracts herein referred to shall be used only for the purpose of verifying royalty statements, shall be treated as Licensee's Confidential Information subject to the obligations of this Agreement and need neither be retained more than one (1) year after completion of an audit hereof, if an audit has been requested; nor more than three (3) years from the end of the calendar year to which each shall pertain.

### 12.2    Audit Reports

The auditors shall only state factual findings in the audit reports and shall not interpret the agreement. The auditors shall share all draft audit reports with the Licensee before the draft report is shared with the Licensor and before the final document is issued. The final audit report shall be shared with the Licensee at the same time it is shared with the Licensor.

### 12.3    Over-or Underpayment

If the audit reveals an overpayment, the Licensor shall reimburse the Licensee for the amount of the overpayment within thirty (30) days. If the audit reveals an underpayment, the Licensee shall make up such underpayment with the next royalty payment or, if no further royalty payments are owed by the Licensee, the Licensee shall reimburse the Licensor for the amount of the underpayment within thirty (30) days. The Licensee shall pay for the audit costs if the underpayment of the Licensee exceeds five percent (5%) of the aggregate amount of royalty payments owed with regard to the royalty statements subject of the audit.

### 12.4    Duration of Audit Rights

If Licensor does not request verification of any royalty calculation within the period during which corresponding records must be maintained under this Section 12.4, then the Licensor will be deemed to have accepted the royalty payments and reports for the relevant periods.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

### 13.  Intellectual Property

### 13.1    Ownership

The Licensor shall own and retain all right, title and interest in the Licensor Know-How and Licensor Patent Rights. The Licensee shall own and retain all right, title and interest in the Licensee Patent Rights and Licensee Know-How.

Any Patent arising from this Agreement and/or the Development Plan and/or the Modified Development Plan shall be owned by the Parties as detailed below. The Parties shall agree on the drafting and filing of patent applications such as the priority application and any international patent application. The JSC shall approve the filing of any priority application or international patent application.

All inventions or discoveries made, or information created, jointly or independently by each Party's (or any of its Affiliates') employees, independent contractors or consultants, in the course of conducting activities under this Agreement, together with all intellectual property rights therein, shall be jointly owned by the Parties and are for the purposes of this Agreement considered as "Joint IP".

For clarification purposes, Joint IP shall be owned jointly by Licensee and Licensor on the basis of an undivided interest. Notwithstanding anything to the contrary herein, each Party shall have the right to use such Joint IP, or license such Joint IP to its Affiliates or any Third Party, or sell or otherwise transfer its interest in such Joint IP to its Affiliates or a Third Party, in each case without the consent of the other Party, so long as such use, sale, license or transfer is subject to the licenses granted pursuant to this Agreement and is otherwise consistent with this Agreement. Expenses for filing and searching of priority applications and any international patent application shall be shared 50 % by each Party. For the rest of Patent Rights belonging to the Joint IP:

> a) Licensee shall have the right, but not the obligation, to file, prosecute, maintain, abandon, defend and litigate Patent Rights at its own expense in the Territory.
> b) Licensor shall have the right, but not the obligation, to file, prosecute, maintain, abandon, defend and litigate Patent Rights at its own expense out of the Territory.
> c) Once the priority applications are used to claim priorities, Licensee shall have the right, but not the obligation, to prosecute, maintain, abandon, defend or litigate them at its own expense if they were filed in or for the Territory. Licensor shall have the right, but not the obligation, to prosecute, maintain, abandon, defend or litigate them at its own expense if they were filed out of the Territory.

If any of the parties has the intention to abandon or not to file, prosecute, maintain, defend or litigate any Patent Right according to a), b) or c), the other Party shall have the right, but not the obligation, to file, prosecute, maintain, abandon, defend and litigate such Patent Rights at its own expense.Except as specifically set forth herein, this Agreement shall not be construed as (i) giving any of the Parties any license, right, title, interest in or ownership to the Confidential Information; (ii) granting any license or right under any intellectual property right; or (iii) representing any commitment by either Party to enter into any additional agreement, by implication or otherwise.

- 31 -



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit Solutions, S.L. on 18/03/2024 17:05:47 UTC

**13.2    Trademarks and Labelling**

The Licensee shall own all trademarks used on or in connection with Products in the Territory ("**Product Trademarks**"), and shall, at its sole cost, be responsible for procurement, maintenance, enforcement and defence of all trademarks used on or in connection with Products in the Territory.

**13.3    Prosecution of the Licensor Patent Rights**

The Licensor shall, at its own expense, (i) Handle all Licensor Patent Rights, (ii) consult with the Licensee as to the Handling of the Licensor Patent Rights, and (iii) furnish to the Licensee copies of all documents relevant to such Handling. The Licensor shall furnish such documents and consult with the Licensee in sufficient time before any action by the Licensor is due to allow the Licensee to provide comments thereon, which comments the Licensor shall consider. At the Licensor's expense and reasonable request, the Licensee shall cooperate, in all reasonable ways with the Handling of all Licensor Patent Rights. If the Licensor wishes to abandon a patent or patent application that is licensed to the Licensee under this Agreement, then at least sixty (60) days prior to any abandonment action or deadline, the Licensor must offer to assign such patent or patent application to the Licensee. The Licensor is only entitled to abandon a patent or patent application when there is a reasonable justification from a business point of view not to continue to prosecute, maintain or extend the patent or patent application for that part of the Territory or with the agreement of the Licensee. If total patent costs for a given country calculated at patent expiration are not higher than 2 % of the (expected) Net Sales for that country at patent expiration, it is agreed that the abandonment of the patent is not justified from a business point of view.

Due to the potential risk of a central revocation at the Unified Patent Court (UPC) of Licensor Patent Rights and the negative impact of it for the Licensee, the Licensee and the Licensor agree to exclude Licensor Patent Rights from the jurisdiction of the UPC for European patents and European patent applications through an opt-out, unless both Parties agree otherwise. If both Parties agree otherwise, they can agree to either request the unitary effect (for the grant of a unitary patent) or not to request the opt-out.

