**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRER INTERNACIONAL S.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:24-cv-00694-RGA |
| | ) |
| VERGE ANALYTICS INC. d/b/a VERGE | ) **PUBLIC VERSION FILED:** |
| GENOMICS, | ) December 2, 2025 |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Ferrer Internacional S.A., for its first amended complaint against defendant Verge

Analytics Inc. d/b/a Verge Genomics, states and alleges that:

**NATURE OF THE ACTION**

1.      Plaintiff seeks recission of the Co-Development and License Agreement (Exhibit 1,

the "Agreement") executed by Plaintiff and the defendant on March 18, 2024 and damages as a

result of the defendant's concealment of material facts from Plaintiff at the time of contracting and

subsequently to the time of contracting, facts that, had Plaintiff been aware of them, would have

caused Plaintiff to not enter into the Agreement.

2.      Specifically, the defendant intentionally concealed the existence of a partial Clinical

Hold by the U.S. Food and Drug Administration ("FDA") regarding VRG50635, the material that

was to be developed and licensed under the Agreement.  FDA issued the partial Clinical Hold

because of serious drug-related issues observed in laboratory animals and required the defendant

to conduct a proposed study and provide safety results from that study before moving ahead in the

development plan

1

3.     In addition, during one clinical study (the "003 study"), three patients suffered severe adverse events, two of whom required hospitalization.

4.     None of this material information was disclosed to Plaintiff before the Agreement was executed.  Had Plaintiff known about the partial Clinical Hold, it would not have executed the Agreement.  When Plaintiff discovered the partial Clinical Hold on May 7, 2024 – by one of the defendant's team members surreptitiously uploading documents onto the parties' shared common research portal – Plaintiff undertook an immediate investigation and provided notice of rescission of the Agreement as soon as practicable.

5.     By contrast, the defendant was aware of the partial Clinical Hold well before it executed the Agreement, as it received correspondence regarding the Clinical Hold on January 19, 2024, and received the formal partial Clinical Hold from FDA on February 16, 2024.  Moreover, prior to the parties executing the Agreement, the defendant's Chief Medical Officer and Chief Business Officer/President specifically discussed whether to disclose the partial Clinical Hold to Plaintiff and elected not to do so.

6.     Defendant concealed the partial Clinical Hold from Plaintiff because it knew that, had Plaintiff been made aware of the partial Clinical Hold, Plaintiff would not have entered the Agreement.  Defendant withheld this information notwithstanding the fact that, during the negotiation of the Agreement and at various other times, Plaintiff directly raised with the defendant and its representatives' concerns about the defendant's regulatory compliance and potential of safety issues relating to VRG50635.

7.     Defendant knew that, to placate Plaintiff's concerns, it had to conceal material negative information from Plaintiff and it repeatedly did so to entice Plaintiff to enter into the Agreement.  Defendant also refused to pause ongoing clinical trials to conclude a safety assessment

including proper product characterization, refused to answer Plaintiff's questions and refused to provide information Plaintiff requested, all the while concealing the partial Clinical Hold that would have caused Plaintiff to not enter into the Agreement.

8. At the direction of its senior officers, the defendant waited until early May 2024 to place the partial Clinical Hold documents into the parties' shared data space without mentioning to Plaintiff that it had done so. Defendant did not want to make Plaintiff aware of this information because of the devastating effect this information would have on its ability to close and maintain the deal with Plaintiff.

9. As a result of learning of the defendant's concealment of material information and fraudulent inducement to enter the Agreement, Plaintiff provided the defendant with a Notice of Rescission on May 30, 2024, a true and correct copy of which is attached as Exhibit 2.

## PARTIES

10. Plaintiff is a pharmaceutical company registered to do business in Spain with its principal place of business located at Av. Diagonal, 549, 5th floor, 08029, Barcelona, Spain.

11. Defendant is a Delaware biotechnology corporation with its principal place of business located at 131 Oyster Point Blvd., Suite 300, South San Francisco, California 94080.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Personal jurisdiction exists over the defendant pursuant to Section 20.3 of the Agreement, by which the defendant expressly submitted to the exclusive jurisdiction of the state and federal courts located in the state of Delaware for disputes arising out of the Agreement.

