**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRER INTERNACIONAL S.A., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) C.A. No. 24-694-RGA |
| | ) |
| VERGE ANALYTICS INC. d/b/a VERGE | ) |
| GENOMICS, | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |

**VERGE ANALYTICS INC. D/B/A VERGE GENOMICS' ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS**

Verge Analytics, Inc. d/b/a Verge Genomics ("**Verge**") files its Answer and Counterclaims in response to the First Amended Complaint filed by Ferrer Internacional, S.A. ("**Ferrer**") as follows:

1.      Verge denies Ferrer is entitled to rescind the Co-Development and License Agreement executed by Verge and Ferrer on March 18, 2024 (the "**CDLA**"). Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time and denies Ferrer is entitled to damages. Verge avers that Verge and Ferrer conducted a diligence process while negotiating the contractual terms of the CDLA during which Ferrer sought a regional co-development license outside North America, and Verge responded to all questions posed by Ferrer and provided access to a virtual data room with all documents requested by Ferrer. The remaining allegations are denied.

2.      The first sentence of Paragraph 2 is denied. Verge avers that the U.S. Food and Drug Administration ("**FDA**") approved Verge to proceed with its Investigational New Drug Application 166524 (the "**IND**") for VRG50635 (the "**Product**") and to conduct Verge's proposed study VGCS-50635-003 in the United States involving clinical trials in healthy adult volunteers of

1

up to fourteen (14) day dosing duration (the "**003 Study**"), and that FDA notified Verge of its approval through a January 19, 2024, email and the February 16, 2024, letter from FDA (together, the "**FDA Correspondence**"). Verge avers the FDA Correspondence notified Verge of a partial clinical hold to the extent that Verge could not proceed with clinical trials in humans dosing beyond fourteen (14) days in the United States—studies which Verge had not requested to perform in the submitted IND application—pending submission of additional information requested by FDA. Verge further avers the FDA Correspondence was confined to the United States and not directed at study VGCS-50635-002 in Canada and Europe (the "**002 Study**") and, therefore, did not fall within Ferrer's "Territory" as defined in the CDLA. The remaining allegations are denied.

3. It is admitted three Serious Adverse Events ("**SAEs**") occurred during the 003 Study and that two participants were admitted to a hospital for evaluation and treatment. It is denied any "patients" suffered adverse events because the 003 Study dosed healthy volunteers only. The remaining allegations are denied.

4. Verge denies the first sentence of Paragraph 4. Verge avers that all of the underlying research data on which FDA referenced or relied upon in the FDA Correspondence was disclosed and provided to Ferrer before execution of the CDLA, and the CDLA attached and incorporated a Clinical Development Plan, which included the limitation imposed by FDA's partial clinical hold. To the extent Ferrer alleges the SAEs were "material information," Verge avers that the SAEs did not occur until after the CDLA was executed. Verge admits that it directed a Verge team member to upload and share with Ferrer the FDA Correspondence through the parties' common research portal along with other FDA and Health Canada correspondence, which information and documents Ferrer requested for the first time after executing the CDLA and after the SAEs. To the extent Paragraph 4 implies that Verge unintentionally or surreptitiously disclosed the FDA

Correspondence to Ferrer, those allegations are denied. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

5.      Verge admits it received the FDA Correspondence. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

6.      Verge admits it received the FDA Correspondence. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. Verge avers that all of the underlying research data on which FDA referenced or relied upon in the FDA Correspondence was disclosed and provided to Ferrer before execution of the CDLA, and the CDLA attached and incorporated a Clinical Development Plan, which included the limitation imposed by FDA's partial clinical hold. The remaining allegations are denied.

7.      Verge denies the first sentence of Paragraph 7. Verge denies that it "refused" to pause the ongoing clinical trials or "refused" to answer Ferrer's questions or to provide information Ferrer requested. Verge avers that it voluntarily paused the 003 Study in the United States, and Ferrer's request to pause the 002 Study in Canada and Europe constituted a material change to the agreed-upon Clinical Development Plan, which Verge was not required to accept under the CDLA. Verge further avers that Ferrer's request to pause the 002 Study was not supported by the independent Data Monitoring Committee or by independent experts. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

8.      Verge admits that it directed a Verge team member to upload and share with Ferrer the FDA Correspondence through the parties' common research portal along with other FDA and

3

Health Canada correspondence, which information and documents Ferrer requested for the first time after executing the CDLA and after the SAEs. To the extent Paragraph 8 implies that Verge unintentionally disclosed the FDA Correspondence with Ferrer, those allegations are denied. Verge denies any allegation or inference that Verge intentionally concealed any material information.

9.      Verge admits that Ferrer's litigation counsel sent a letter purporting to rescind the CDLA, but Verge denies Ferrer was entitled to rescission and denies that the notice was provided on May 30, 2024. The letter, which Ferrer attached as Exhibit 2 to its Complaint, was dated May 31, 2024. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Verge admits that Michelle Mathers of FDA emailed Diego Cadavid of Verge on January 19, 2024. Verge avers that Ms. Mathers informed Verge that FDA approved Verge to proceed with the conduct of the 003 Study proposed in the IND application. Verge avers that Ms. Mathers' email notified Verge of a partial clinical hold to the extent that FDA determined Verge

4

could not proceed with clinical trials in humans dosing beyond fourteen (14) days in the United States—studies which Verge had not requested to perform in the submitted IND application—pending submission of additional information requested by FDA. The remaining allegations are denied.

