IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


FERRER INTERNACIONAL,  )
S.A.,                  )
                       )
        Plaintiff,     )  C.A. No. 24-694-RGA
                       )
v.                     )
                       )
VERGE ANALYTICS, INC., )
                       )
        Defendant.     )


Monday, November 24, 2025
11:00 a.m.
Courtroom 6A



844 King Street
Wilmington, Delaware



BEFORE:  THE HONORABLE RICHARD G. ANDREWS
    United States District Court Judge



APPEARANCES:


    ROSS, ARONSTAM & MORITZ, LLP
    BY:  ADAM D. GOLD, ESQ.

    -and-

    BAKER McKENZIE
    BY:  ALEXANDER D. BURCH, ESQ.

                    Counsel for the Plaintiff

APPEARANCES CONTINUED:

              POLSINELLI
              BY:   STEPHEN J. KRAFTSCHIK, ESQ.

                         Counsel for the Defendant


                         ---------------------------


THE COURT:  All right.  So we're here on the motion to continue the trial setting in the case filed by the plaintiff, which is docket item 76.  And I regret that I should know at least one of the two lawyers on the plaintiff's side, but I don't.

MR. GOLD:  Good morning, Your Honor.  Adam Gold from Ross, Aronstam & Moritz on behalf of plaintiff Ferrer.  And introducing my co-counsel who has been pro hac'ed in, this is Alex Burch from Baker McKenzie.

THE COURT:  All right.  Good morning to you both.  And Mr. Burch, welcome to Delaware.

Mr. Kraftschik, good morning.

MR. KRAFTSCHIK:  Good morning, Your Honor.  Stephen Kraftschik of Polsinelli for the defendant Verge.

THE COURT:  Okay.  I have read the briefing but I haven't spent a whole lot of time on this, and I'm trying to figure out stuff.  So I, you know -- and so part of the stuff that I'm trying to figure out is is deposition

scheduling.  So from -- it looks to me like from the docket that there might be as many as five depositions actually scheduled.  And I'm talking about Diego Cadavid, Kristin Longobardi, Robert Scannevin, Paula Sandler and Jane Rhodes.

Am I right about that or have I missed the point?

MR. BURCH:  Your Honor, you are correct in terms of your reading of the docket.  There are more depositions expected and even as of this past week the parties have agreed to several other depositions.

THE COURT:  Well, so let me go back to the five that are on the schedule here.  I take it none of them have actually occurred yet?

MR. BURCH:  Two have taken place, Your Honor.

THE COURT:  Which two?

MR. BURCH:  Diego Cadavid and Robert Scannevin.

THE COURT:  Okay.  And I believe it's the case, they are people who have some -- they were depositions that you noticed and so they have some connection to the defendant, right?

MR. BURCH:  Yes, Your Honor.  Both of the ones that were deposed were former employees of the defendant.

THE COURT:  Okay.  And Longobardi, when is she scheduled?

MR. BURCH:  Longobardi is scheduled for

January 8th.

THE COURT:  And Paula Sandler?

MR. BURCH:  We got an agreement with her late last week for January 14th.

THE COURT:  And Jane Rhodes?

MR. BURCH:  She's available in January.  I believe we're thinking about January 9th or January 26th.  January 9th I think is where we've tentatively landed right now.

THE COURT:  Okay.  And are they all people that are also associated with the defendant?

MR. BURCH:  Yes, Your Honor.

THE COURT:  But none of them are the rule 30(b)(6) witnesses, is that right?

MR. BURCH:  No, Your Honor.  That's correct.

THE COURT:  Okay.  And these people are all located in the United States?

MR. BURCH:  Yes, Your Honor.  The ones we've spoken with so far are in the United States.

THE COURT:  Okay.  So you said there are some more that are almost scheduled.  That may not have been your exact words, but there are some more -- well, I don't know.  Tell me who else is --

MR. BURCH:  So we still have Brian Shook who will be served on Monday.  He's agreed to accept service on

Monday of his subpoena.  We're anticipating taking his deposition on December 15th, also associated as a former employee of Verge.

THE COURT:  Anyone else?

MR. BURCH:  We've made four attempts to serve a woman by the name of Michelle Mighdoll.  We've been unsuccessful in serving her.

THE COURT:  Anybody else?

MR. BURCH:  The Verge corporate representative is scheduled for December 4th.  And that is Verge is, I guess, offering up their CEO, Ms. Alice Zhang.

THE COURT:  And you said that was December 4th?

MR. BURCH:  Yes, Your Honor.

THE COURT:  And I thought I saw there were -- I think I saw maybe that there were some other depositions scheduled for December 2nd or am I making that up?

MR. BURCH:  Those were the original dates, but we contacted the witnesses and the witnesses were not available, so we altered the dates.  I think that may have been maybe Brian Shook and Longobardi.

THE COURT:  Doesn't matter.  And so was there a Rule 30(b)(6) of a person from Ferrer that's scheduled?