**13.4    Infringement of Licensor intellectual property rights**

Each Party shall promptly provide written notice to the other Party during the Agreement Term of any (i) known infringement or suspected infringement by a Third Party of any Licensor Patent Rights, or (ii) known or suspected unauthorised use or misappropriation by a Third Party of any Licensor Know-How and shall provide the other Party with all evidence in its possession supporting such infringement or unauthorised use or misappropriation.

In case of known or suspected infringement or unauthorised use or misappropriation of any of Licensor Patent Rights or any Licensor Know-How in the Territory within sixty (60) days after the Licensee provides or receives such written notice ("**Decision Period**"), the Licensee, in its sole discretion, shall decide whether or not to initiate such suit or action in the Territory and shall notify the Licensor in writing of its decision ("**Suit Notice**").

If the Licensee decides to bring a suit or take action, once the Licensee provides Suit Notice, the Licensee may immediately commence such suit or take such action. In the event that the Licensee (i) does not in writing advise the Licensor within the Decision Period that the Licensee will commence suit or take action, or (ii) fails to commence suit or take action within sixty (60) days after providing Suit Notice, the Licensor



shall thereafter have the right to commence suit or take action in the Territory and shall provide written notice to the Licensee of any such suit commenced or action taken by the Licensor.

Upon written request, the Party bringing suit or taking action ("**Initiating Party**") shall keep the other Party informed of the status of any such suit or action and shall provide the other Party with copies, to the extent the Initiating Party is lawfully permitted to do so, of all substantive documents or communications filed in such suit or action. The Initiating Party shall have the sole and exclusive right to select counsel for any such suit or action.

The Initiating Party shall, except as provided below, pay all expenses of the suit or action, including the Initiating Party's attorneys' fees and court costs. Any damages, settlement fees or other consideration received as a result of such suit or action shall be allocated as follows:

(a)    First, to reimburse the Initiating Party for its costs and, if any remains, to the other Party for any advisory counsel fees and costs; and

(b)    Second, the balance, if any, shall be allocated to the Licensee and be considered as Net Sales subject to the corresponding Royalties to be paid to the Licensor according to this Agreement.

If the Initiating Party believes it is reasonably necessary or desirable to obtain an effective remedy, upon written request the other Party agrees to be joined as a party to the suit or action but shall be under no obligation to participate except to the extent that such participation is required as the result of its being a named party to the suit or action. At the Initiating Party's written request, the other Party shall offer reasonable assistance to the Initiating Party in connection therewith at no charge to the Initiating Party. The other Party shall have the right to participate and be represented in any such suit or action by its own counsel at its own expense.

The Initiating Party may settle, consent judgment or otherwise voluntarily dispose of the suit or action ("**Settlement**") without the written consent of the other Party but only if such Settlement can be achieved without adversely affecting the other Party (including any of its Patent Rights). If a Settlement could adversely affect the other Party, then the written consent of the other Party would be required, which consent shall not be unreasonably withheld.

**13.5    Defence in case of alleged infringement of third-parties rights**

If an action for infringement is commenced against either the Licensor or a member of the Licensee Group related to the discovery, development, manufacture, use or sale of a Product in the Territory pursuant to this Agreement, then the Licensee shall have the right to defend such action at its own expense, and the Licensor shall assist and cooperate with the Licensee, at the Licensor's expense (so long as such expense is reasonable and not excessive), to the extent necessary in the defence of such suit. The Licensee shall have the right to settle the suit or consent to an adverse judgment thereto, in its sole discretion, so long as such settlement or adverse judgment does not adversely affect the patent rights of the Licensor.

If the manufacture, use, importation, offer for sale or sale of any Product pursuant to this Agreement results in any claim, warning letter, suit or proceeding alleging patent infringement or trade secret misappropriation against the Licensor or a member of the Licensee Group, then such Party shall promptly notify the other Party hereto. The Parties shall cooperate with each other in connection with any such claim, warning letter,

- 33 -

suit or proceeding and shall keep each other reasonably informed of all material developments in connection with any such claim, warning letter, suit or proceeding.

If a Third Party asserts that Patent Rights owned by or licensed to it are infringed by the development, manufacture, use, importation, offer for sale or sale of Products by a member of the Licensee Group, or that its trade secrets were misappropriated in connection with such activity, then Licensee in addition to other rights and remedies of this Agreement (i) shall have the exclusive right and responsibility to resolve any such claim, whether by obtaining a license from such Third Party, by defending against such Third Party's claims or otherwise, and (ii) shall be solely responsible for the defence of any such action, and in the case of any infringement risk that the Parties identified during the due diligence process as of or prior to the Effective Date, 70% of all costs incurred in connection with such action (including, without limitation, attorneys' and expert fees) and all liabilities incurred in connection therewith shall be reimbursed or otherwise contributed by Licensor. At the Licensee's request, the Licensor will assist and cooperate with the Licensee, at the Licensor's expense, in assessing the merits of the Third Party assertion.

### 13.6    Common Interest Disclosures

With regard to any information or opinions disclosed pursuant to this Agreement by one Party to each other regarding intellectual property and/or technology owned by Third Parties, the Parties agree that they have a common legal interest in determining whether, and to what extent, Third Party intellectual property rights may affect the development and/or commercialisation of the Products, and have a further common legal interest in defending against any actual or prospective Third Party claims based on allegations of misuse or infringement of intellectual property rights relating to the development, manufacturing and/or commercialisation of the Products. Accordingly, the Parties agree that all such information and materials obtained by the Licensor and the Licensee from each other will be used solely for purposes of the Parties' common legal interests with respect to the conduct of the Agreement. All information and materials will be treated as protected by the attorney-client privilege, the work product privilege, and any other privilege or immunity that may otherwise be applicable. By sharing any such information and materials, neither Party intends to waive or limit any privilege or immunity that may apply to the shared information and materials. Neither Party shall have the authority to waive any privilege or immunity on behalf of the other Party without such other Party's prior written consent, nor shall the waiver of privilege or immunity resulting from the conduct of one Party be deemed to apply against any other Party.