14. Even without the jurisdictional language in the Agreement, personal jurisdiction exists over the defendant because it is incorporated in Delaware.

15. Venue is proper in this Court because Section 20.3 of the Agreement provides that any dispute arising under the Agreement shall be submitted to a court in Delaware, including this Court. Venue is further proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) because the defendant is incorporated in Delaware.

**FACTUAL ALLEGATIONS**

### I. Negotiations For Co-Developing VRG50635

16. In March 2023, during a BIO-Europe convention, the parties began discussing the idea of Plaintiff co-developing VRG50635 for use in Europe, Central America and South America. VRG50635 is a PIKfyve inhibitor that was indicated to treat ALS patients. Defendant opened a data room in April 2023 with initial exchanges of information to allow due diligence relating to the proposed co-development transaction.

17. The parties signed a non-binding Term Sheet to begin negotiations and due diligence on October 24, 2023. The parties started virtual due diligence on October 30, 2023.

### II. Unbeknownst To Plaintiff, A Partial Clinical Hold Is Issued On VRG50635

18. On December 20, 2023, the defendant submitted an investigational new drug application, IND 166524, under section 505(i) of the Federal Food, Drug and Cosmetic Act, for VRG50635.

19. On January 19, 2024, Michelle Mathers of FDA emailed Diego Cadavid, Chief Medical Officer of the defendant, informing the defendant that IND 166524 was placed on a partial Clinical Hold and that the defendant could not initiate any clinical trials with respect to VRG50635 under the IND except as specified. FDA expressly required specific documentation for the

material to be released from the hold, documentation that, on information and belief, was never provided to FDA.

20.    Between January 19 and February 16, 2024, Mr. Cadavid and other employees of the defendant discussed why the partial Clinical Hold was issued and specifically withheld information regarding the partial Clinical Hold from suppliers of components for VRG50635.

21.    On January 22, 2024, the defendant emailed Plaintiff with a regulatory update but omitted any mention of the notice it had received from FDA informing the defendant that IND 166524 was being placed on a partial Clinical Hold. Instead, the defendant told Plaintiff that it received "full approval" from European regulatory authorities in the Netherlands, Belgium, Sweden, Spain and Finland "for CTIS part 1 and full (4) or conditional (1) approval for part 2 to proceed with Verge's ALS proof of concept study VGCS-50635-002." While the defendant referenced FDA in its January 22 email, it misleadingly stated that "FDA has approved Verge's IND to initiate a clinical pharmacology study in the US that will test the new granulated formulation of VRG50635."

22.    FDA followed up with the defendant on February 16, 2024, formally issuing the partial Clinical Hold with respect to VRG50635.

23.    The partial Clinical Hold noted that, as part of IND 166524, the defendant provided clinical data from Study VGCS-50635-001, during which volunteers were administered VRG50635 in single doses of up to 1600 mg and multiple doses of up to 1200 mg daily for 14 days. Defendant reported no adverse events or dose-limiting toxicities as part of the study. However, FDA noted that serious drug-related findings were observed in oral toxicity studies in mice so, for the defendant to proceed beyond that dose and duration, the defendant was required

to provide complete safety results from a proposed study (the 003 study) and provide an appropriate monitoring strategy to avoid serious toxicity in animals.

24.     The 003 study is a Phase 1 study to assess safety and pharmacokinetics data of different dose regimens, different formulations and drug substance processes.  The 003 study followed Study VGCS-50635-002 (the "002 study"), a Phase 1B study using IP batches of new drug substance processes.

25.     The 003 study was beset with issues indicating that VRG50635 was not safe; notably there were two reported Suspected Unexpected Serious Adverse Reactions ("SUSARs") in patients in the study and a serious adverse event in one patient.  Both SUSARs required hospitalization, as the first consisted of mental status changes and the second consisted of an acute kidney injury.  The third serious adverse event was a case of anaphylaxis.