20.    Verge admits Mr. Cadavid and other Verge employees communicated about the Partial Clinical Hold. The remaining allegations are denied.

21.    Verge admits that it emailed Ferrer on January 22, 2024, but Verge denies the email was intended to be a comprehensive update on all regulatory matters or a complete recitation of all correspondence with regulators in all regions or countries, including those regions and countries outside the "Territory" as defined in the CDLA. Verge admits it informed Ferrer that FDA approved the IND for the 003 Study as proposed by Verge. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

22.    Verge admits that FDA sent Verge a letter on February 16, 2024, confirming that FDA approved Verge to proceed with the conduct of the 003 Study proposed in the IND application and notifying Verge of a partial clinical hold to the extent that FDA determined Verge could not proceed with clinical trials in humans dosing beyond fourteen (14) days in the United States—studies which Verge had not requested to perform in the submitted IND application—pending submission of additional information requested by FDA. The remaining allegations are denied.

23.    The first sentence of Paragraph 23 is admitted. The second sentence is admitted because there were no SAEs or dose-limiting toxicities as part of Study VGCS-50635-001 (the "**001 Study**"). Verge avers that FDA's observation in the FDA Correspondence relating to alleged

toxicity was not directed at the 001 Study but rather Verge's nonclinical toxicity studies in laboratory animals, which studies were dose ranging and included high doses to select the range viable for clinical trials in humans, such as the 002 and 003 Studies. Verge avers that all of the underlying research data on which FDA referenced or relied upon in the FDA Correspondence was disclosed and provided to Ferrer before execution of the CDLA, and the CDLA attached and incorporated a Clinical Development Plan, which included the limitation imposed by FDA's partial clinical hold. The remaining allegations are denied.

24.     The first sentence of Paragraph 24 is admitted. The second sentence is denied. Verge avers that the 002 Study was ongoing in Europe and Canada when the 003 Study began.

25.     Verge denies that the 003 Study was "beset with issues indicating [the Product] was not safe." It is admitted three SAEs occurred during the 003 Study, two of which were referred to as Serious Unexpected Serious Adverse Reactions, and that two participants were admitted to a hospital for evaluation and treatment. It is denied the SAEs involved "patients" because the 003 Study dosed healthy volunteers only. The remaining allegations are denied.

26.     Verge admits that the parties' senior leadership met in a face-to-face meeting in Boston on February 6, 2024. The second sentence of Paragraph 26 is admitted. Verge denies any allegation or inference that Verge intentionally concealed any material information during the meeting. Verge avers the purpose and objective of the meeting was to agree and finalize the Clinical Development Plan to append to the CDLA. Verge avers that discussion focused on the 002 Study and the incorporation of European regulatory feedback into the Clinical Development Plan. Verge avers that Ferrer did not request any information or regulatory update regarding FDA or the 003 Study during the meeting. The remaining allegations are denied.

27.    Verge admits that Diego Cadavid of Verge met with Ferrer's representatives in Amsterdam on February 23, 2024. Verge denies any allegation or inference that Verge intentionally concealed any material information during the meeting. Verge avers the purpose and objective of the meeting was for Mr. Cadavid to educate Ferrer's representatives on the Clinical Development Plan for the 002 Study, part of which was being conducted in Ferrer's "Territory" as defined in the CDLA. Verge avers that Ferrer did not request any information or regulatory update regarding FDA or the 003 Study during the meeting. The remaining allegations are denied.

28.    Verge admits that it emailed Ferrer with an update on European regulatory approvals because Ferrer specifically requested an update on European regulatory approvals. Verge avers that Ferrer did not request an update on United States regulatory approvals, including all FDA correspondence. Verge denies the allegation that it "did not inform" and "did not mention" the FDA Correspondence to Ferrer, as the FDA Correspondence was not encompassed by any request Ferrer made. Verge denies any allegation or inference that Verge intentionally concealed any material information. The remaining allegations are denied.

29.    The first sentence of Paragraph 29 is denied. Verge admits that Mr. Cadavid and Ms. Rhodes communicated about the Partial Clinical Hold by email on March 7, 2024. The email is the best evidence of its content, and Verge denies any allegations inconsistent with the email. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

30.    Denied.

31.    Admitted.

32.    The first sentence of Paragraph 32 is admitted to the extent the Clinical Development Plan was variously referred to as "Exhibit 3" or "Appendix 3" in the CDLA. The

second sentence is denied to the extent it implies Verge was obligated to "adapt" the Clinical Development Plan.  Verge avers that FDA approved the IND for the 003 Study as proposed by Verge. Verge avers that the Clinical Development Plan attached to and incorporated with the CDLA included the relevant details of the partial clinical hold from the FDA Correspondence and specifically stated that "Study 003 can proceed Jan '2024 (002 not filed); FDA wants to see results of 003 before approving ALS trials." Verge further avers that the Clinical Development Plan in the CDLA stated, "Will add US sites to Study 002 Cohort 2 if there is a Go; will provide 003 data and chronic tox data to FDA." Verge denies any allegation or inference that Verge intentionally concealed any material information.