MR. BURCH:  Yes, Your Honor.  December 18th is the -- well, that's the CEO of Ferrer and that will be in Barcelona.  And December 19th will be the corporate

representative of Ferrer.

THE COURT:  Also in Barcelona?

MR. BURCH:  Also in Barcelona, yes, Your Honor.

THE COURT:  And all right.  So I signed these two letters of request to, I guess, the United Kingdom or England.  Based on the experience, does anyone have an opinion on, assuming that the proper authorities there accept the letter, how long that's likely to take?

MR. BURCH:  Yes, Your Honor.  I've spoken with our counsel out of the United Kingdom and it could take up to two months.  The process -- and maybe I explained the process a little bit.  As I understand it is the letter of request that you signed is going to go to the Court and it will sit there.  It could sit there for maybe two weeks.  Literally goes into a bin and could sit there for a couple days.

THE COURT:  I don't really need granular details, particularly about bins.

MR. BURCH:  Right.

THE COURT:  Your UK corresponding counsel estimates two months is a reasonable expectation?

MR. BURCH:  Yes.  And in particular, the Court will shut down in mid December for a month.

THE COURT:  Okay.  So and that's two months from when I signed these?

MR. BURCH:  Yes, Your Honor.

THE COURT:  Which was on the 19th.

And I remember that was for a Dr. Chris McDonald or something and somebody else?

MR. BURCH:  Anthony Fox, Your Honor, was the other.

THE COURT:  All right.  So the original brief here, a motion for continuance, plaintiff was asking for deposition dates relating to eight people and other than Geoff Goodfellow, I think we've just gone through the first seven, is that right?

MR. BURCH:  Yes, Your Honor.

THE COURT:  So what about Geoff Goodfellow; is he still in the picture or is he surplusage?

MR. BURCH:  I don't recognize the name Jeff Goodfellow, Your Honor, to be honest.

THE COURT:  Does anyone know who Geoff Goodfellow is?  Okay.  So I guess he's probably not too important.

So then there were some more people named, Mr. Cadavid, who we've dealt with, Dr. Angela Genge, Dr. Phillip Van Damme, Professor Leonard van den Berg and Dr. Fox.  So we've taken care of Dr. Fox here.  Dr. Genge, Dr. Van Damme, and Professor van den Berg, are any of them in the United States or are they abroad?

MR. BURCH:  No, Your Honor.  Three of them are in the Netherlands, one is in Belgium and one is in Italy.

THE COURT:  Wait a second.  I just named three people and you're telling me where five people are.

MR. BURCH:  I thought you were going off their expert list.

THE COURT:  No, I'm going off the brief that you wrote.

MR. BURCH:  Yes, Your Honor.

THE COURT:  So Dr. Genge, Dr. Van Damme, Dr. Van den Berg, where are those three?

MR. BURCH:  Dr. Van Damme is in Belgium.

THE COURT:  Okay.

MR. BURCH:  Dr. Van den Berg is the Netherlands.  And Dr. Valdecamp is the Netherlands.

THE COURT:  How about Dr. Genge?

MR. BURCH:  Dr. Genge is Canada.

THE COURT:  And as things stand, are those three people, Mr. Kraftschik, are they in any way under the control of the defendant, either by contract or -- well, by contract, I guess is pretty much the only way they would be under control.

MR. KRAFTSCHIK:  Your Honor, my understanding is no, they are not under the control of the defendant at this point.

THE COURT:  And why are those three particular names involved here?

MR. KRAFTSCHIK:  So my understanding is that these folks were on the -- they were investigators on one of the studies, but they were not --

THE COURT:  Well, I guess what I'm wondering is, at some point the defendant said here's 11 non-retained experts who may have expert testimony.  Is that where these three names come from?

MR. KRAFTSCHIK:  I think they're also included on our initial disclosures, Your Honor.

THE COURT:  Well, so what I'm wondering about is this.  The reason why we're talking about it is because you have raised their names and now the plaintiff wants to depose them.  What about just saying you're not going to rely on them and then we don't need to worry about whether or not -- then there's no reason for the plaintiff to depose them?  And particularly if they're not in your control, I don't know how you're going to -- how are you going to get them here?

MR. KRAFTSCHIK:  Your Honor, I think those are -- I don't have authority at this point to make that type of agreement that we can't call them, that we definitively won't call them.  I think at this point, you know, we don't think that they're needed at all.  They were

more identified out of an abundance of caution as potential rebuttal witnesses.  We think this case is, you know, a pretty straightforward contractual dispute, but we don't know how the trial is going to go and what's going to a happen over the next few months.

THE COURT:  But how can you have people who are not under your control who are rebuttal for, I don't know, surprises that may occur at trial when they're in Canada, Belgium and the Netherlands?  If you call them up and say we need you, why would they say, yep, I'll be there?