### 13.7    Patent Term Extensions for Licensor Patent Rights

At the request of the Licensee, Licensor shall use Commercially Reasonable Endeavours to obtain all available patent term extensions, adjustments or restorations, or supplementary protection certificates ("**SPCs**", and together with patent term extensions, adjustments and restorations or equivalent rights, "**Patent Term Extensions**"). The Licensor shall execute such authorisations and other documents and take such other actions as may be reasonably requested by the Licensee to obtain such Patent Term Extensions, including designating the Licensee as its agent for such purpose. All filings for such Patent Term Extensions shall be made by the Licensor, unless legally required otherwise.

- 34 -

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

## 14. Representations and Warranties

The following representations and warranties are made as of the Effective Date.

### 14.1    Third Party Patent Rights

The Licensor has no knowledge of the existence of any patent or patent application owned by or licensed to any Third Party that has a substantial likelihood of preventing the Licensee from developing, registering, making, having made, using, promoting, offering for sale, selling or importing the Product in the Territory.

### 14.2    Ownership of Patent Rights

The Licensor is the exclusive owner of all right, title and interest in the Licensor Patent Rights. Exhibit 5 contains a complete and accurate list of all patents and patent applications included in the Licensor Patent Rights. Exhibit 5 shall be updated with any new Licensor Patent Right.

The Licensor Patent Rights are free and clear of all liens, claims, security interests and other encumbrances of any kind or nature. The Licensor has not granted any licenses to the Licensor Patent Rights to any Third Party in the Territory, nor has the Licensor effectuated any prior transfer, sale or assignment of any part of the Licensor Patent Rights in the Territory.

### 14.3    Inventors

The Licensor has obtained the assignment of, or an exclusive license under, all interest and all rights or licenses thereunder with respect to the Licensor Patent Rights necessary to grant the licenses granted hereunder and/or enforce the patents. All of the Licensor's employees, officers and consultants have executed agreements requiring assignment to the Licensor of all Inventions made by such individuals during the course of and as a result of their association with the Licensor.

### 14.4    Grants

The Licensor has the lawful right to grant the Licensee and its Affiliates the rights and licenses described in this Agreement.

### 14.5    Authorisation of the Licensor

The execution, delivery and performance of this Agreement by the Licensor and all instruments and documents to be delivered by the Licensor hereunder: (i) are within the corporate power of the Licensor; (ii) have been duly authorised by all necessary or proper corporate action; (iii) are not in contravention of any provision of the deed of incorporation or by-laws of the Licensor; (iv) to the knowledge of the Licensor, will not violate any law or regulation or any order or decree of any court of governmental instrumentality; (v) will not violate the terms of any, mortgage, lease, agreement, or other instrument to which the Licensor is a party or by which the Licensor or any of its property is bound, which violation would have an adverse effect on the financial condition of the Licensor or on the ability of the Licensor to perform its obligations hereunder; and (vi) do not require any filing or registration with, or the consent or approval of, any governmental body, agency, authority or any other person, which has not been made or obtained previously

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



(other than approvals required under Regulatory Approvals required for the sale of Products and Filings required in connection with Products).

### 14.6    Validity of Patent Rights

The Licensor has disclosed to the Licensee all information relevant to the Licensor Patent Rights and the Licensor is of the opinion that none of this information could render invalid and/or unenforceable any claims of granted patents in any of the Licensor Patent Rights. The Licensor has no knowledge of any inventorship, ownership or validity disputes concerning any Licensor Patent Rights.

### 14.7    Ownership and Validity of Know-How

The Licensor's Know-How is legitimately in the possession of the Licensor and, to the best of the Licensor's knowledge, has not been misappropriated from any Third Party. Licensor has taken reasonable measures to protect the confidentiality of its Know-How.

### 14.8    No Claims

To the best of Licensor's knowledge, there are no claims or investigations, pending or threatened against the Licensor or any of its Affiliates, at law or in equity, or before or by any governmental authority relating to the matters contemplated under this Agreement or that would materially adversely affect the Licensor's ability to perform its obligations hereunder.

### 14.9    No Conflict

Neither the Licensor nor any of its Affiliates is or will be under any obligation to any person, contractual or otherwise, that is conflicting with the terms of this Agreement or that would impede the fulfilment of the Licensor's obligations hereunder.

### 14.10    Authorisation of the Licensee

The execution, delivery and performance of this Agreement by the Licensee and all instruments and documents to be delivered by the Licensee hereunder: (i) are within the corporate power of the Licensee; (ii) have been duly authorised by all necessary or proper corporate action; (iii) are not in contravention of any provision of the deed of incorporation or by-laws of the Licensee; (iv) to the knowledge of the Licensee, will not violate any law or regulation or any order or decree of any court of governmental instrumentality; (v) will not violate the terms of any mortgage, lease, agreement, or other instrument to which the Licensee is a party or by which the Licensee or any of its property is bound, which violation would have an adverse effect on the financial condition of the Licensee or on the ability of the Licensee to perform its obligations hereunder; and (vi) do not require any filing or registration with, or the consent or approval of, any governmental body, agency, authority or any other person, which has not been made or obtained previously (other than approvals required under Regulatory Approvals required for the sale of Products and Filings required in connection with Products).  Licensee has full capacity and authority and all necessary rights, licenses, and consents to enter into and to perform this Agreement.  Licensee has the financial capability to make all payment obligations under this Agreement.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



**14.11 Disclaimer of Warranties.**

EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH HEREIN, NEITHER LICENSEE NOR LICENSOR NOR ANY OF THEIR RESPECTIVE AFFILIATES MAKES ANY REPRESENTATIONS OR GRANTS ANY WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, AND EACH PARTY SPECIFICALLY DISCLAIMS ANY OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, OR EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF QUALITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR USE OR PURPOSE OR ANY WARRANTY AS TO THE VALIDITY OF ANY PATENTS OR THE NON-INFRINGEMENT OF ANY INTELLECTUAL PROPERTY OF THIRD PARTIES.