**III.    Defendant Conceals The Hold From Plaintiff To Get It To Execute The Agreement**

26.     The parties' senior leadership participated in a face-to-face negotiation in Boston on February 6, 2024, during which they discussed the approach of the clinical development plan and a preliminary issues list regarding the terms and conditions of the proposed Co-Development and License Agreement.  Mr. Mario Rovirosa (Chief Executive Officer), Mr. Óscar Perez (at the time, Chief Marketing, Pricing & Market Access and Business Development Officer; later, Chief Scientific Officer), Mrs. Meritxell Casas (Chief Legal Officer), Mr. David Ferrando (Business Development Director), Mrs. Anca Craciun Boldeanu (Business Development Head) and Mrs. Ariadna Duran (Legal Counsel) attended for Plaintiff, and Mrs. Jane Rhodes (President and Chief Business Officer), Mr. Diego Cadavid (Chief Medical Officer), Michelle Mighdoll (Senior Director, Business Development and Corporate Strategy) and Chris Simpson (the defendant's

outside counsel) attended for the defendant.  The defendant did not mention the partial Clinical Hold or any FDA action relating to VRG50635 during this face-to-face meeting.

27.    The parties' clinical teams had a face-to-face meeting in Amsterdam on February 23, 2024, during which Plaintiff reviewed all clinical trial information in the proposed Clinical Development Plan.  Those materials did not include the partial Clinical Hold or any reference to action by FDA and the defendant did not mention the partial Clinical Hold or concerns by FDA during the face-to-face meeting.

28.    The defendant did not inform Plaintiff of the Clinical Hold after it received the formal partial Clinical Hold on February 16, 2024.  The defendant emailed Plaintiff on March 4, 2024 about regulatory approvals in the E.U. but did not mention the partial Clinical Hold or any action by FDA.

29.    Two days later, on March 7, 2024, Diego Cadavid and the defendant's Chief Business Officer and President, Jane Rhodes, specifically discussed withholding the partial Clinical Hold's existence from Plaintiff.  Mr. Cadavid stated to Ms. Rhodes in an email, "I have not had a chance to discuss with you whether the letter sent by FDA 2 weeks ago regarding the IND filing should be or is relevant to Ferrer."  Ms. Rhodes and Mr. Cadavid agreed to discuss the matter further over the telephone later that day.

30.    Defendant, through its executive and senior officers, chose to conceal from Plaintiff the existence of the partial Clinical Hold.

31.    The parties executed the Agreement on March 18, 2024.

32.    Appendix 3 of the Agreement includes the Clinical Development Plan, which has a description of the defendant's ongoing clinical trials.  The defendant did not adapt the Clinical

7

Development Plan to reflect the requirements of FDA's partial Clinical Hold or otherwise reference the Clinical Hold.

33.     Throughout the parties' negotiations, Plaintiff requested and received information and updates from the defendant.  As part of the negotiation, Plaintiff expected all pertinent information relating to VRG50635 to be provided.

34.     However, at no point did the defendant tell Plaintiff about the partial Clinical Hold issued by FDA.

**IV.     After Executing The Agreement, Plaintiff Learns About Issues With The 003 Study**

35.     Plaintiff first became aware of the serious safety issues reported in the 003 study on March 27, 2024 – nine days after executing the Agreement – when the defendant revealed the existence of the two SUSARs relating to drug intake in the 003 study.

36.     On April 4, 2024, Plaintiff and the defendant met regarding the SUSARs in the 003 study.  During that meeting, the defendant provided no conclusive information regarding the root cause of the SUSARs and represented that its intent was to continue dosing on the 002 study.

37.     On April 10, 2024, the defendant told Plaintiff that the SUSARs were caused by different meal conditions.  Plaintiff did not accept this explanation and insisted on conducting a proper and complete assessment of the drug substance characterization, toxicology and pharmacokinetics data.  Plaintiff followed up two days later with an email setting forth various questions for the defendant to address to allow Plaintiff to conduct the requested assessment.

38.     On April 16, the parties met for a third time.  During that meeting, the defendant proposed alternative dosing for the 002 study not addressing Plaintiff's previous request.  Plaintiff rejected this proposal and, concerned about further SUSARs, asked the defendant to reassess clinical testing to secure product safety before continuing.  At that meeting, Plaintiff first learned about the anaphylaxis event in the 003 study.