33.    The first sentence of Paragraph 33 is admitted. The second sentence is admitted to the extent it confirms that Ferrer did not request information or documents that would encompass the FDA Correspondence, but rather had an unstated "expectation" about what it should receive. Verge denies any allegation or inference that Verge intentionally concealed any material information.

34.    Denied. Verge avers that it directed a Verge team member to upload and share with Ferrer the FDA Correspondence through the parties' common research portal along with other FDA and Health Canada correspondence, which information Ferrer requested for the first time after executing the CDLA and after the SAEs. Verge denies any allegation or inference that Verge intentionally concealed any material information.

35.    Denied to the extent Paragraph 35 suggests or implies the SAEs occurred before the CDLA was executed. Verge avers that the first SAE occurred March 25, 2024, and the second SAE occurred on March 26, 2024—both after the CDLA was executed. Verge avers that it first reported and disclosed those SAEs to Ferrer on March 26, 2024.

36.     The first sentence of Paragraph 36 is admitted. The second sentence is denied.

37.     The first sentence of Paragraph 37 is denied. Verge avers that it provided a hypothesis explaining the SAEs and proposed a series of investigational studies to test the hypothesis. It is admitted Ferrer did not accept Verge's hypothesis. It is admitted Ferrer sent a follow up email with a variety of questions. The remaining allegations are denied.

38.     The first sentence of Paragraph 38 is admitted. It is admitted that Verge made a proposal for alternative dosing for the 002 Study during the April 16, 2024, meeting, and Verge avers that its proposal was supported by the independent Data Monitoring Committee and independent experts. It is admitted Ferrer rejected Verge's proposal and asked to pause and reassess all clinical testing, including the 002 Study. The remaining allegations are denied.

39.     Verge admits that Ferrer sent Verge a letter on April 16, 2024, and demanded all clinical activities be suspended, but Verge denies Ferrer's demanded suspension would have been "temporary." Verge avers that Ferrer's demanded suspension of the 002 Study would have required all subjects to be released from the 002 Study and the Study effectively terminated, thereby incurring a six (6) to twelve (12) month delay to the 002 Study. Verge admits that it did not accept Ferrer's demands because, among other reasons, the independent Data Monitoring Committee and independent experts did not support Ferrer's position. Verge denies that Ferrer was primarily concerned with "safety." Verge denies any allegation or inference that Verge intentionally concealed any material information. The remaining allegations are denied.

40.     Verge admits the Joint Steering Committee met on April 18, 2024. Verge admits that Ferrer proposed material alterations to the Clinical Development Plan, and Verge avers that the independent Data Monitoring Committee and independent experts did not support Ferrer's proposals. Verge avers that its proposed changes were supported and recommended by the

9

independent Data Monitoring Committee and independent experts. The remaining allegations are denied.

41.    The first sentence of Paragraph 41 is admitted. Verge avers that it provided a hypothesis explaining the SAEs and proposed a series of investigational studies to test the hypothesis. The remaining allegations are denied.

42.    The first sentence of Paragraph 42 is admitted. The second sentence is denied in that Ferrer demanded a suspension of the 002 Study and all clinical activities, not merely a "reassessment." The remaining allegations are admitted.

43.    Verge admits that it did not agree to "pause" the 002 Study, but Verge denies that any such "pause" would be "temporary." Verge denies that it "did not provide the requested information." Verge avers that it populated a comprehensive data room regarding the SAEs, included Ferrer personnel in all clinical development team meetings, meetings of the Data Monitoring Committee, and Chemistry Manufacturing and Controls meetings; and expediently provided extensive information to Ferrer as requested. Verge denies any allegation or inference that Verge intentionally concealed any material information. The remaining allegations are denied.

44.    To the extent Paragraph 44 implies that Verge unintentionally disclosed the FDA Correspondence to Ferrer, those allegations are denied. Verge avers that it directed a Verge team member to upload and share with Ferrer the FDA Correspondence through the parties' common research portal along with other FDA and Health Canada correspondence, which information and documents Ferrer requested for the first time after executing the CDLA and after the SAEs. Verge denies any allegation or inference that Verge intentionally concealed any material information. The remaining allegations are denied.

10

45.     The first sentence of Paragraph 45 is denied. Verge admits that Ferrer began requesting the information and documents reflected in the second sentence of Paragraph 45 for the first time after the SAEs, but Verge denies that Ferrer expressed concerns about the viability of the CDLA or the FDA Correspondence, including but not limited to FDA's notification to Verge of a partial clinical hold. Verge denies that it "failed and refused to provide the requested information to Plaintiff." Verge avers that it populated a comprehensive data room regarding the SAEs; included Ferrer personnel in all clinical development team meetings, meetings of the Data Monitoring Committee, and Chemistry Manufacturing and Controls meetings; and expediently provided extensive information to Ferrer as requested. Verge denies any allegation or inference that Verge intentionally concealed any material information. The remaining allegations are denied.

46.     Denied.

47.     The first sentence of Paragraph 47 is denied. Verge admits that Ferrer's litigation counsel sent a letter purporting to rescind the CDLA, but Verge denies Ferrer was entitled to rescission and denies that the notice was provided on May 30, 2024. The letter, which Ferrer attached as Exhibit 2 to its Complaint, was dated May 31, 2024. The remaining allegations are denied.