MR. KRAFTSCHIK:  I don't know that they would, Your Honor.  And I think that we can't guarantee they would be there and we at this point don't have, you know, an intention to call them because the fact that they're rebuttal.  So if Your Honor -- I could certainly, if the Court's proposal is take them off the table, you know, and we can moot this whole issue, I can certainly follow up with my client on that.

THE COURT:  Well, so let me just ask Mr. Gold -- I'm sorry, Mr. Burch.  Sorry.  Yeah.  I take it the only reason you want to depose them is because the defendant has raised them as potential witnesses?

MR. BURCH:  I wouldn't say that's the only reason.  The way that they've disclosed them, they've disclosed them as having knowledge about one of Verge's key

defenses and that is that Ferrer's request to pause the clinical studies of this product that's at issue in this case, the impact of Ferrer's request to pause those studies and Verge has disclosed them as, one, having knowledge about the studies, and two, that such a pause requested by Ferrer would have been catastrophic to the clinical studies.  And this is their own disclosures.  And so regardless of whether they want to bring them to trial or not, we think these witnesses are still critical to those facts underlying the safety of these -- of this product.

THE COURT:  But don't you have a whole bunch of other witnesses who have opinions about the safety of these products?

MR. BURCH:  Well, we have our own witnesses.  But these individuals were the ones disclosed as having knowledge of the clinical studies.  We don't have people that have the knowledge of the clinical studies that these individuals do.

THE COURT:  But isn't that where Dr. McDermott and Anthony Fox come in too.

MR. BURCH:  From the United Kingdom?

THE COURT:  Right.

MR. BURCH:  Potentially, yes.

THE COURT:  And Diego Cadavid -- and well, is he on the same -- is he also somebody who fits into this

category?

MR. BURCH:  He would as an employee of Verge. The distinction is these others doctors we think were independent individuals not tied directly to Verge.  So their testimony may be critical to even rebut Dr. Cadavid's testimony.

THE COURT:  Even though based on the fact that the defendant has named them and you haven't, it seems like the defendant thinks their testimony would help the defendant.

MR. BURCH:  That's correct, Your Honor.  That's how they've been disclosed.

THE COURT:  So you'd like to go depose them so they can develop this testimony that would help them? That's what you're telling me?

MR. BURCH:  What's interesting is the more we discover in this case the better out case gets.  And that's sort of the issue in this case is as the evidence has come out, the more we learn about the fraud claim that is pending before this court.  And we think that those individuals, particularly knowing what we know now, with the fact that the FDA has now completely put a full hold and now its come back now to partial hold on this same product, we think that their testimony is going to be critical to helping us prove that this was not safe and that Verge knew it wasn't safe

going in before even executing this company development license agreement.

THE COURT:  And so these were people running clinical trials and you think that they're going to say we knew the product was unsafe?

MR. BURCH:  I don't -- well, it would be great if they said that.  I imagine that they'll be a little bit judicial in their language in terms of more technical about the studies and what they knew in terms of regulatory compliance and how they were reporting these severe adverse events that were taking place in these clinical studies.

THE COURT:  And they reported these severe adverse events to the FDA?

MR. BURCH:  Eventually, yes, they did.

MR. KRAFTSCHIK:  Could I jump in quickly, Your Honor?

THE COURT:  Yes.

MR. KRAFTSCHIK:  As their original claim is pled and their fraud claim is pled, I think that the key time frame here when they're saying the fraud occurred is in January of 2024.  And the CDLA is signed, I believe, on March 20th of 2024.

THE COURT:  Wait, wait.  I'm sorry, what is the CD --

MR. KRAFTSCHIK:  The common -- sorry.  What's

the first word?

MR. BURCH:  Co-development.

MR. KRAFTSCHIK:  Co-development license agreement.  It's the key document that they're saying their client was fraudulently induced to sign.

THE COURT:  When was that signed?

MR. KRAFTSCHIK:  I believe it was March 20th, 2024.  March 18th, 2024.

THE COURT:  And so I'm not sure what the point of these dates is.

MR. KRAFTSCHIK:  The point of these things was that they're saying the fraud occurs in January of 2024, before the license is entered into in March 18th, 2024.  The serious adverse events happen after this.  The serious adverse events, this is all kind of ex post facto things that happened after, has nothing to do, from our perspective, with what they're saying is the fraud in the first instance.

THE COURT:  When do the clinical trials start?

MR. KRAFTSCHIK:  Well, this was before that.  I don't have the specific date for that.  It was certainly before the CDLA.

MR. BURCH:  Your Honor, there were several clinical trials going on.  There was clinical trial one, which involved animals.  There was clinical trial two, which

involves humans. And clinical trial three. Clinical trial two began before the parties signed the CDLA.

THE COURT: When you say shortly before, that can cover a range of time. What time?

MR. BURCH: I don't have the exact time, but I want to say it was weeks, maybe even the week of. It was very close to that in time.

THE COURT: So in terms of adverse events occurring during clinical trials, essentially they didn't -- what Mr. Kraftschik said, they occurred after the agreement was signed, that's correct?