## 15. Indemnification

**15.1    Indemnification by the Licensee**

The Licensee shall indemnify, hold harmless and defend the Licensor and its directors, officers, employees and agents from and against any and all losses, expenses, cost of defence (including without limitation attorneys' fees, witness fees, damages, judgments, fines and amounts paid in settlement) and any amounts the Licensor becomes legally obligated to pay because of any claim or claims against it to the extent that such claim or claims arise out of negligence, recklessness, or willful misconduct activities related to the Product or Active Ingredient conducted solely by or on behalf of the Licensee or any breach of Licensee's obligations under this Agreement or the representations and warranties set forth in this Agreement, except to the extent such losses, expenses, costs and amounts are due to the gross negligence or wilful misconduct or failure to act of the Licensor.

**15.2    Indemnification by the Licensor**

The Licensor shall indemnify, hold harmless and defend Licensee and its directors, officers, employees and agents from and against any and all losses, expenses, cost of defence (including without limitation attorneys' fees, witness fees, damages, judgments, fines and amounts paid in settlement) and any amounts Licensee becomes legally obligated to pay because of any claim or claims against it to the extent that such claim or claims arise out of negligence, recklessness, or willful misconduct activities related to the Product or the Active Ingredient conducted solely by or on behalf of the Licensor or any breach of Licensor's obligations under this Agreement or the representations and warranties set forth in this Agreement, except to the extent such losses, expenses, costs and amounts are due to the gross negligence or wilful misconduct or failure to act of the Licensee.

**15.3    Procedure**

In the event of a claim by a Third Party against a Party entitled to indemnification under this Agreement ("**Indemnified Party**"), the Indemnified Party shall promptly notify the other Party ("**Indemnifying Party**") in writing of the claim and the Indemnifying Party shall undertake and solely manage and control, at its sole expense, the defence of the claim and its settlement. The Indemnified Party shall cooperate with the Indemnifying Party and may, at its option and expense, be represented in any such action or proceeding by counsel of its choice. The Indemnifying Party shall not be liable for any litigation costs or expenses incurred by the Indemnified Party without the Indemnifying Party's written consent. The Indemnifying

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-9e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

Party shall not settle any such claim unless such settlement fully and unconditionally releases the Indemnified Party from all liability relating thereto, unless the Indemnified Party otherwise agrees in writing. The Indemnified Party's failure to comply with its obligations pursuant to this Section 15.3 shall not constitute a breach of this Agreement or relieve the Indemnifying Party from its indemnification obligations, except to the extent, if any, that the Indemnifying Party's defence of the claim was actually materially impaired thereby.

## 16. Obligation Not to Disclose Confidential Information

### 16.1    Non-Use and Non-Disclosure

During the Agreement Term and for five (5) years thereafter, a Receiving Party shall (i) treat Confidential Information provided by Disclosing Party as it would treat its own information of a similar nature, (ii) take all reasonable precautions not to disclose such Confidential Information to Third Parties, without the Disclosing Party's prior written consent, and (iii) not use such Confidential Information other than for fulfilling its obligations under this Agreement.

### 16.2    Permitted Disclosure

Notwithstanding the obligation of non-use and non-disclosure, the Parties recognise the need for certain exceptions to this obligation, specifically set forth below, with respect to press releases, patent rights, publications, and certain commercial considerations.

### 16.3    Press Releases

During the Agreement Term, the Parties shall discuss whether or not to issue a public announcement of the execution of this Agreement and if the Parties agree on a public announcement, they shall agree on the timing and form thereof as soon as possible. Thereafter, the Parties shall use good faith efforts to agree on joint press releases with respect to anything arising out of this Agreement.

### 16.4    Publications

Neither Party shall publish or publicly disclose the results generated in the course of this Agreement without the prior written consent of the other Party after prior review and approval by the JSC.

The Party seeking to publish results hereunder ("Publishing Party") shall provide the other Party ("Reviewing Party") with a copy of such proposed abstract, manuscript, or presentation no less than thirty (30) days prior to its intended submission for publication. The Reviewing Party shall respond in writing promptly and in no event later than fifteen (15) days after receipt of the proposed material.

### 16.5    Commercial Considerations

Nothing in this Agreement shall prevent the Licensee or its Affiliates from disclosing Confidential Information of the Licensor (including a copy of this Agreement) to (i) governmental agencies to the extent required or desirable to secure government approval for the development, manufacture or sale of Product



in the Territory, (ii) Third Parties acting on behalf of the Licensee, to the extent reasonably necessary for the development, manufacture, analytics or sale of Product in the Territory, or (iii) Third Parties to the extent reasonably necessary to market the Product in the Territory. The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent that such Confidential Information is required to be disclosed by the Receiving Party to comply with Applicable Law, to defend or prosecute litigation or to comply with governmental regulations, provided that the Receiving Party provides prior written notice of such disclosure to the Disclosing Party and, to the extent practicable, takes reasonable and lawful actions to minimise the degree of such disclosure.

## 17. Term and Termination

### 17.1 Commencement and Term

This Agreement shall commence upon the Effective Date and continue for the Agreement Term.

On a country-by-country basis, upon the expiry of the Agreement Term, the Licensee shall retain a fully paid up, perpetual, irrevocable, royalty free and exclusive license with the right to sublicense.

### 17.2 Termination

#### 17.2.1 Mutual Termination Rights

**17.2.1.1 Due to a Material Breach.**

A Party ("Non-Breaching Party") shall have the right to terminate this Agreement in its entirety or on a country-by-country basis in the event the other Party ("Breaching Party") is in breach of any of its material obligations under this Agreement. The non-Breaching Party shall provide written notice to the Breaching Party, which notice shall identify the breach and the countries in which the Non-Breaching Party intends to have this Agreement terminate. The Breaching Party shall have a period of ninety (90) days after such written notice is provided ("Peremptory Notice Period") to cure such breach. If the Breaching Party has a dispute as to whether such breach occurred or has been cured, it will so notify the Non-Breaching Party, and the expiration of the Peremptory Notice Period shall be tolled until such dispute is resolved. Upon a determination of breach or failure to cure, the Breaching Party may have the remainder of the Peremptory Notice Period to cure such breach. If such breach is not cured within the Peremptory Notice Period, then absent withdrawal of the Non-Breaching Party's request for termination, this Agreement shall terminate in such countries effective as of the expiration of the Peremptory Notice Period.