39.    That same day, Plaintiff sent the defendant a letter requesting a temporary suspension of all clinical activities because of the incomplete information provided by the defendant and a lack of conclusive explanation or clear investigation hypothesis for the events reported to that date.  Plaintiff's primary concerns were the safety record and the feasibility of regulatory acceptance due to the SUSARs.  Plaintiff was unaware that FDA had already issued a partial Clinical Hold on VRG50635.

40.    On April 18, 2024, Plaintiff called a meeting of the Joint Steering Committee, which was required under the Agreement to manage the contractual Clinical Development Plan.  At that meeting, Plaintiff and the defendant confirmed their different approaches with regard to the continuity of the Clinical Development Plan.  In essence, Plaintiff wished to reassess all clinical testing to secure product safety, and the defendant wanted to continue as if nothing had happened.

41.    Defendant responded to Plaintiff's April 16 letter by letter dated April 19.  That letter blamed a food effect for the adverse health effects and stated that the defendant intended to maintain full activity for the 002 study.

42.    Plaintiff responded to the defendant's April 19 letter on April 25.  Plaintiff reiterated its previously communicated position that clinical development plan should be reassessed and the defendant must immediately provide the requested clinical and CMC-related information.

43.    Defendant refused to temporarily pause the ongoing clinical trials and reassess the overall clinical development plan, and did not provide the requested information.

## V.    Two Months After Executing The Agreement, Plaintiff Discovers The Partial Clinical Hold

44.    On May 7, 2024, Plaintiff first learned that the defendant had been issued an FDA partial Clinical Hold.  Plaintiff did not learn that critical fact from the defendant; Plaintiff only became aware that there were issues with the drug that it had contracted for when one of the

defendant's team members uploaded the partial Clinical Hold documents to the parties' research portal.

45.    Deeply concerned about the viability of the Agreement in light of the FDA action, Plaintiff immediately requested information relating to the partial Clinical Hold.   Plaintiff requested the full package of regulatory documentation, including all correspondence, information about the batches and the manufacturing processes of the material administered to each subject of the study, safety events reports and follow-up and the long-term pre-clinical data.  Defendant failed and refused to provide the requested information to Plaintiff.

46.    Plaintiff subsequently discovered that the 003 study did not have a well-established pharmacovigilance system and that there were discrepancies with respect to the relevant documentation versions.

47.    Since the defendant had failed to disclose and/or concealed information that was material to the Agreement, refused to provide requested information and declined to reassess the clinical trials of VRG50635, Plaintiff had no choice but to rescind the Agreement pursuant to its terms.  On May 30, 2024, Plaintiff sent a Notice of Rescission of Co-Development and License Agreement to the defendant, informing the defendant that the Agreement was null and void.

## <u>COUNT I: FIRST CLAIM FOR RELIEF</u>

### (Rescission)

48.    Plaintiff hereby incorporates by reference paragraphs 1 through 47 above as though set forth herein in full.

49.    Plaintiff and the defendant executed the Agreement on March 18, 2024.  The Agreement provides for Plaintiff to exclusively license VRG50635 to research, manufacture, distribute and sell the drug in Europe, Central America and South America.  The parties agreed to

establish a Joint Steering Committee, with representatives from each side, to manage the Development Plan for VRG50635, including development tasks, timelines, costs and expected development activities for obtaining regulatory approvals.  For its exclusive license, Plaintiff was to pay the defendant an upfront fee of €15 million and 30% of the defendant's development costs already incurred, and up to €39 million in milestone payments as the parties achieved certain milestones with regard to product development and royalties relating to any sales.  Attached hereto as **Exhibit 1** is a true and correct copy of the Agreement.

50.	Under the Agreement, either party had the right to terminate the Agreement upon a material breach by the other party, and Plaintiff had the right to terminate the Agreement without cause, due to the defendant ceasing development, due to risk of infringement of a third-party intellectual property right and due to failure to launch and commercialize the drug in Europe and/or the U.K. due to infringement of any third-party intellectual property right.