<u>**COUNT I: FIRST CLAIM FOR RELIEF**</u>

**(Recission)**

48.     Verge incorporates by reference its responses to the preceding paragraphs as if restated fully herein.

49.     The first sentence of Paragraph 49 is admitted. The second and third sentences are denied as stated. The fourth sentence is admitted. It is admitted that Ferrer attached a copy of the CDLA as Exhibit 1 to the Complaint, but the copy Ferrer attached did not include the CDLA's "Exhibits" or "Appendices," including the Clinical Development Plan.

11

50.     The allegations of Paragraph 50 are denied as stated.

51.     Verge admits that it directed a Verge team member to upload and share with Ferrer the FDA Correspondence through the parties' common research portal along with other FDA and Health Canada correspondence, which information and documents Ferrer requested for the first time after executing the CDLA and after the SAEs. To the extent Paragraph 51 implies that Verge unintentionally disclosed the FDA Correspondence with Ferrer, those allegations are denied. Verge denies any allegation or inference that Verge intentionally concealed any material information. Verge avers that all of the underlying research data on which FDA referenced or relied upon in the FDA Correspondence was disclosed and provided to Ferrer before execution of the CDLA, and the CDLA attached and incorporated a Clinical Development Plan, which included the limitation imposed by FDA's partial clinical hold. The remaining allegations are denied.

52.     Denied.

53.     The first sentence of Paragraph 53 is denied. Verge does not have sufficient knowledge or information to admit or deny the second sentence of Paragraph 53 and, therefore, it is denied.

54.     Denied.

55.     Denied.

56.     Verge denies any allegation or inference that Verge intentionally concealed any material information. Verge does not have sufficient knowledge or information to admit or deny the remaining allegations of Paragraph 56 and, therefore, they are denied.

57.     Denied.

## COUNT II: SECOND CLAIM FOR RELIEF

### (Fraudulent Concealment and Common Law Fraud)

58.     Verge incorporates by reference its responses to the preceding paragraphs as if restated fully herein.

59.     Denied.

60.     Verge admits that Michelle Mathers of FDA emailed Mr. Cadavid of Verge on January 19, 2024. Verge avers that Ms. Mathers' email notified Verge of a partial clinical hold to the extent that FDA determined Verge could not proceed with clinical trials in humans dosing beyond fourteen (14) days in the United States—studies which Verge had not requested to perform in the submitted IND application—pending submission of additional information requested by FDA. The remaining allegations are denied as stated.

61.     Denied.

62.     Verge admits that it emailed Ferrer on January 22, 2024, but Verge denies the email was intended to be a comprehensive update on all regulatory matters or a complete recitation of all correspondence with regulators in all regions or countries, including those regions and countries outside the "Territory" as defined in the CDLA. Verge admits it informed Ferrer that FDA approved the IND for the 003 Study as proposed by Verge. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

63.     The first sentence of Paragraph 63 is denied. Verge admits that Mr. Cadavid and Ms. Rhodes communicated about the Partial Clinical Hold by email on March 7, 2024. The email is the best evidence of its content, and Verge denies any allegations inconsistent with the email. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

64.    Denied.

65.    Verge admits that it directed a Verge team member to upload and share with Ferrer the FDA Correspondence through the parties' common research portal along with other FDA and Health Canada correspondence, which information and documents Ferrer requested for the first time after executing the CDLA and after the SAEs. Verge denies any allegation or inference that Verge intentionally concealed any material facts from Ferrer at any time. The remaining allegations are denied.

66.    Denied.

67.    Denied.

## AFFIRMATIVE DEFENSES

Verge states the following defenses and reserves its right to assert other and additional defenses and claims not asserted herein of which it becomes aware through discovery or other investigation as may be appropriate at a later time. In asserting these defenses, Verge does not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon Ferrer. Verge expressly reserves the right to supplement and/or amend its Answer.

1.    The Complaint fails to state a claim for which relief may be granted as to Ferrer, and Ferrer's claims should be dismissed with prejudice.

2.    Ferrer has not sustained any damages because of the acts and omissions alleged in the First Amended Complaint, and Ferrer's claims should be dismissed with prejudice.

3.    Ferrer's claims are barred because Ferrer first materially breached the CDLA and repudiated its obligations under the CDLA.

14

4.      Ferrer is not entitled to rescission of the CDLA or an award of damages because Verge did not intentionally conceal any material information from Ferrer and had no legal obligation to disclose the information on which Ferrer founds its Complaint.

5.      Ferrer's claims should be barred by the doctrine of unclean hands.

6.      Ferrer's claims should be barred or its alleged damages, if any, reduced for failure to mitigate because its alleged damages, if any, could have been avoided with reasonable efforts, but Ferrer failed to take reasonable steps to avoid harm.

7.      Ferrer's claim should be barred by the doctrine of waiver.

## COUNTERCLAIMS

Verge Analytics, Inc. d/b/a Verge Genomics ("**Verge**"), now having fully answered, asserts the following Counterclaims against Ferrer Internacional, S.A. ("**Ferrer**") and alleges as follows:

## NATURE OF THE ACTION

1.      Ferrer filed suit against Verge seeking this Court's blessing in its attempt to run away from its contractual commitments—including multi-million-Euro financial obligations—by claiming it is entitled to rescind the Co-Development and License Agreement executed by Verge and Ferrer on March 18, 2024 (the "**CDLA**").