MR. BURCH: I believe the first human adverse effects, serious adverse events did occur that first or second week after the agreement was signed. The fraud has nothing to do with the fact that there were severe adverse events. That's not the fraud. The fraud is the failure to disclose the FDA clinical hold that occurred starting in January and February of 2023 or 2024. Excuse me the dates, but several months before the parties signed.

THE COURT: Well, if that's the fraud, what do Drs. Genge, Van Damme and van den Berg have to do with that?

MR. BURCH: So what the FDA -- what the FDA wrote in terms of why it was -- there was concerns about the safety of this particular drug, VRG50635, so they said we're going to put you on a partial clinical hold, and you can

only do X, Y, and Z.  That was not disclosed.  Had they disclosed that information to my client, there would be no co-development license agreement.  But they didn't disclose that.

THE COURT:  And so again, what does that have to do with the three witnesses in Canada, Belgium and the Netherlands?

MR. BURCH:  Because immediately after the serious adverse events occurred, right after the parties signed this agreement, and at this point Ferrer had no idea about the FDA clinical holds, those serious adverse events occurred.  Ferrer went to Verge immediately when those happened and said, okay, let's pause everything, pause all the clinical studies, pause all the trials.  Verge refused.  Part of their defense and how they've disclosed them is that our request to pause the clinical studies in the name of safety would have been detrimental to the development -- co-development agreement to the development of this drug.  That's one of their defenses.  They've pled it and stated it in their disclosures.  And that's one of the purposes of deposing these individuals is to go into that particular issue.  Why would you not pause these studies in the name of safety?  They may have a very valid reason for that, but that's one of Verge's defenses and we're entitled to delve into that.

THE COURT: But the decision or the argument by Ferrer to or not to pause, presumably that's coming from Ferrer, not from miscellaneous doctors who are running clinical trials.

MR. BURCH: So these doctors were all part of -- I think all of them were a part of the data management committee who would actually decide whether or not to pause the clinical studies or not. And again, it's Verge's position that they all decided, at least most of them, decided to continue on with the trials. What happened shortly even after that, the week we filed this lawsuit the FDA issued a full hold on this product for the very reasons that Ferrer wanted to pause the trials. It was not safe and we needed more studies. Let's take some time. And so I think we think that these individuals will have key testimony as to the efficacy of these clinical studies, as to what was going on, and to why the FDA actually agreed with us and decided to pause everything going on with these clinical studies.

THE COURT: All right. So if for whatever reason I took Dr. Genge, Dr. Van Damme and Dr. Van den Berg out of this case, would there be any particular reason to be seeking a continuance?

MR. BURCH: Yes, Your Honor.

THE COURT: Okay. Tell me what.

MR. BURCH:  Well, one, we still have the London doctors that we have to depose.

THE COURT:  Right.  Even though we're estimating them by the middle of January?

MR. BURCH:  Right.

THE COURT:  When you already got a whole bunch of other depositions scheduled in January?

MR. BURCH:  Yes, Your Honor.  So pending before the Court is also our motion to amend.

THE COURT:  Right.

MR. BURCH:  So we need to at least have that for the Court.  We actually scheduled to take corporate representative depositions not knowing whether or not that claim is going to be present.  So we really can't get into our claim have fraud with Verge's corporate representative because they could just object.  There's no claim before the Court and so they'd have a valid objection to anything we inquired into at the deposition regarding the fraud.

THE COURT:  Mr. Kraftschik, what do you have to say about that?

MR. KRAFTSCHIK:  Your Honor, if I could just hand you a demonstrative.

THE COURT:  I wouldn't call this a demonstrative.

MR. KRAFTSCHIK:  The point that I think this

shows and I think it shows in their notice of recision back in May of 2024, their claim the entire time has been a claim based on fraud.  They're seeking recision.  The reason to rescind a contract, as far as I know, are fraudulent inducement or mutual mistake.  So if you go look at all the elements of fraud, a fraud claim --

THE COURT:  I take it you're saying mutual mistake is not an issue in this case?

MR. KRAFTSCHIK:  It's not an issue.

MR. BURCH:  I believe fraud is the issue, Your Honor.

THE COURT:  Yes, okay.

MR. KRAFTSCHIK:  They have every single element of fraud pled in their complaint since they filed this complaint in June of 2024.

THE COURT:  So I take it that means you don't actually oppose them amending the complaint even though you filed a brief saying you do?

MR. KRAFTSCHIK:  We oppose it because of the logistical consequence of what they're seeking to do including what they acknowledge in their motion to continue that they want to turn this from a bench trial to a jury trial.  They want to turn it from a two-day trial to a five-day trial and seek damages, an expert report on damages which they missed their opportunity to do that.

THE COURT:  Well, so the length of the trial, whether it's a bench trial or a jury trial, do those things actually make any difference?

MR. KRAFTSCHIK:  Yes, Your Honor.  I think they make a huge difference for my client.  In terms of jury versus bench, I think this is a huge issue.  I think we've got clear case law that they can't resuscitate a jury --

THE COURT:  Well, so leave aside that.  That's arguing the merits.  What I'm asking in terms of, for lack of a better word, prejudice to you all, what does it matter whether it's one thing or the other?