#### 17.2.2 Licensee Rights of Termination

**17.2.2.1 Termination without a Cause.**

The Licensee shall have the right to terminate this Agreement at any time on a country-by-country basis upon three (3) months prior written notice.

**17.2.2.3 Termination due to cease in the Development by the Licensor.**

The Licensee shall have the right to terminate this Agreement in the event Licensor ceases the Development of the Product and/or Active Ingredient for any cause.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



**17.2.2.4 Termination due to risk of infringement of a Third-Party Intellectual Property Right.**

The Licensee shall have the right to terminate this Agreement on a country-by-country basis if it is not possible to continue with the Development or Commercialization of the Product or Active Ingredient in the Territory due to a risk that the research, development, manufacture, distribution and/or sale of the Product in the Territory may infringe any Intellectual Property Right of any Third Party.

**17.2.2.5 Termination due to failure to launch and commercialize the Product in the European Economic Area (EEA) and/or the United Kingdom, due to infringement of any Third Party Intellectual Property Right.**

The Licensee shall have the right to terminate this Agreement in the European Economic Area (EEA) and/or the United Kingdom, if Licensee is prevented from the launch and Commercialization of the Product or Active Ingredient due to any infringement of any Third Party Intellectual Property Right restrains the ability of Licensee to launch, commercialize and distribute the Product and the Active Ingredient in the European Economic Area (EEA) and/or the United Kingdom.

**17.3    Consequences of Termination**

**17.3.1    Termination by the Licensor for Breach by the Licensee**

Upon any termination by the Licensor for an uncured breach of a material obligation by the Licensee, the rights and licenses granted by the Licensor to the Licensee under this Agreement shall terminate in their entirety or on a country-by-country basis, as applicable, on the effective date of termination. All rights shall automatically revert back to the Licensor and all payment obligations of Licensee according to Section 9 accrued until the effective date of termination will be due and payable by the Licensee.

In order for the Licensor to make the decision whether or not to continue the exploitation of a terminated Product, the Licensee shall within thirty (30) days of termination of the Agreement according to Section 17.2.1.1 provide the documentation necessary for the Licensor to determine whether or not to continue the exploitation of such Product.

If the Licensor determines it wishes to continue the exploitation of such Product, then the Licensor shall give a written notice to the Licensee (the Continuation Election Notice) as soon as reasonably possible but no later than sixty (60) days from the Licensee's receipt of the Licensor termination notice. If the Licensee receives such a timely Continuation Election Notice, and to the extent reasonably requested by the Licensor:

a)  The Licensee shall, to the extent the Licensee has the right to do so, assign and transfer to the Licensor all Filings and approvals, all final pre-clinical and clinical study reports and clinical study protocols, Product Trademarks and all data, including clinical data, materials and information, in the Licensee's possession and control related to Product(s) in the country required for the Licensor to continue to exploit the Product(s). All documents shall be transferred in the form and format in which such materials are maintained by the Licensee. Original paper copies shall only be transferred, if legally required. The Licensee shall not be required to prepare or finalise any new data, reports or information solely for purposes of transfer to the Licensor.

b)  The Licensee shall assign all clinical trial agreements, to the extent such agreements have not been cancelled and are assignable without the Licensee paying any consideration or commencing litigation in order to effect an assignment of any such agreements.  Furthermore, the Licensee shall endeavour to assign such agreements with Third Parties to the Licensor.

The Licensor shall, upon transfer, have the right to disclose such filings, approvals and data to (i) governmental agencies of the country to the extent required or desirable to secure government approval for the development, manufacturing or sale of Product(s) in the country, (ii) Third Parties acting on behalf of the Licensor, its Affiliates or licensees, to the extent reasonably necessary for the development, manufacture, or sale of Product(s) in the country, and (iii) Third Parties to the extent reasonably necessary to market Product(s) in the country.

(c) The Licensor shall have a non-exclusive and royalty-free license under the Licensee Patent Rights and Licensee Know-How, solely to the extent necessary to allow the Licensor, its Affiliates or licensees to develop, manufacture, have manufactured, use, offer to sell, sell, promote, export and import the applicable Product(s) in the applicable country(ies). For clarity, the licenses under this Section 17.3.1(c) shall not include any licenses that the Licensee has with a Third Party for which such grant would be prohibited or under which a member of the Licensee Group would incur financial obligations to such Third Party.

### 17.3.2  Termination by the Licensee for Breach by the Licensor or cease in the Development

Upon any termination by the Licensee for breach by the Licensor, the Licensee and its Affiliates may upon notice retain all rights and licenses granted to the Licensee by the Licensor under this Agreement; provided that after the effective date of termination the obligation of the Licensee to make the payments pursuant to Section 9 hereof shall continue with a fifty percent (50%) reduction. Licensor will pay its portion of the costs for any Development activity commenced prior to the effective date of termination.

Licensee shall, however, be entitled to seek remedies, including but not limited to damages.

In addition to, when applicable:

a)  The Licensor shall assign and transfer to the Licensee all Filings and approvals, all final pre-clinical and clinical study reports and clinical study protocols, and all data, including clinical data, materials and information, in the Licensor's possession and control related to Product(s) in the country required for the Licensor to continue to exploit the Product(s). All documents shall be transferred in the form and format in which such materials are maintained by the Licensor.

b)  The Licensor shall assign all clinical trial agreements, to the extent such agreements have not been cancelled and are assignable without the Licensee paying any consideration or commencing litigation in order to affect an assignment of any such agreements.