51.	On May 7, 2024, Plaintiff was made aware for the first time that the defendant had received a partial Clinical Hold from FDA before the Agreement was executed.  Plaintiff also learned that the defendant had been informed about the partial Clinical Hold on January 19, 2024. Despite knowing this critical information that bears directly on the Agreement, the defendant did not disclose the information to Plaintiff before the Agreement was executed.  In fact, Plaintiff did not learn about the partial Clinical Hold from the defendant at all.

52.	FDA's partial Clinical Hold was material information to Plaintiff with respect to whether to enter into the Agreement or any contract relating to the licensing and distribution of VRG50635.  FDA's partial Clinical Hold indicated a serious risk that FDA would not approve the drug, which would make the Agreement worthless or, at the very least, significantly diminish its

11

value.  Plaintiff would not have entered the Agreement had it known this information at the time of contracting.

53.    The fact that VRG50635 posed potentially significant health risks to patients was also material information to Plaintiff.  Plaintiff would never wish to license or distribute a dangerous product.

54.    Plaintiff repeatedly requested all regulatory information prior to executing the Agreement but the defendant, despite knowing of the partial Clinical Hold, did not disclose this information to Plaintiff.

55.    On information and belief, the defendant concealed this information from Plaintiff to induce Plaintiff to enter into the Agreement, since it knew that Plaintiff would not enter into a licensing agreement for a product that was subject to a partial Clinical Hold from FDA.

56.    Plaintiff entered into the Agreement because it believed that the defendant and the product did not have any regulatory issues.  These beliefs would have changed had the true facts been disclosed by the defendant.

57.    Plaintiff provided notice of rescission as provided by the terms of the Agreement.

## COUNT II: SECOND CLAIM FOR RELIEF

### (Fraudulent Concealment and Common Law Fraud)

58.    Plaintiff hereby incorporates by reference paragraphs 1 through 57 above as though set forth herein in full.

59.    Defendant misrepresented, omitted and/or concealed multiple material facts during the negotiations prior to and since the execution of the Agreement.

60.    On January 19, 2024, Michelle Mathers of FDA notified the defendant that the FDA was placing IND 166524 on a partial Clinical Hold based on FDA's significant concerns regarding

toxicity of VRG50635 in animal studies.  Specifically, FDA noted that serious drug-related findings were observed in oral toxicity studies in mice, requiring the defendant to provide complete safety results from a proposed study and an appropriate monitoring strategy to avoid serious toxicity in animals to proceed beyond their initial dose and duration regimen for the 003 Study.

61.    The partial Clinical Hold constituted a material fact as to which the defendant owed Plaintiff a duty to disclose.  Defendant specifically chose to conceal the Clinical Hold and to misrepresent the safety and efficacy of VRG50635 to induce Plaintiff to enter into and maintain the Agreement.  Defendant knew that Plaintiff would not enter into or remain in a licensing agreement to develop a product that was subject to a partial Clinical Hold from FDA, especially when the Clinical Hold was due to significant toxicity issues with the drug that posed safety risks to subjects and, ultimately, patients.

62.    Only three days after FDA's issuance of the Clinical Hold, on January 22, 2024, the defendant provided a regulatory update to Plaintiff that purported to represent that FDA had approved without limitation the defendant's proposal "to initiate a clinical pharmacology study in the US that will test the new granulated formulation of VRG50635."  In reality, the defendant knowingly and intentionally withheld the existence of the Clinical Hold and misrepresented the true nature of FDA's position and the safety and efficacy of VRG50635.  Defendant's statement to Plaintiff on January 22, 2024 was false, misleading and incomplete in failing to reveal the existing Clinical Hold issued by  FDA because VRG50635 had shown serious toxicity in animal studies.

63.    Defendant's Chief Medical Officer, Diego Cadavid, and Chief Business Officer/President, Jane Rhodes, specifically discussed withholding the partial Clinical Hold from Plaintiff.  Mr. Cadavid stated to Ms. Rhodes in an email on March 7, 2024, "I have not had a

chance to discuss with you whether the letter sent by FDA 2 weeks ago regarding the IND filing should be or is relevant to Ferrer." Ms. Rhodes and Mr. Cadavid agreed to discuss the matter further over the telephone later that day.