2.      Ferrer concocted its rescission arguments only after it unsuccessfully attempted to strongarm Verge into giving up rights retained by and granted to Verge under the CDLA.

3.      Specifically, Ferrer withheld a Fifteen Million Euro (€15,000,000.00) payment Ferrer was contractually obligated to pay upon execution of the CDLA.

4.      Ferrer used its withholding of that payment—along with other multi-million-Euro payment obligations it refused and failed to pay—while attempting to extract concessions from Verge that Ferrer had not bargained for and to alter the parties' agreement.

15

5.      Ferrer's unreasonable and misguided demands flew in the face of the recommendations of multiple independent outside clinicians, scientists, and experts, including the independent Data Monitoring Committee, which was charged with overseeing the clinical trials to ensure vigilant and compliant conduct of the trial and the safety of all subjects.

6.      When Verge refused to bow to Ferrer and demanded payment of the by-then overdue payments, Ferrer sent a notice purporting to "rescind" the CDLA premised on the false notion that Verge concealed "material information" from Ferrer before and after the parties signed the CDLA.

7.      Ferrer has no legal or factual basis for rescission of the CDLA.

8.      Verge did not materially misrepresent or conceal any material facts from Ferrer at any time.

9.      Ferrer materially breached the CDLA, and Verge is entitled to recover all amounts due and owing under the CDLA, along with interest and its attorneys' fees.

## **PARTIES**

10.     Verge is a clinical-stage biotechnology company focused on developing therapeutics for complex diseases with high unmet need using human genomics from patient disease tissues and machine learning. Verge is incorporated in Delaware with its registered office at 131 Oyster Point Blvd., Suite 300, South San Francisco, California 94080.

11.     Ferrer manufactures and markets pharmaceuticals and chemical products. Ferrer is a company registered in Spain having its registered office at Av. Diagonal, 549, 5th floor, 08029, Barcelona, Spain.

16

## JURISDICTION

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Personal jurisdiction exists over Ferrer pursuant to Section 20.3 of the CDLA.

14.     Venue is proper in this Court pursuant to Section 20.3 of the CDLA and pursuant to 28 U.S.C. § 1391(c)(2) and (3).

## FACTUAL BACKGROUND

### I.     Verge developed a breakthrough pharmaceutical product, VRG50635, which has the potential to treat Amyotrophic Lateral Sclerosis.

15.     Verge developed and is the sole and full owner of certain patents, technology, know-how, and other intellectual property rights relating to a compound known and identified as VRG50635 (the "**Product**")—Verge's principal drug candidate for the treatment of sporadic and familial forms of Amyotrophic Lateral Sclerosis ("**ALS**").

16.     ALS, the most common motor neuron disease, is a progressive neurodegenerative disease of motor neurons in the brain and spinal cord, resulting in progressive paralysis, with death typically within 2 to 5 years of diagnosis.

17.     ALS is a rare disease with multifactorial etiology, and the precise pathogenic mechanism is still unknown.

18.     The Product is a potential best-in-class small molecule inhibitor of PIKfyve, a therapeutic target for ALS discovered from diseased human tissues.

19.     The Product is also a potent, orally bioavailable PIKfyve inhibitor that could improve survival in ALS patient neurons and has shown efficacy in multiple preclinical studies in ALS-relevant models of motor neuron degeneration.

17

20.    Currently, the Product is undergoing a study in Canada and several European Countries in which ALS patients are receiving doses of therapeutics containing the Product (the "**002 Study**").

21.    The 002 Study, which has been applauded for its cutting-edge design, incorporates innovative technology that makes it possible to collect dense amounts of unbiased, objective disease-relevant data to properly assess safety, tolerability, pharmacological dose-response, and potential efficacy, including for disease modification, early in clinical development.

## II.    <u>Ferrer and Verge began negotiations to enter into a partnership and agreement to develop and commercialize the Product.</u>

22.    In the fall of 2023, Verge and Ferrer began discussions regarding a partnership and strategic collaboration to co-develop pharmaceutical products that contain the Product.

23.    Verge sought and was negotiating for the right to co-develop and commercialize the Product in European Economic Area (EEA), United Kingdom, Switzerland, geographically Central and South America (including, for the avoidance of doubt, Mexico, Belize, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, South America, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Guyana, Paraguay, Peru, Suriname, Uruguay, Venezuela), Brunei Darussalam, Cambodia, Indonesia, Laos, Malaysia, Myanmar (Burma), Philippines, Singapore, Timor-Leste, Thailand, Vietnam and Japan (the "**Territory**").

24.    At no time did Ferrer seek development or commercialization rights in the United States or Canada.

25.    Instead, Verge informed, disclosed, and made it clear to Ferrer that Verge intended to retain rights to develop and commercialize the Product in the United States and Canada, and that it would retain responsibility for regulatory approvals in those regions and outside the Territory.

18

26.    Before the parties executed the CDLA, Verge and Ferrer conducted a diligence process whereby Verge provided Ferrer with access to a virtual data room which Verge had populated with information and documents relating to the Product.