MR. KRAFTSCHIK:  I think you're right as far as liability.  If what we're arguing about in the discovery, you know, for proving liability or not, I think it is exactly the same from our perspective.  I think the prejudice and I think it's severe prejudice to be raising damages at this point, because that is not discovery that would have been --

THE COURT:  Well, so that's the one thing that you, you know, that seems like -- that seems like your best argument, the damages as a new issue.

MR. KRAFTSCHIK:  Yes.

THE COURT:  What I'm trying to figure out is, isn't that you're only argument in reality?

MR. KRAFTSCHIK:  I acknowledge, I think as I

just said, that the liability is the same, so I don't think we're saying the fact discovery on liability is any different.  So, I also -- I don't want to re-raise the jury issue, but I think that's also an issue.

THE COURT:  But that's not a -- who decides the case whether it's a jury or a judge, particularly when you really haven't been doing the depositions yet, that seems to me like a nonissue.

Just on the subject of the motion to amend the complaint, I take it, Mr. Burch, to the extent that I've gotten Mr. Kraftschik to concede that there's no particular prejudice, I realize there may be other things to consider, but in terms of there's no particular prejudice other than arguably this plaintiff's damages expert or damages expert business where after all if you come up with a damages expert, they're probably going to want to come up with a damages expert, how would -- what do you have to say about that?

MR. BURCH:  I think that's exactly right, Your Honor.  We would like to bring an expert in to assist us with the fraud claim, to assist the finder of fact on our fraud claim, which doesn't exist yet.

THE COURT:  So what I'm trying to do is to see whether, in fact, there's very little reason not to grant the motion to amend the complaint when -- and appreciate Mr.

Kraftschik's candor, which is pretty well known, that essentially the fraud claim is just a recision claim as a legal matter rather than an equitable matter. And I guess what I'm trying to figure out is because if -- if I allowed you to amend the complaint, and I think there was something I saw in the briefing on this motion saying that at least when you filed the motion to amend the complaint, you said that it wouldn't affect the trial date, and so I'm just wondering if the complaint were -- if I permitted amendment of the complaint, whether you could actually keep the trial date.

MR. BURCH: We don't believe we can, Your Honor.

THE COURT: So you filed the motion to amend the complaint on August 13th. If I -- why not?

MR. BURCH: Well, so as of August 13th we did not know that all of the witnesses that Verge had disclosed as being under their control were not under their control. So that requires us to take additional time to subpoena them and find them. And still, as we noted earlier, there's one individual we still haven't been able to serve a subpoena.

THE COURT: Yeah, even though nobody seems to even know who he is.

MR. BURCH: Michelle Mighdoll.

THE COURT: Oh, I'm sorry. I thought you were talking about Mr. Goodfellow.

MR. BURCH:  At the time we filed the motion to amend there was not 11 non-retained experts disclosed by Verge.  That was on September 2nd, seven weeks later.

THE COURT:  The 11 non-retained experts, aren't they the same group of people that we've just been discussing?

MR. BURCH:  We've discussed several fact witnesses, and yes, we've discussed the non-retained experts.

THE COURT:  Are there any non-retained experts other than the people we've already mentioned?

MR. BURCH:  No, Your Honor.  I will say the one in Belgium, I think it will be unlikely that we can successfully compel his deposition, if you will, since Belgium is not a member of the Hague.

THE COURT:  This is Dr. Van Damme?

MR. BURCH:  No, this is -- it might be.

THE COURT:  Dr. Van Damme you said is in Belgium.

MR. BURCH:  Yes, Your Honor.  Dr. Van Damme.

THE COURT:  So I appreciate your candor.  So arguing about him is kind of pointless.

MR. BURCH:  We think it's unlikely.  We may try still, but we think it's unlikely we'll be able to secure Dr. Van Damme.

THE COURT: Okay. I take it the rules in Canada and the Netherlands are more favorable to this sort of thing?

MR. BURCH: Yes, Your Honor.

THE COURT: And yet even though you've filed the two motions to -- so for Dr. Genge and Dr. Van den Berg in Canada and the Netherlands, were you -- how are you expecting to be able to depose them? Were you expecting to file a letter request?

MR. BURCH: Yes, Your Honor. We've been in contact with our Netherlands counsel. And we've sent or we're sending him drafts of the letters of request to see if there's anything unique that needs to go in it before it comes to your office, Your Honor.

THE COURT: I appreciate that, because I hate to sign these things and then have them rejected just because I'm the one who signs them. All right. And so you're working on Dr. Van den Berg and Dr. Genge in Canada.

MR. BURCH: Yes, Your Honor.

THE COURT: Are you working on her?

MR. BURCH: I don't have a draft yet for her, but it will be -- I don't have Canadian counsel contacted on her yet.