The Licensee shall, upon transfer, have the right to disclose such filings, approvals and data to (i) governmental agencies of the country to the extent required or desirable to secure government approval for the development, manufacturing or sale of Product(s) in the country, (ii) Third Parties acting on behalf of the Licensee, its Affiliates or licensees, to the extent reasonably necessary for the

- 41 -



development, manufacture, or sale of Product(s) in the country, and (iii) Third Parties to the extent reasonably necessary to market Product(s) in the country.

(c) The Licensee shall have a non-exclusive and royalty-free license under the Licensor Patent Rights and Licensor Know-How, to the extent necessary to allow the Licensee, its Affiliates to develop, manufacture, have manufactured, use, offer to sell, sell, promote, export and import the applicable Product(s) in the Field and in the applicable country(ies).

### 17.3.3   Termination by the Licensee without Cause.

Upon any termination by the Licensee without cause, the rights and licenses granted by the Licensor to the Licensee under this Agreement shall terminate in their entirety or on a country-by-country, on the effective date of termination. All Licensed Rights shall automatically revert back to the Licensor and all payment obligations of Licensee according to Section 9 accrued until the effective date of termination will be due and payable by the Licensee. In addition, Licensee will pay its portion of the costs for any Development activity commenced prior to the termination by Licensee without cause.

### 17.3.4 Termination by the Licensee due to a risk of infringement of a Third-Party Intellectual Property Right.

Upon any termination by the Licensee due to a risk of an infringement of a Third-Party Intellectual Rights, the rights and licenses granted by the Licensor to the Licensee under this Agreement shall terminate in their entirety or on a country-by-country, on the effective date of termination. All Licensed Rights shall automatically revert back to the Licensor.

### 17.3.5 Termination by the Licensee due to failure to launch and commercialize the Product in the European Economic Area (EEA) and/or the United Kingdom, due to a risk of infringement of any Third Party Intellectual Property Right.

Upon any termination by the Licensee due to failure to launch and commercialize the Product in the European Economic Area (EEA) and/or the United Kingdom due to an infringement of any Third Party Intellectual Property Right and the Parties were aware of and identified  in the due diligence process on or prior to the Effective Date, then the rights and licenses granted by the Licensor to the Licensee under this Agreement shall terminate  for all countries pertaining to the EEA and/or the United Kingdom on the effective date of termination and all payment obligations of Licensee according to Section 9 accrued until the effective date of termination will be due and payable by the Licensee. In addition, if the Licensee effects a termination pursuant to this Section 17.3.5 as a result of an infringement of Third Party Intellectual Property Right and the Parties were aware of and identified in the due diligence process on or prior to the Effective Date, then Licensor and Licensee shall enter in good faith into a definitive agreement regarding a royalty payment payable by Licensor to Licensee based on Licensor sales of the Product outside the Territory until the recovery by Licensee of the 50% of its  Development Costs up to the date of termination within ten (10) years  pursuant to this Section 17.3.5.

### 17.4   Ancillary Agreements

Unless otherwise agreed by the Parties, the termination of this Agreement shall cause the automatic termination of all ancillary agreements related hereto.

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac70444b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**17.5    Royalty and Payment Obligations**

Except otherwise agreement, termination of this Agreement by a Party, for any reason, shall not release the Licensee from any obligation to pay royalties or make any payments to the Licensor that are due and payable prior to the effective date of termination except otherwise agreed in the Agreement.

**17.5    Survival**

Section 13.1 (Ownership); Section 15 (Indemnification), Section 16 (Obligation Not to Disclose Confidential Information), Section 17 (Term and Termination), Section 20.1 (Governing Law) and Section 20.3 (Jurisdiction) shall survive any expiration or termination of this Agreement for any reason.

## 18.   Change of Control

Following consummation of any Change of Control, the Parties shall adopt in writing reasonable procedures to prevent the disclosure of sensitive information beyond the Acquired Party's personnel who need to know the sensitive information solely for the purpose of fulfilling the Acquired Party's obligations under this Agreement.

All licenses granted by the Licensor to the Licensee shall remain in effect, subject to the payment obligations under this Agreement.

## 19. Bankruptcy

All rights and licenses granted under or pursuant to any clause of this Agreement, are and will otherwise be deemed to be for purposes of Section 365(n) of the United States Bankruptcy Code (Title 11, U.S. Code), as amended (the "Bankruptcy Code"), licenses of rights to "intellectual property" as defined in Section 101(35A) of the Bankruptcy Code. Licensee will retain and may fully exercise all of its respective rights and elections under the Bankruptcy Code.

Licensor agrees that Licensee, as licensee of such rights under this Agreement, will retain and may fully exercise all of its rights and elections under the Bankruptcy Code or any other provisions of applicable law outside the United States that provide similar protection for "intellectual property." Any agreements supplemental hereto will be deemed to be "agreements supplementary to" this Agreement for purposes of Section 365(n) of the Bankruptcy Code. Intellectual property rights as set out in this clause shall be dealt with in bankruptcy in accordance with US bankruptcy law.

## 20. Miscellaneous

**20.1    Governing Law**

This Agreement shall be governed by and interpreted in accordance with the laws of Delaware (USA) without reference to conflict of laws principles. The validity of the intellectual property rights shall be subject to an evaluation under the law of the country in which the intellectual property rights were applied for or have been issued.



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**20.2    Disputes**

Unless otherwise set forth in this Agreement, in the event of any dispute in connection with this Agreement, such dispute shall be referred to the respective executive officers of the Parties designated below or their designees, for good faith negotiations attempting to resolve the dispute within thirty (30) days after the dispute has been brought to the attention of such executive officers.

**20.3    Jurisdiction**

Should the Parties fail to agree within such thirty (30) day period, the Parties, expressly waiving their right to any other jurisdiction to which they might otherwise be entitled, agree to submit any dispute which may arise with respect to the existence, validity, interpretation, scope, content, performance, suspension, or termination of the Agreement to the jurisdiction of the courts of the Delaware.