64. Plaintiff repeatedly requested current information regarding regulatory compliance and updates as part of Plaintiff's due diligence process before signing the Agreement. In addition, in the 59 days between FDA's issuance of the partial Clinical Hold to the defendant and the execution of the Agreement, the parties met face-to-face twice, exchanged numerous communications regarding regulatory updates and had other discussions about VRG50635. As a result, the defendant had many opportunities to disclose the partial Clinical Hold to Plaintiff. Rather than disclose the Clinical Hold as it was required to do, the defendant purposefully misrepresented FDA's position on VRG50635 and revealed only partial information regarding regulatory compliance. Defendant knew the Clinical Hold would negatively impact negotiations regarding the Agreement. Without knowing about the partial Clinical Hold, and after being misled about the safety and efficacy of VRG50635, Plaintiff entered into the Agreement in justifiable reliance on the defendant's misrepresentations. If Plaintiff had known that VRG50635 had safety and efficacy issues and/or was subject to a partial Clinical Hold, Plaintiff would not have entered into the Agreement with the defendant.

65. Defendant had a duty to provide this material information to Plaintiff as soon as the defendant became aware of it but, in any event, well before Plaintiff executed the Agreement. However, the partial Clinical Hold document was not disclosed to Plaintiff until it was uploaded to the parties' shared data room on May 7, 2024, without notice and approximately 50 days after the execution of the Agreement.

66.     Defendant acted with knowledge, intent and/or reckless disregard when misrepresenting, concealing and/or omitting the safety and efficacy of VRG50635 and/or the partial Clinical Hold.  Defendant's fraudulent representations and concealment of material information from Plaintiff caused Plaintiff to enter into the Agreement and thereby incur obligations and costs that Plaintiff would not have otherwise incurred.  Defendant's intentional or reckless misrepresentations, concealment and/or omission regarding VRG50635 and/or the partial Clinical Hold were relied on by Plaintiff to its detriment, using extensive damages to Plaintiff in an amount to be proven at trial.

67.     Defendant's conduct in causing harm to Plaintiff was malicious, oppressive and fraudulent, requiring punitive and exemplary damages to be awarded against the defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for Judgment in Plaintiff's favor and against the defendant and that provides the following relief to Plaintiff:

1.     A declaration that the Agreement is rescinded and was null and void from its inception;

2.     An award of economic damages to Plaintiff resulting from the defendant's fraud in an amount to be proven at trial;

3.     An award of punitive and exemplary damages against the defendant as a result of its malicious, oppressive and/or fraudulent conduct;

4.     Pre- and post-judgment interest on damages as allowed by law;

5.     Attorneys' fees and costs of suit herein incurred;

6.     An order that defendant take nothing by its counterclaims; and

7.     Any further relief that the Court deems just and proper.

*Of Counsel*:

BAKER & MCKENZIE LLP

Mark C. Goodman
Two Embarcadero Center, 11th Floor
San Francisco, CA 94111
(415) 576-3000
mark.goodman@bakermckenzie.com

Alexander D. Burch
800 Capitol Street, Suite 2100
Houston, Texas 77002
(713) 427-5000
alexander.burch@bakermckenzie.com

Carson J. Henderson
1900 North Pearl Street, Suite 1500
Dallas, Texas 75201
(214) 978-3000
carson.henderson@bakermckenzie.com

Dated:  November 25, 2025

**PUBLIC VERSION FILED:**
December 2, 2025

ROSS ARONSTAM & MORITZ LLP

*/s/ Adam D. Gold*
Bradley R. Aronstam (#5129)
Adam D. Gold (#6412)
Thomas A. Barr (#5589)
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, DE 19801
(302) 576-1600
baronstam@ramllp.com
agold@ramllp.com
tbarr@ramllp.com

*Attorneys for Plaintiff*
*Ferrer Internacional S.A.*

16