27.    During the diligence process, Ferrer submitted follow up questions and requests for information to Verge, and Verge responded to all of Ferrer's questions and provided all information and documents Ferrer requested.

28.    At no time—during the diligence process or otherwise—did Verge intentionally conceal, omit, misrepresent, or misconstrue any material fact relating to the Product.

29.    Verge also did not withhold any information or documents which Ferrer requested.

30.    Although Ferrer requested regulatory information relating to European regulators, Ferrer did not submit any request to Verge seeking all information, documentation, and correspondence from or relating to regulatory authorities in the United States and Canada, including but not limited to the U.S. Food and Drug Administration ("**FDA**") or Health Canada.

31.    In December of 2023 while the parties were actively negotiating, Verge made the decision to submit Investigational New Drug Application 166524 (the "**IND**") for the Product to FDA, whereby Verge requested to perform its proposed study VGCS-50635-003 in the United States involving clinical trials in healthy adult volunteers of up to fourteen (14) day dosing duration (the "**003 Study**").

32.    Unlike the 002 Study, the IND application proposed that 003 Study would dose healthy volunteers only, and no patients would be enrolled in the 003 Study.

33.    At that time, the 002 Study was ongoing in Europe and Canada, but Verge did not submit an IND to FDA for the 002 Study to be performed in the United States.

19

34.     Verge also did not submit a request with the IND to perform studies dosing beyond fourteen (14) days in the United States.

35.     Verge informed Ferrer that it had submitted the IND application to FDA and requested to perform the 003 Study as proposed.

36.     Verge did not represent to Ferrer that it had submitted a request with the IND to perform studies dosing beyond fourteen (14) days in the United States or to conduct the 002 Study in the United States.

37.     In fact, at all times, Ferrer was aware of the limited nature of the 003 Study and knew that Verge did not submit the 002 Study to FDA with the IND.

38.     Ferrer also knew that FDA had not approved the 002 Study in the United States.

39.     Verge never represented or claimed to Ferrer that FDA had approved the 002 Study or permitted clinical trials dosing beyond fourteen (14) days.

40.     As part of the ongoing due diligence, Verge provided to Ferrer all of the same underlying data and information that Verge submitted to FDA with the IND, including toxicology data from its earlier nonclinical study involving laboratory animals and data from Verge's first clinical study in humans, Study VGCS-50635-001 (the "**001 Study**").

41.     On January 19, 2024, and February 16, 2024, FDA sent correspondence to Verge approving the 003 Study (the "**FDA Correspondence**").

42.     As part of the FDA Correspondence, FDA also notified Verge of a partial clinical hold to the extent that Verge could not proceed with clinical trials in humans dosing beyond fourteen (14) days in the United States, pending submission of additional information requested by FDA.

43.    In the January 19 email, FDA referenced "notable toxicity . . . observed in nonclinical studies" as the basis for imposing "a limit on the duration exceeding 14 days due to safety concerns raised in nonclinical studies." Verge was and remains unclear as to the rationale for FDA's comment because there was no evidence of notable toxicity in nonclinical studies at clinically relevant exposures.

44.    Regardless, the FDA Correspondence was confined to the United States and not directed at study the 002 Study, over which FDA had no regulatory authority whatsoever and which had not been submitted with the IND.

45.    The FDA Correspondence was also confidential and had no bearing on the regulatory approvals within the "Territory" for which Ferrer was negotiating rights.

46.    In essence, FDA notified Verge that it could not proceed with a study format that Verge had not submitted.

47.    Although Verge disclosed to Ferrer that FDA approved the IND as proposed, Ferrer did not at any time request any additional information or documents relating to the FDA's formal or informal responses to the IND.

48.    Instead, Ferrer's discussions and meetings with Verge and its document requests focused on the 002 Study and European regulators.

49.    Ferrer did not submit any request to Verge that sought FDA's notice and correspondence regarding the IND.

50.    Before executing the CDLA, Ferrer knew that it had not submitted any request to Verge seeking all information, documentation, and correspondence from or relating to regulatory authorities outside the Territory, such as FDA or Health Canada.

51.     FDA's partial clinical hold was not material to the parties or to the execution of the CDLA.

### III.    Verge and Ferrer executed the CDLA, which obligated Ferrer to make a Fifteen Million Euro (€15,000,000.00) payment along with other multi-million-Euro obligations.

52.     On March 18, 2024, Verge and Ferrer executed the CDLA, which granted Ferrer exclusive rights to co-develop and commercialize the Product in the Territory. Consistent with the pre-execution negotiation, the CDLA defined the scope of the Territory in which Ferrer had obtained development and commercialization rights.

53.     Meanwhile, under the CDLA, Verge maintained development and commercialization rights in the United States, Canada, and other regions and countries outside Ferrer's defined Territory.

54.     The CDLA attached and incorporated a Clinical Development Plan, which included the limitation imposed by FDA's partial clinical hold and specifically stated that "Study 003 can proceed Jan '2024 (002 not filed); FDA wants to see results of 003 before approving ALS trials." The Clinical Development Plan in the CDLA also stated, "Will add US sites to Study 002 Cohort 2 if there is a Go; will provide 003 data and chronic tox data to FDA."