THE COURT: Okay.

MR. BURCH: That should happen pretty quickly.

We have our own offices in Canada.

THE COURT:  All right.  So going back to the amending the complaint.  You're talking about all these witnesses.  You've got them all -- you've got most of them in hand.  Presumably if you can't find Michelle Mighdoll nobody else is going to find her either and she's just not going to be there.  So in terms of -- how do you imagine your damages expert on fraud goes?  Have you looked around for such a person yet?

MR. BURCH:  We've not retained a person yet.  We would like our claim to be before the Court before we spend money on doing that, Your Honor.

THE COURT:  I understand.  But let's assume that I granted the motion to amend, the fraud theory -- how is the fraud theory of damages much different than the recision in terms of what they are?  I mean, recision, I take it, if I understand things correctly, Ferrer says you owe them 15 million euros.  I take it you've already put a certain amount of money into this and that's what you want to get back through recision or do you just want to not owe them the 15 million?

MR. BURCH:  We want to not owe the 15 million euros.  That's one, yes.  But that's not the damages.

THE COURT:  What are the damages?

MR. BURCH:  The damages are going to be the

costs and expenses leading up from when they should have disclosed the FDA clinical hold, all of the costs and expenses going through due diligence, and anything incurred once the co-development license agreement was actually signed.

THE COURT:  What do you think that amount of money is, ballpark?

MR. BURCH:  I don't have a ballpark, Your Honor.

THE COURT:  Well --

MR. BURCH:  Our client is currently collecting that information.

THE COURT:  You must be able to give me some estimate, because I imagine that that number is a small fraction of the 15 million euros that you presently owe.

MR. BURCH:  I don't know that it reaches the 15 million euros, Your Honor.  I would be surprised if it did.

THE COURT:  I would be shocked if it did.

MR. BURCH:  But I don't now how many individuals were involved and what that looks like.  I don't know if there's also a claim for lost business opportunity with other potential co-developers.  I don't know about that either.  And I think that's something that the client is looking into as well.

THE COURT:  Okay.  Do you have any comment on that, Mr. Kraftschik?

MR. KRAFTSCHIK:  My comment on that, Your Honor, is, you know, obviously I don't know that my co-counsel and I have heard their statement of what their damages theories might be.  It's one thing if it's adding up numbers and costs.  I'm not even sure you need an expert for that.  If we're -- I don't know that the second theory that Mr. Burch mentioned of missed development theory is even a cognizable theory of damages.  If it were allowed that truly blows open the door on potential other discovery that might need to be taken to rebut that type of theory.

THE COURT:  All right.  So on the motion to amend, one of the arguments has to do with upsetting a schedule, due diligence or not due diligence, but just diligence.  And the impression I have is, for better or for worse, that plaintiff's fraud -- well, actually so you've said essentially the fraud theory and recision theory are essentially the same.  It almost sounds like you've said that too, Mr. Burch.  Why wasn't the fraud theory brought a long time ago?

MR. BURCH:  Several reasons.  One, we didn't have the evidence of it until they produced it on July 2nd, 2025.

THE COURT:  But you had enough evidence to file the recision claim.

MR. BURCH:  That's right, Your Honor.  But a

recision claim doesn't require meeting the requirements of Rule 9(b), the pleading requirements, the heightened fraud pleading requirements.  So it's one thing to speculate about fraud and maybe we did speculate about fraud, but when you find e-mails in their discovery disclosed in July of 2025 where the two directors basically talk with each other and say let's talk about whether or not we should disclose this FDA clinical hold to our future co-development partner, we don't know what happened to those.  We deposed Diego Cadavid.  He doesn't recall that conversation.  We imagine conveniently he doesn't know, but that's one thing that at least a jury should be able to decide.

THE COURT:  All right.

MR. BURCH:  In any event, we didn't get the documents until July 2nd and we got more documents after September even after we filed a motion to amend.

THE COURT:  And in terms of the --

MR. BURCH:  And just to -- we've only requested a six-month continuance, which is not a lot in the scheme of things.  This case has barely been -- has been on file since 2024.  This is our first request for continuance in the case.  And what we've been doing, the parties have been doing -- and we've worked well together in trying to stipulate extensions of time.  But we are where we are, we are here, and we just don't think that trying to squeeze

everything in and coming back -- just to come back to the Court in a couple of months requesting more time is beneficial to anyone.

THE COURT:  Did I have in the original schedule, which I haven't looked at, some provision for dispositive motions and Daubert motions?

MR. KRAFTSCHIK:  You expressly struck that provision because this is a bench trial.

THE COURT:  Okay.  Sometimes I do that, and sometimes I don't.  That's the reason I had ask.  But I thought that was a possibility, because it didn't seem like there was enough time built in for that anyhow.

Well, certainly if we were talking about a jury trial I would have to build that back in.  So if we're talking about granting a motion to amend where plaintiff says, and I think they might actually be right, they'd then have a right when this is actually amended to request a jury trial -- they may not be right.  I don't actually know.  But it's plausible that would probably result in a longer delay than six months.