**20.4    Assignment**

Neither Party may assign its rights or obligations under this Agreement absent the prior written consent of the other Party, except to any of its Affiliates or in the context of a Change of Control of the Party seeking to assign, in which case such Party in its sole discretion may assign its rights and obligations under this Agreement. In any permitted assignment, all terms of this Agreement shall be binding on the assignee or successor of the assigning Party.

**20.5    Parties in Interest.**

All of the terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of and be enforceable by the Parties hereto and their respective successors and permitted assigns. The covenants and agreements set forth in this Agreement are for the sole benefit of the Parties and their successors and permitted assigns.

**20.6    Debarment**

The Licensor represents and warrants that it has never been debarred, disqualified or banned from practicing medicine and that it is not under investigation by any regulatory authority for debarment, disqualification or any similar regulatory action in any country. The Licensor will notify the Licensee immediately in writing if any such investigation, disqualification, debarment or ban occurs. Any breach of this section shall give the Licensee the right to terminate this Agreement immediately for cause.

**20.7    Independent Contractor**

No employee or representative of either Party shall have any authority to bind or obligate the other Party to this Agreement for any sum or in any manner whatsoever or to create or impose any contractual or other liability on the other Party without said Party's prior written approval. For all purposes, and notwithstanding any other provision of this Agreement to the contrary, the Licensor legal relationship to the Licensee under this Agreement shall be that of independent contractor.

**20.8    Unenforceable Provisions and Severability**

If any of the provisions of this Agreement are held to be void or unenforceable, then such void or unenforceable provisions shall be replaced by valid and enforceable provisions that will achieve as far as

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

possible the economic business intentions of the Parties. However, the remainder of this Agreement will remain in full force and effect, provided that the material interests of the Parties are not affected, i.e. the Parties would presumably have concluded this Agreement without the unenforceable provisions.

## 20.9    Waiver

The failure by either Party to require strict performance and/or observance of any obligation, term, provision or condition under this Agreement will neither constitute a waiver thereof nor affect in any way the right of the respective Party to require such performance and/or observance. The waiver by either Party of a breach of any obligation, term, provision or condition hereunder shall not constitute a waiver of any subsequent breach thereof or of any other obligation, term, provision or condition.

## 20.10    Appendices and Exhibits

All Appendices to this Agreement shall form an integral part to this Agreement.

## 20.11    Amendments

No amendments of the terms and conditions of this Agreement shall be binding upon either Party hereto unless in writing and signed by both Parties.

## 20.12    Invoices

All invoices that are required or permitted hereunder shall be in writing and sent by the Licensor or Licensee (as the case may be)  to the  other Party at the following address or email address, as applicable or other address or email address as the Licensee or Licensor may later notify according to Section 20:

**Licensee**



**Licensor**

## 21. Compliance with Licensee Ethical Code for Third Parties

Licensee is committed to make a positive impact on society and the environment and expects any third party that Licensee collaborates with to commit to the principles of integrity, sustainable development and to aim for the highest standards of our industry with respect to environment, quality, health and safety, as well as human rights and equality.



In this sense, Licensor undertakes to read and comply, at any time, with the values and principles included in the "Ethical Code for Third Parties", provided by Licensee and also available in the following link [Ethical Code for Third Parties_0.pdf (ferrer.com)], and to be able to represent and warrant that the information provided to Licensee regarding compliance with the commitments thereby included is accurate and complete.

Licensor also accepts Licensee's right to monitor its activity and/or to audit documents, records and/or any facilities, directly or through an independent expert, to evidence compliance with the provisions included in such Code.

The breach of the provisions of the "Ethical Code for Third Parties", delay, opposition or negative for the performance of any of the above, will be considered a serious breach of its obligations and it may result in appropriate action, including termination of this Agreement.

### 22. Anticorruption Policy Compliance

Licensor shall prohibit conducts such as corruption, extortion, embezzlement, and fraud. Licensor shall not give, directly or indirectly, special benefits, offer, promise, pay or accept bribes or take beneficial part in any other kind of unlawful incentive in the framework of commercial or governmental relations.
Without limiting the foregoing, Licensor will not: directly or indirectly, pay any money to, or promise, offer or give anything of value to, any Government Official, in order to obtain or retain business or to secure any commercial or financial advantage for Licensee for itself or any Affiliate, consultants, sub distributors or other representatives of Licensor;

offer, promise, or give any financial or other kind advantages to another person where it is intended to bring about the improper performance of a relevant function or activity, or to reward such improper performance; accept any offered or promised advantage given in to obtain improper performance of a relevant function or activity, "improper performance" meaning a breach of expectations that a person will act in good faith, impartially, or in accordance with a position of trust.

Licensor shall be able to reflect financial transactions and dispositions of assets in reasonable detail and to evidence internal accounting controls. In this regard, Licensor also accepts to provide access, not more than once a year, to Licensee, a designated person of Licensee or any independent expert appointed by Licensee to records, accounts or controls to verify compliance with the abovementioned. For the avoidance of doubt, this restricted annual audit shall not apply to for-cause audits, which may be conducted at any time.

Licensor shall also be required to have mechanisms in place to identify and manage conflicts of interests in the most appropriate manner.

**Training on Compliance and Anticorruption**

Licensee may request the Licensor to complete Compliance and Anticorruption training in order to ensure that their officers and/or employees understand and comply with all applicable anticorruption laws, rules and regulations.

- 46 -



**Reporting System on Ethics and Compliance**

In the event of knowing or having suspicions of any breach of Licensee's "Ethical Code for Third Parties", or any misconduct related to bribery and corruption that may affect Licensee or the Products, the Licensor agrees to report it to Licensee and cooperate with Licensee to investigate and resolve any potential breach. For these purposes, the Licensor shall use the form provided by Licensee, available at Licensee's website: . The confidentiality of the persons involved in the investigation as well as the contents of the process will always be guaranteed.

## 23. Data Protection

The Parties acknowledge that, in order to comply with the purpose of this Agreement, it may be necessary to transfer personal data to each other according to the territorial requirements of each Party on data privacy laws and regulations.