55.     As partial consideration for Verge granting rights and licenses to Ferrer, under Section 9.1 of the CDLA, Ferrer was obligated to pay or cause to be paid a one-time, non-refundable fee of Fifteen Million Euro (the "**Upfront Payment**") within thirty (30) Business Days after March 18, 2024, and subject to the receipt of invoice from Verge.

56.     As further consideration, Ferrer also agreed to pay Verge thirty percent (30%) of the Development Costs already incurred by Verge, which costs were disclosed and set forth in the

CDLA. That additional payment was also due within thirty (30) Business Days after March 18, 2024, and subject to the receipt of an invoice from Verge.

57.     As required, Verge supplied, and Ferrer received, invoices reflecting the due and owing Upfront Payment and Ferrer's thirty percent obligation for Verge's incurred Development Costs.

## IV.     After execution of the CDLA, safety events occurred in the 003 Study, which Verge reported to Ferrer and other entities as required.

58.     On March 25, 2024, Verge was notified of a Serious Adverse Events ("**SAEs**") that occurred that day in the 003 Study, in which a subject developed rising creatinine and was sent to a hospital for evaluation and treatment.

59.     On March 26, 2024, Verge learned that another subject developed mental status changes and was sent to a hospital for evaluation and treatment, resulting in a second SAE.

60.     That same day, Verge voluntarily suspended the 003 Study, including all dosing, and Verge notified Ferrer of the two SAEs.

61.     Both SAEs occurred after the execution of the CDLA.

62.     As required, Verge finalized and shared with Ferrer "Suspect Adverse Reaction Reports" for the two SAEs within fifteen days.

63.     Verge also informed other regulators worldwide and notified the independent Data Monitoring Committee overseeing the 002 Study of the SAEs.

64.     The Data Monitoring Committee was charged with giving recommendations on a wide array of issues related to 002 Study, including "protocol, dosing paradigm, dose interruption, study stopping, and study resumption based on safety data review." The Committee's Charter also specified that the Committee was established "to oversee, monitor and review all accumulated safety, tolerability, and [pharmacokinetics] data during . . . the study, to advice [sic] on clinical

23

trial subject safety and/or to advise on clinical project adaptations and/or clinical project termination of the [002 Study]." Before giving advice to Verge as the study's "sponsor," the Charter directed the Data Monitoring Committee to "consider the safety and wellbeing of participants as well as scientific and ethical implications of any recommendation. If advice on termination is given, it should be done in the context of the safety and benefit risk balance."

65.    The Data Monitoring Committee received and reviewed the reports regarding the SAEs but did not recommend stopping the 002 Study.

**V.    Following the safety events in the 003 Study, Ferrer refused and failed to make the required payments and inundated Verge with first-time document and information requests.**

66.    Following disclosure of the SAEs, Ferrer refused and failed to make the required Upfront Payment.

67.    Instead, Ferrer made numerous demands to Verge, including that Verge suspend and stop the 002 Study and all clinical trial activity.

68.    Although Ferrer characterized its demanded suspension as "temporary," the suspension would have required all subjects to be released from the 002 Study and the Study effectively terminated, thereby incurring a six (6) to twelve (12) month delay to the 002 Study.

69.    Ferrer's demanded suspension would have constituted a material change to the Clinical Development Plan pursuant to Section 1.46 of the CDLA.

70.    Ferrer's demanded suspension also would have been devastating to the study participants and would have been detrimental to the CDLA and the parties' partnership.

71.    The independent Data Monitoring Committee and other independent outside clinicians, scientists, and experts did not support Ferrer's demanded suspension of the 002 Study.

72.    When Verge did not immediately accede to Ferrer's demand, Ferrer began to inundate Verge with requests for information and documents, none of which Ferrer had not submitted previously to Verge.

73.    For the first time Ferrer requested all regulatory information and correspondence from regulators outside the Territory, including FDA and Health Canada.

74.    Ferrer's requests amounted to a tacit acknowledgement that it had not requested all FDA or Health Canada documents until after executing the CDLA and until after the SAEs.

75.    Ferrer knew that it had not requested regulatory information from outside the Territory, including FDA's response to the IND.

76.    After Ferrer made its first-time requests, Verge directed a Verge team member to upload to the parties' common research portal all correspondence from FDA and Health Canada, including the FDA Correspondence.

77.    Although Verge disclosed the FDA Correspondence to Verge weeks earlier, until May 31, 2024, Ferrer expressed no concern about FDA's partial clinical hold.

78.    Instead, Ferrer continued to demand the 002 Study be stopped and continued to make document and information requests, all of which Verge worked diligently respond to. Verge also complied with the provisions of the CDLA governing disputes among the parties, which included convening a meeting of the companies' Chief Executive Officers and a meeting of the Joint Steering Committee the parties created through the CDLA.

79.    Despite all of Verge's good faith efforts, Ferrer refused and failed to make the required payments.

## VI.    **<u>Ferrer sent a letter purporting to rescind the CDLA.</u>**

80.    On May 31, 2024, Ferrer's litigation counsel sent a letter (the "**Rescission Notice**") purporting to rescind the CDLA.

81.    The Rescission Notice was premised on the false notion that Verge concealed "material information" from Ferrer before and after the parties signed the CDLA.