In terms of diligence, Mr. Kraftschik, what do you have to say?  The essence of what I understood from Mr. Burch is they got the proof they wanted of their fraud claim in July of 2025 and I guess they filed the motion to amend in August.

MR. KRAFTSCHIK:  I think that's a -- I think if you look at the pleadings, including this chart that I gave you, I think it shows they had the facts the whole time. These aren't allegations in their original complaint. They're not allegations upon information and belief.  These are hard allegations that match up with each of the elements of fraud.  And so if they thought they could make those allegations in their original complaint, they found a document to try to justify their belated addition here, but they had all the facts the entire time.  They knew as early as I think, you know, May of 2024, before they filed the claim, about the FDA partial clinical hold.  They knew -- they didn't have the one e-mail that they claim, you know, justifies their delay here, but they had everything else. They knew about the clinical hold.  They knew about other correspondence with the FDA that was uploaded to the site before they filed their initial claim, so I think they're trying to find some hook to say, well, we couldn't have done this before.  But I think if you really look at the pleadings and the evidence they had already, that just doesn't hold up to scrutiny.  They allege concealment, they allege that justifiable reliance.  Even their letter, their recision letter that they filed as an attachment to the original complaint, Your Honor, if I could pass you a copy that I've highlighted, they're asserting, "On May 31st of

2024, material misrepresentations and concealment of material facts by Verge prior to entering the CDLA.  Had Ferrer been made aware of the facts surrounding Verge's material, including the partial clinical hold and basis therefore prior to entering the CDLA it would not have entered into that agreement.  Verge made material misrepresentations, concealed material facts concerning the developments of its material, including the existence of the partial clinical hold."  So I think they were very well aware of everything that they would have needed to plead this in the first instance and to swing open the doors, I don't know internally what made them not do this originally.  I don't have visibility into that, but I think someone changed their mind and I think it's too late to do that.

THE COURT:  So hold the -- and in the end, that's what it boils down to, Mr. Burch, is you had some evidence of fraud, but you thought you needed more, and this letter is the more that you thought you needed?

MR. BURCH:  Yes, Your Honor.  The letter is the proof of intent.  That's the evidence that we needed to support a pleading claim under Rule 9 for fraud.

THE COURT:  And Mr. Kraftschik, you said you don't have any insight into the decision, which is understandable.  But what would be -- but I guess why would the plaintiff not plead fraud at the beginning if they

thought they had a fraud case?

MR. KRAFTSCHIK:  I think it's tough for me to speculate, Your Honor.  You know, I don't know tactically what their strategy is here and I feel uncomfortable making suggestions about counsel or their side's motivations.

THE COURT:  Well, I can -- I can appreciate that response.

All right.  Is there anything, Mr. Burch, you want to say in addition to what we've already discussed or you've already said that you want me to consider in regards to either the motion to amend or the motion to continue?

MR. BURCH:  Your Honor, just that the plaintiffs want the case tried on a full record.

THE COURT:  And so that's something you said in your briefing.  I don't understand what that means, because you can always get more evidence.  You know, saying I want it on a full record, that doesn't mean you have to depose every person who is out there.  And in fact -- well --

MR. BURCH:  And I appreciate the distinction, Your Honor.  I know what you are getting at with that.  At the very least we want to be able to investigate the facts of these cases fully.  And we think that these depositions are needed, and that just a little more time is required for this case so that the parties can do it in an economical and reasonable way.

THE COURT: All right. Anything more you want to say, Mr. Kraftschik?

MR. KRAFTSCHIK: I think the concept of having enough time to complete the notice depositions, I think my client thinks there is enough time, we've got everything scheduled. So my client doesn't think any extension is necessary. If there's some extension necessary to get through all of the discovery, I think my client could live with that even though it doesn't think it's necessary. I think the issue of expanding into damages -- and I know you haven't wanted to address it. Maybe it would need to be addressed later, but certainly throwing open the length of the trial to a jury is a huge issue I think that has been waived. We said --

THE COURT: And that's the reason, you know, I was thinking about it because I recently dealt with this issue in a different context, and it occurred to me that I'm not sure what the answer is. So I want to keep my options open on that to try to get it right. But that doesn't -- but as I said earlier, I really don't think that whether there is or is not a right to a jury trial it makes all that much difference as long as you know that in advance of the trial.

MR. BURCH: And we can tee that up. Once we request a jury trial we can object to it and --

THE COURT: Go ahead, Mr. Kraftschik. I think I cut you off.

MR. KRAFTSCHIK: Yes, Your Honor. We think with all the depositions seemingly being completed by January on a claim that was in the original pleading, every element was in there, there really should be nothing else to do. We can complete this all by January. Or worst case, if Your Honor thinks some short extension is necessary, I think that's feasible without blowing open the schedule by six months or longer. Whatever might be required to have expert disclosures, and potentially depending on the scope of that expert disclosure, if it were allowed, will open the doors to even wider discovery. So I think we should complete the discovery that's been noticed, the fact discovery that's been noticed as scheduled and I think we can try this case as it currently stands in a short two-day trial on a relatively, from my perspective, my client's perspective, simple contract issue.