Upon the transfer of the personal data, the recipient shall become, according to the provisions of data protection regulation, its responsible or controller and it should be regulated accordingly before the data is being transferred. The Parties should be considered independent controllers unless the Parties themselves, in view of the nature and progress of their relationship, or even the data protection authorities understand otherwise.

Therefore, the Parties, as independent controllers shall be responsible of complying with any applicable data protection laws and regulations that are in force from time to time, and particularly, with the obligation to provide information relating to its data processing to the data subject.

The Parties assure that they have the technical and organizational capabilities to protect personal data against unintentional or unlawful destruction or accidental loss or unintentional alteration, unauthorized disclosure or unauthorized access. The Parties will endeavour to ensure a high level of security and to manage the risks which can arise while processing personal data.

## 24. Notice

All notices that are required or permitted hereunder shall be in writing and sufficient if delivered personally, sent by e-mail (and promptly confirmed by personal delivery, registered or certified mail or overnight courier), sent by nationally recognised overnight courier or sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| **if to Licensor, to:** | Attn: Chief Business Officer<br>131 Oyster Point Blvd, Suite 300<br>South San Francisco, CA 94080 |
| **And a copy (which shall not constitute notice):** | Christopher P. Simpson<br>Polsinelli, PC<br>One International Place<br>Suite 3900<br>Boston, MA 02110<br>Email: csimpson@polsinelli.com |

- 47 -

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

if to Licensee, to:                     Ferrer Internacional S.A.
                                        Av. Diagonal 549, 5th floor
                                        08034 Barcelona
                                        Spain
                                        Attn: Chief Scientific and Business Development Officer
                                        E-mail address: operez@ferrer.com

and:                                    Attn. Chief Legal Officer
                                        E-mail address: mcasas@ferrer.com

or to such other address as the Party to whom notice is to be given may have furnished to the other Party in writing in accordance herewith.

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the Effective Date by their authorised representatives.

**Verge Analytics, Inc.**

7848d5ef-7b4a-3230-9f77-6d652efd310a
2024-03-18 17:04:06 UTC

Name: Alice Zhang

Title: CEO

9d96d674-261b-3acd-84c7-62a00dc7fa1c
2024-03-18 17:03:15 UTC

Name: Jane Rhodes

Title: President and CBO

**Ferrer Internacional S.A.**

0470aeb3-f93c-3f51-a730-2aa23bc3bd92
2024-03-18 17:05:45 UTC

Name: Mario Rovirosa Escosura

Title: CEO

e0b0a8c8-6e19-3a16-a2d2-04a9e7bd1aa6
2024-03-18 17:05:01 UTC

Name: Óscar Pérez Albet

Title: Chief Scientific and Business Development Officer

- 48 -



Advanced Electronic Signing Process ID: 5059e7c6-5996-43ba-8e34-98f4ac7044b0
Document electronically signed through Signaturit, Solutions, S.L. on 18/03/2024 17:05:47 UTC

**List of Exhibits**

Exhibit 1 – Active Ingredient
Exhibit 2 – List of Licensor Know How
Exhibit 3– Development Plan
Exhibit 4 – List of CMO Agreements
Exhibit 5 – Licensor Patent Rights

# EXHIBIT 2

# REDACTED

# Baker McKenzie.

**Baker & McKenzie LLP**

452 Fifth Avenue
New York, NY 10018
United States

Tel: +1 212 626 4100
Fax: +1 212 310 1600
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East & Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Munich
Paris
Prague
Riyadh*
Rome
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Los Angeles
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Washington, DC

\* Associated Firm
\*\* In cooperation with
Trench, Rossi e Watanabe
Advogados

May 31, 2024

Attn: Chief Business Officer
Verge Analytics Inc., d/b/a Verge Genomics
131 Oyster Point Blvd, Suite 300
South San Francisco, CA 94080

**By certified mail**

Christopher P. Simpson
Polsinelli, PC
One International Place, Ste. 3900
Boston, MA 02110

**By email**
csimpson@polsinelli.com

### Notice Of Rescission Of Co-Development And License Agreement

We represent Ferrer Internacional S.A. and hereby inform you that Ferrer hereby fully and finally rescinds the Co-Development and License Agreement by and among Ferrer and Verge Analytics Inc., d/b/a Verge Genomics, dated March 18, 2024 (the "*CDLA*"), based on material misrepresentations and concealment of material facts by Verge prior to entering into the CDLA. As a result of the rescission of the CDLA, the contract is null and void and no amounts are or will be due or owing under the CDLA.

Based on documents uploaded to the common research portal by a Verge contractor on May 7, 2024, Ferrer was made aware *for the first time* ████████████████████████████████ ████████████████████████████████████████████████ This information makes clear that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

Had Ferrer been made aware of the facts surrounding Verge's material, ████████ ████████████████████ prior to entering into the CDLA, it would not have entered into that agreement. Moreover, despite Ferrer's repeated requests for ████████ ████████ prior to execution of the CDLA, Verge made material misrepresentations to and concealed material facts from Ferrer concerning the development of its material, including █ ████████████████████ when responding to those requests. While █████ ████████████████ appear to have preceded the parties' exchange of other relevant regulatory information and execution of the CDLA, one would have to assume that Verge was previously made aware of the issues that gave rise to ████████████████ and, at the very least, that Verge made its representations concerning regulatory issues with reckless

Baker & McKenzie LLP is a member of Baker & McKenzie International.



indifference to their truth or falsity and with the intent that Ferrer rely on those representations that concealed critical, material facts to the contract.

To date, Verge has provided no reasonable explanation for why these materials were concealed from Ferrer prior to execution of the CDLA. Indeed, no such explanation is likely to be plausible. Because Ferrer would never have entered into the CDLA had these facts been provided by Verge, Ferrer hereby provides notice to Verge of Ferrer's full and final rescission of the contract.

Please immediately confirm your understanding that the CDLA has been voided, that Verge will return any amounts paid in connection to that agreement and that the parties are returned to their *status quo ante* prior to execution of the contract.

Sincerely,

Mark C. Goodman

(415) 576-3080
Mark.Goodman@bakermckenzie.com

2