82.    Specifically, Ferrer falsely claimed that FDA's partial clinical hold was material information despite the fact that (1) Ferrer did not specifically request all regulatory correspondence from FDA or other regulators outside the Territory until after the SAEs occurred; (2) Ferrer had in its possession all of the underlying data which FDA referenced and relied upon in the FDA Correspondence; (3) FDA approved Verge's IND as proposed and approved the 14-day study timeline Verge submitted; (4) Ferrer knew Verge had not submitted the 002 Study to FDA with its IND and had not requested to perform clinical trials in humans dosing beyond fourteen (14) days in the United States; and (5) the Clinical Development Plan in the CDLA reflected the limitation in the 003 Study along with the parties' expectation that FDA would require additional information before approving the 002 Study or a study like it.

83.    Conspicuously absent from the Rescission Notice was any document or exhibit showing that Ferrer had, in fact, requested the information on which it relied for rescission.

84.    Ferrer's theory of concealment fails because, among many other reasons, Verge disclosed the very information which Ferrer claims was concealed when Ferrer requested it.

85.    Verge had no reason to hide any information from Ferrer, which is why, as Ferrer admits in its Complaint, Verge freely disclosed the information to Ferrer after Ferrer made its first request for the information.

86.    Verge did not intentionally conceal any material facts from Ferrer at any time.

87.     Before execution of the CDLA, Verge provided all documents and information that Ferrer requested, and Verge has continued to do so since then.

88.     Under no set of facts will Ferrer prove that Verge intentionally withheld or concealed any material information that Ferrer requested or that Verge was otherwise obligated or required by law to divulge.

## VII.    Ferrer owes all amounts due and payable under the CDLA.

89.     Ferrer materially breached the CDLA when it failed to make the Upfront Payment and to pay for its share of the Development Costs.

90.     Ferrer's purported Recission Notice smacks of buyer's remorse and a short-sighted attempt to run away from the substantial monetary sum which it is obligated to pay.

91.     On multiple occasions, Ferrer's key executives and others within the company acknowledged that Ferrer was in breach of the CDLA, while at the same time holding Verge hostage for the outstanding payments in an attempt to extract concessions from Verge about the clinical studies—concessions which Ferrer was not entitled to under the CDLA and which the Data Monitoring Committee and other experts opposed.

92.     Those required payments were not contingent upon any action by either party other than execution of the CDLA and Verge providing an invoice to Ferrer.

93.     Those require payments were not contingent upon Verge accepting Ferrer's demands to stop the clinical trials.

94.     Those payment obligations were satisfied, and they are contractually binding.

95.     Ferrer's Rescission Notice amounts to a termination without cause pursuant to Section 17.2.2.1 of the CDLA.

27

96.     Because Ferrer terminated the CDLA without cause and without providing the ninety (90) days' notice required under Section 17.2.2.1, all of Ferrer's payment obligations through May 31, 2024, and for the ninety (90) days thereafter remain due and owing.

97.     In addition, all rights licensed to Ferrer automatically revert back to Verge pursuant to Section 17.3.3 of the CDLA.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract

98.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

99.     Verge and Ferrer were parties to the CDLA.

100.    Verge has provided all services and complied with all obligations contemplated under the CDLA.

101.    The CDLA was an enforceable contract.

102.    Ferrer breached the CDLA by failing to make payments owed thereunder and by repudiating its obligations in reliance on a Rescission Notice not grounded in law or fact.

103.    Ferrer's breaches were material and, as a result, Verge has been harmed in an amount to be proven at trial.

### COUNT II
### Declaratory Judgment

104.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

105.    Ferrer's Rescission Notice is not grounded in law or fact, and its notice was ineffective, null, and void.

28

106.    Because Ferrer cannot prove that Verge intentionally withheld or concealed any material information, Verge seeks a declaration that Ferrer had no right to rescind the CDLA.

107.    Verge further seeks a declaration that the Rescission Notice constituted a termination without cause under Section 17.2.2.1 of the CDLA, that all of Ferrer's payment obligations through May 31, 2024, and for the ninety (90) days thereafter remain due and owing, and that all rights licensed to Ferrer automatically revert back to Verge.

## **PRAYER FOR RELIEF**

WHEREFORE, Verge prays that the Court enter judgment in its favor and against Ferrer by:

a.   Dismissing Ferrer's Complaint with prejudice and denying each request for relief made by Ferrer;

b.   Declaring Ferrer had no basis to rescind the CDLA and that its Rescission Notice was ineffective, null, and void;

c.   Declaring that all rights licensed to Ferrer automatically revert back to Verge;

d.   Granting Verge judgment in its favor on its counterclaims and awarding it monetary damages plus interest;

e.   Awarding Verge its attorneys' fees and cost of suit; and

f.   Awarding Verge any and all other relief, at law or in equity, which the Court deems just and proper.

POLSINELLI PC

/s/ Stephen J. Kraftschik

Stephen J. Kraftschik (#5623)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
(302) 252-0920
skraftschik@polsinelli.com

*Attorneys for Verge Analytics, Inc.*

Joseph Hubbard
Keelin M. Kraemer
POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37220
(615) 292-3940
joseph.hubbard@polsinelli.com
kkraemer@polsinelli.com

Daniel Hoelting
POLSINELLI PC
150 N. Riverside Plaza, Suite 300
Chicago, IL 60606
(312) 463-6308
dhoelting@polsinelli.com

Dated: December 9, 2025