THE COURT: Well, in terms of the actual disclosed experts, not the list of 11, but actually the specially retained experts as it were, have you all gotten any?

MR. BURCH: No.

MR. KRAFTSCHIK: No. There are none, Your Honor. I think because this is a relatively simple dispute

about whether or not there was fraudulent intent here.  But there's a deadline of September 2nd to disclose experts.  We did the non-retained expert disclosure out of abundance of caution, but there was no affirmative designation of -- and they didn't either.  So there are no retained experts in this case.

MR. BURCH:  Not currently, Your Honor.

THE COURT:  Well, right.  Okay.  All right.  Well, let me take a little recess here.  Don't you all go anywhere.  I'll be back in a few minutes.

(A brief recess was taken.)

THE COURT:  You don't have to get up.

So I think I may have been under a misapprehension here.  Actually the way that the schedule has gone, the motion to amend, the complaint was filed by -- in the time allowed by the scheduling order, right?

MR. BURCH:  Yes, Your Honor.

MR. KRAFTSCHIK:  Yeah, we've never disputed that, Your Honor.

THE COURT:  Yeah, but unlike the briefing for the continuance request, which I read, I didn't read the briefing for the motion to amend.  I had gotten the impression from the continuance, the briefing on that, that the motion to amend was untimely, but I think it was actually timely so it doesn't call into question or call at

issue the provision of Rule 16 that it requires good cause. It's more just a question of, you know, is it futile or is there prejudice or is there some other reason for it.

MR. KRAFTSCHIK:  Delay.

THE COURT:  Well, I think I can take care of that.

So here's what I'm going to do.  I'm going to grant the motion to amend the complaint.  I'm going to dismiss the leave to file a sur-reply brief as being moot. I'm going to deny the motion for the continuance.  I'm going to grant plaintiff two weeks -- this is a bad week, I guess. I'm going to grant them until the end of the week of December 8th, whatever that is, 12th.  I think December 12th you find your damages expert and to have him or her prepare a report and you should be -- and when your damages expert writes his or her report to disclose, if you haven't already, all the underlying documentation that goes along with it.  You said your client is trying to collect it now, so that makes me think you probably haven't disclosed it so far, or at least some of it.  And I'll give the defendant until the Friday before the Martin Luther King holiday to file an answering report if you think that's necessary and you can depose each others' experts in the three weeks following that.  And --

MR. BURCH:  Your Honor, one question.

THE COURT:  And I was going to say.  And you can file a motion to get a jury trial on this sometime in the next two weeks.

MR. BURCH:  With respect to -- as I'm understanding the way you're putting the schedule out, it seems as if we're engaging an expert in discovery at the same time we're doing fact discovery?

THE COURT:  Well, the fact discovery seems to be kind of irrelevant to your damages theory, right?  So, yes.  That's how I'm going to keep it on schedule.  And if you can figure out how to depose Dr. Genge and Dr. Van den Berg, you can -- you can do that.  But if you can't do that in the time allotted, based on what I've heard they seem to be pretty superfluous, so I'm not going to continue the trial if you can't get that done by say the end of the first week of February.

I'm also -- looked to me like the pretrial order was due more like a month before trial.  And which is -- I'm not entirely sure why I ordered that.  I'm referring, Mr. Kraftschik, if that's what you're looking for, to D.I. 47.

MR. KRAFTSCHIK:  Yes, Your Honor.

THE COURT:  Which says the pretrial order is due 2-3-2026.

MR. KRAFTSCHIK:  Yes, Your Honor.  I see that.

THE COURT:  So given -- so I'm not going to try

to do this off the top of my head, but I would certainly basically want to move that back on the Friday that's ten days before the trial date.

MR. KRAFTSCHIK:  Understood, Your Honor.

THE COURT:  And if it turns out that there is no jury trial right here, then I will end up continuing the trial, because I almost certainly will end up continuing the trial.  But right now I'm operating on the assumption that there might not be a right to a jury trial, but if there was a right to a jury trial, I'd feel pretty obligated to give you all a chance to file summary judgment motions.

All right?

MR. KRAFTSCHIK:  Thank you, Your Honor.  No questions.

MR. BURCH:  Understood.

THE COURT:  Okay.  So I'll enter at least some order to dispose of these.  But to the extent -- but I'm not going to write anything more.  So the transcript of this proceeding will serve as my rationale for these various things.  All right?

MR. KRAFTSCHIK:  Thank you, Your Honor.

MR. GOLD:  Thank you, Your Honor.

THE COURT:  Have a good day.

(Court adjourned at 12:19 p.m.)

----------------------------------

        I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

                              /s/ Stacy M. Ingram, RPR
                              Official Court Reporter
                                U.S. District Court